Mark E. Andrews
State Bar No. 01253520
Aaron M. Kaufman
State Bar No. 24060067
**COX SMITH MATTHEWS INCORPORATED**
1201 Elm Street, Suite 3300
Dallas, Texas 75270
(214) 698-7800
(214) 698-7899 (Fax)
mandrews@coxsmith.com
akaufman@coxsmith.com

*COUNSEL TO DR. JIM BRAND, MAUNA LISA, LLC AND THE SARAH ASHLEY BRAND TRUST*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **In re:** § <br> § <br> **PACIFIC PLAINS COMPANY, LLC** § <br> § <br> **Debtor.** § | **CHAPTER 11 CASE** <br><br> **CASE NO. 12-31653-sgj-11** |

**MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

**TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:**

Dr. Jim Brand, Mauna Lisa LLC ("Mauna Lisa") and the Sarah Ashley Brand Trust (the "Brand Trust" and, collectively with Dr. Brand and Mauna Lisa, the "Brand Parties" or the "Movants") file this *Motion for the Appointment of a Chapter 11 Trustee* (the "Motion"), pursuant to section 1104(a) of title 11 of the United States Code (the "Bankruptcy Code")[1] and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking the appointment of a chapter 11 trustee. In support of this Motion, the Movants respectfully represent as follows:

---

[1] *See* 11 U.S.C. §§ 101-1532 *et seq.* (2010).

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein appears under sections 105(a) and 1104(a) of the Bankruptcy Code and Bankruptcy Rules 2007.1(a) and 9014.

## II. SUMMARY OF RELIEF REQUESTED

2. The Debtor is a Texas limited liability company whose primary asset is approximately 634 acres of undeveloped real estate in Hawaii (the "Property"). The Debtor has held the Property for approximately 15 years but has not utilized the Property for its highest and best use. As discussed below, the highest and best use of the Property includes two independent components: (a) a subdivision of the oceanfront property (also known as the "makai land") into several residential lots; and (b) the operation of one or more sporting ventures on the larger, mountainside or ranchland (also known as the "mauka land") with or without the creation of additional land subdivisions.[2] The Debtor's current manager has made no material progress on the oceanfront property subdivision in the Debtor's 15 year history, and she has grossly mismanaged the sporting operations on the ranch land. Further, the Debtor's current manager has disregarded corporate formalities, caused the Debtor to incur unnecessary obligations, engaged in extensive self-dealing, and generally deceived the other members of the company to their detriment.

3. During a recently held 341 Creditors' Meeting, the Debtor's management team made clear that it was incapable of fulfilling its fiduciary duties in managing the Debtor's bankruptcy estate for the best interests of creditors and equity holders. Instead, the Debtor's

---

[2] For simplicity, the Movants refer to the "makai" as the "oceanfront" land, and the "mauka" as the ranch land.

management has engaged in self-dealing, depleted the Debtor's available cash, failed to pursue causes of action against third parties and demonstrated that it is incapable of continuing to manage the Debtor's affairs in a manner that serves the best interest of creditors and equity holders. For all of these reasons, the Movants request the appointment of a chapter 11 trustee to replace the Debtor's current management.

### III. BACKGROUND FACTS

*A.  The Property*

4.  The history surrounding the Property pre-dates the formation of the Debtor. However, a brief discussion of the Property is necessary to understand the extent to which the Debtor's current management is unqualified to serve as an estate fiduciary.

5.  In 1988, a Japanese company known as Chalon Corporation ("Chalon") entered into an agreement to purchase a larger tract of real estate in Hawaii from Hartford Realty Corporation ("Hartford"), an entity associated with Louis Reese III. As a part of the transaction, and in consideration for services provided by Dr. Brand, Mr. Reese, Jeff Grad and David Fuertes (collectively, the "Initial Beneficiaries"), Chalon agreed to convey a portion of the property it was acquiring to the Initial Beneficiaries. The arrangement between Chalon and the Initial Beneficiaries provided for the conveyance of 634 total acres, of which: (i) approximately 150 acres would be oceanfront property; (ii) the apportionment of oceanfront property would be sufficient for construction of *at least* one residence; (iii) the remaining 485 acres would be mountainside or ranch property known as "mauka land"; (iv) no more than 25% of the total acreage would be gulch land; and (v) Chalon would have the ultimate discretion to decide which portion(s) of the acreage to convey to the Initial Beneficiaries.

6.  Contemporaneous with the execution of this transaction, the Initial Beneficiaries executed a trust agreement providing for the property to be conveyed by Chalon to an entity

called Fairfield Realty Corporation ("Fairfield"), an entity controlled by Mr. Reese. The trust agreement provided that Fairfield would hold the property as trustee for the Initial Beneficiaries, and that the Initial Beneficiaries would hold beneficial interests in the trust as follows:

(a) Dr. Brand            50% interest (appx. 317 acres);

(b) Jeffrey S. Grad      4.7% interest (appx. 30 acres);

(c) David Fuertes        3.1% interest (appx. 20 acres); and

(d) Louis G. Reese, III  42.2% interest (appx. 267 acres).

7. Shortly thereafter, in January 1989, Mr. Reese conveyed all of his interests in the property and the trust to Susan Reese, his wife. Ms. Reese is the widow of the now-deceased Louis Reese, III.

8. For reasons not directly related to this bankruptcy case, a lawsuit was commenced against Mr. Reese, Fairfield and Chalon concerning the transaction between Hartford and Chalon. The lawsuit was resolved, but not before Mr. Reese caused Fairfield to execute a side agreement with Chalon. That side agreement recites that the conveyance of the Property to Fairfield was delayed by the lawsuit, and provided Mr. Reese's personal agreement to reimburse Chalon for its legal expenses of $139,740.19. Payment of Chalon's legal expenses became a new condition for Chalon's obligation to convey the Property to Fairfield.

9. To pay Chalon's legal expenses, as well as other expenses necessary to effectuate the conveyance of the property from Chalon, Susan Reese caused $200,000 to be paid on behalf of Fairfield, through her entity SDL Partners, Limited ("SDL"). In exchange for SDL's payment of $200,000.00, the Initial Beneficiaries agreed to assign SDL a 30.8% interest in the Property to be conveyed from Chalon. SDL's interest was comprised of 16.7% from Dr. Brand (reducing his interest to 33.3%), and 14.1% from Susan Reese (reducing her interest to 28.1%). Following the

assignment of Dr. Brand's and Susan Reese's interests to SDL, the collective share of the property was as follows:

(a) Dr. Brand 33.3% interest;

(b) Jeffrey S. Grad 4.7% interest;

(c) David Fuertes 3.1% interest;

(d) Susan Reese 28.1% interest; and

(e) SDL 30.8% interest.

10. During this period, Dr. Brand and his wife Deborah divorced and agreed to an equal division of Dr. Brand's interest in the property. Thereafter, Dr. Brand's ex-wife remarried an individual named Charles Snell.

### B. *The Debtor, Its Members and Management*

11. The Debtor was formed in 1997 for the purpose of holding, developing and managing the Property for the interest of the members. The initial members of the Debtor were as follows:

(a) Susan Reese 280 units;

(b) Jeffrey Grad 50 units;

(c) David Fuertes 30 units;

(d) SDL 308 units;

(e) Dr. Brand 166 units; and

(f) Deborah Snell f/k/a Deborah Brand 166 units.

12. Susan Reese was appointed as the initial President and Secretary of the Debtor, and has served as the Debtor's only manager.

13. Chalon conveyed the Property to the Debtor, effective by a deed recorded on or about September 23, 1997.

14. Ms. Reese's duties under the *Regulations of Pacific Plains Company, L.L.C.* (the "Company Regulations") are well defined. Among other things, she is required to hold annual meetings and provide annual financial reports to be provided every year. She may also call special meetings, provided that members are given notice. She has failed to conduct the Debtor's business consistent with her duties to the Debtor and its members. Among her many failures as a manager of the Debtor, Ms. Reese has failed to hold and keep minutes of the annual meetings required under the Company Regulations. She has also failed to call special meetings prior to engaging in several self-dealing transactions, as discussed below. She did not provide annual financial reports until 2004, several years after the Debtor's formation, and such financial reports are irreconcilable and inconsistent. She has never provided timely annual reports as required by the Company Regulations.

15. Ms. Reese has caused the Debtor to incur significant debts to her family members and other entities she controls. The single largest debt of the company is allegedly owed to Madison Pacific Development Company, Inc. ("Madison Pacific"), in the stated amount of $1,651,707.23. On information and belief, the overwhelming majority of this debt is interest accrued at an above-market rate, and the underlying principal relates to advances made to satisfy Mr. Reese's obligations to Chalon. Such obligations were believed by the other members to have been satisfied from the funds advanced by SDL prior to the formation of the Debtor. The other members do not agree that Mr. Reese's obligation should have been passed onto the Debtor as Ms. Reese asserts (through the Debtor's Schedules) that it should be. Further, it is unclear whether this obligation is enforceable under state law, as the underlying note matured over 10 years ago and no demand was made by Madison Pacific for payment.

16. Ms. Reese has also caused the Debtor to enter into a lease with an entity controlled by her son, Louis Reese, IV. On information and belief, Ms. Reese's son owns, operates and/or controls an entity known as Ohana Living Farms ("Ohana"). According to the Debtor's Schedules of Assets and Liabilities ("Schedules"), Ohana is indebted to the Debtor for at least $6,000.00, and the collectability of such obligation is unknown. On information and belief, the Debtor entered into a lease or other arrangement with Ohana to enable Ohana to operate a farm on the Property. The lease required Ohana to attain specified goals. While some of the members were involved in the initial negotiations of the lease between Ohana and the Debtor, Ms. Reese has refused to provide reports of Ohana's purported operations and financial condition, despite numerous requests. The members have information and reason to believe that Ohana has breached its obligations to the Debtor and has allowed the leased portion of the Property to fall into disrepair or to be occupied by unauthorized individuals.

17. Ms. Reese has also caused the Debtor to borrow funds from her father, William Bergquist. According to the Debtor's Schedules, the Debtor is indebted to Mr. Bergquist pursuant to a pre-petition promissory note. On further inquiry of this debt during the 341 Creditors' Meeting, Ms. Reese testified that she caused the Debtor to borrow approximately $30,000.00 to construct a solar-electricity system on a cabin previously constructed on the Property. The Movants have reasons to believe that the funds borrowed from Mr. Bergquist were not used to construct the solar system, but instead to purchase the equipment from Ms. Reese's son, who had previously constructed the system. The other members were given no notice of this transaction and never authorized it. Dr. Brand first became aware of the transaction by reviewing the Debtor's tax return. In essence, the transaction allowed Mr. Bergquist to give money to his grandson *and* saddle the Debtor with an obligation to repay

him at 12% interest. Moreover, the solar panels were not necessary to the Debtor's ultimate plan to subdivide the oceanfront property into residential lots.

18. Ms. Reese has also caused the Debtor to take actions resulting in litigation by Mr. Snell. Mr. Snell is the widower of Dr. Brand's former spouse, Deborah Snell. Ms. Snell passed away on or about March 21, 2007. Under the Company Regulations, the death of an individual member may be a "Terminating Event" requiring the Debtor to make distributions to the deceased member's heirs for the value of such member's interest. Under the Company Regulations, if the Debtor lacks the cash to satisfy this obligation, the Debtor may pay the obligation over time, with interest. The Brand Trust should have received one half of Ms. Snell's 166 units pursuant to Ms. Snell's last will and testament, and Mr. Snell would have received the other half. Shortly after Ms. Snell's passing, Ms. Reese caused the Debtor to notify Mr. Snell that the Debtor's liabilities exceeded the value of its assets and, thus, Ms. Snell's heirs were not entitled to any distributions from the Debtor. The unaudited balance sheet provided with such notification attributed a value of $147,795.27 to the Property, and listed debts owed to Madison Pacific of more than $1 million. The Property is valued in the several millions for property tax purposes. Unsurprisingly, Mr. Snell commenced a lawsuit against the Debtor in response to that notification (the "Snell Litigation").

19. The Snell Litigation caused the Debtor to incur significant legal expenses and resulted in a settlement agreement (the "Snell Agreement"). Under the Snell Agreement, the Debtor agreed to pay $200,000 for Mr. Snell's legal fees and $550,000 to Mr. Snell to buy out his interests in the Debtor. The first installment to Mr. Snell was due in January 2012. As discuss below, it was Ms. Reese's decision not to satisfy that obligation to Mr. Snell that

ultimately caused this bankruptcy filing. The Snell Agreement further purports to reduce the Brand Trust's interests in the Debtor for no apparent consideration to the Brand Trust.[3]

*C.  Cash Flow and Pre-Petition Mismanagement*

20. In recent years, the Debtor's sole source of income has been derived from the operation of a zip line on the Debtor's ranch land. Since 2008, such operations were performed by an entity called Big Island Eco-Adventures, LLC ("Big Island") pursuant to a lease agreement dated September 30, 2008 (the "Big Island Lease"). Under the terms of the Big Island Lease, the Debtor was to receive rent from Big Island, which was to be calculated as a percentage of Big Island's gross revenues generated from the operation of a zip line on the Property. In 2010, the Debtor's income from the Big Island Lease was over $400,000, and in 2011, the Debtor's income was more than $300,000.

21. Sometime in June or July of 2011, Big Island discontinued its zip line operations and stopped tendering payments to the Debtor under the lease or license agreement. The Debtor has not commenced any legal actions against Big Island or its principals to collect the amounts due under the lease agreement or license, or any other damages caused to the Debtor as a result of Big Island's acts or omissions. In its Schedules, the Debtor alleges that at least $300,000 may be due from Big Island but stated that the collectability of such amount was unknown. During the 341 Meeting, Ms. Reese could not recall what actions, if any, had been taken to collect from Big Island or its principals. She further admitted to having no real plan to do so. It has been nearly a full year since Big Island terminated its operations and discontinued rent payments to the Debtor.

---

[3] By way of example, Mr. Snell was to receive a buy-out of his interests through four installments, but the Brand Trust received no equivalent buy-out consideration.

22. Following Big Island's cessation of the zip line operations, Ms. Reese traveled to Hawaii with her son, Louis Reese IV and Larry Vineyard. The Debtor paid at least $15,000 for such travel expenditures. According to Ms. Reese, the purpose for the trip was to investigate the Property and consider options to replace the revenue stream.

23. In addition to these travel expenditures, the Debtor paid a management fee to Madison Partners, LLC ("Madison Partners"). Madison Partners is an entity owned and controlled by Ms. Reese and Mr. Larry Vineyard. Mr. Vineyard was present at the 341 Meeting and testified that the management fees were ordinary, but that there was no written management agreement between the Debtor and Madison Partners. Vineyard also testified that the Debtor was not Madison Partners' only client; Madison Partners does the "back office" work for the Debtor and all of the other non-debtor Reese family entities. Ms. Reese testified that she and Mr. Vineyard are the only owners and/or employees of Madison Partners and Madison Pacific.

24. In December 2011, weeks before the first installment under the Snell Agreement became due, the Debtor formed a new entity called OCT Kohala, LLC ("OCT Kohala"). As of the commencement of this case, the Debtor was the sole member of OCT Kohala. Contemporaneously with its formation in December 2011, the Debtor transferred to OCT Kohala $250,000. The Debtor's Schedules lists its membership interest to OCT Kohala as an asset, but the Debtor's SOFA lists this transfer as a loan. During the 341 Creditors' Meeting, Ms. Reese could not explain this apparent discrepancy, nor could she confirm whether any writing existed in relation to this supposed transaction. Instead, she described OCT Kohala as a proposed vehicle through which she hoped to construct a canopy tour on the Property to replace the zip line formerly operated by Big Island. The Debtor's management is presently negotiating with a

third-party manager to operate the canopy tours, but the proposed terms of the agreement have not been disclosed to the Debtor's creditors or members.

25. The Debtor commenced this case on March 14, 2012 (the "Petition Date"). According to the Debtor, the company filed bankruptcy because of its pending obligations to Mr. Charlie Snell that "it could not meet with current cash."[4] The Debtor contends that this case was also commenced to resolve various "management issues."[5] Movants contend that these wounds are self-inflicted by the Debtor's gross mismanagement and deception.

## D. *Liabilities*

26. The Debtor filed its Schedules of Assets and Liabilities (the "Schedules") on or about April 9, 2012. According to the Schedules, the Debtor has no secured creditors, and approximately $2.34 million in unsecured debt. The largest creditor listed in the Debtor's schedules is an entity called Madison Pacific. The Debtor alleges that it borrowed funds from Madison Pacific in 1998 under a certain promissory note, and the note remains outstanding.

27. Madison Pacific is an entity owned and controlled by Ms. Reese. During the section 341 Creditors' Meeting, held on May 2, 2012, Ms. Reese testified that the principal balance of the obligation was approximately $300,000 - $400,000, and that note has accrued over $1.2 million in interest over the past 14 years. Ms. Reese did not know why the Debtor never paid the balance. She also testified that the note was not secured by any of the Debtor's property.

28. The second largest debt listed in the Schedules is a $550,000 obligation owed to Mr. Snell under the Snell Agreement. As discussed in greater detail above, the obligations due

---

[4] Audio recording of 341 Creditors' Meeting, May 2, 2012.
[5] *Id.*

under the Snell Agreement arose to settle litigation brought as a direct consequence of an untenable position taken by the Debtor, at Ms. Reese's direction.

29. The next largest obligation scheduled is to Dr. Brand for $111,418.49. Dr. Brand is owed amounts paid to third-party professionals in Hawaii to promote the subdivision of the oceanfront property, as the Initial Beneficiaries had planned to do since 1988.

30. Finally, the last significant obligation listed in the Schedules is a $24,913.20 debt owed to Walter Bergquist. As discussed further above, Mr. Bergquist is Ms. Reese's father, and this debt allegedly was incurred to construct a solar system on the "eco hut" constructed on the Property. It remains unclear why the Debtor could not fund such construction from its cash on hand; nor can Ms. Reese explain why the obligation bears an above-market rate of interest.

### IV. ARGUMENTS AND AUTHORITY

#### A. *Standards under Section 1104(a)*

31. Section 1104 governs the appointment of a trustee. That section provides three separate grounds for such appointment:

> The Bankruptcy Code provides that any time prior to confirmation, the Court shall order the appointment of a Chapter 11 trustee upon request by a party in interest: (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case; (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate (without regard to the number of holders of securities or the amount of assets or liabilities); or (3) if grounds exist to convert or dismiss under section 1112, but the appointment of a trustee instead is in the best interests of creditors and the estate."

*In re Patman Drilling Int'l, Inc.,* Case No. 07-34622, 2008 Bankr. LEXIS 715 *14-15 (Bankr. N.D. Tex. Mar. 14, 2008) (citing 11 U.S.C. § 1104(a)); *see also In re Cajun Elec. Power Co-op, Inc.,* 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on rehearing,* 74 F.3d 599 (5th Cir.

1996) (withdrawing section IV and adopting reasoning of dissent in prior opinion), *cert. denied*, 519 U.S. 808, 117 S. Ct. 51, 136 L. Ed. 2d 15 (1996); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 475 (3d Cir. 1998).

32. "Cause" exists for the appointment of a trustee where there exist conflicts of interest and instances of gross mismanagement, apparent incompetence, continuing losses, and acrimonious relationships between Debtor's management and creditors." *See In re Patman Drilling,* 2008 Bankr. LEXIS 715 at *16-17. In determining whether a trustee would serve the best interest of creditors and/or equity holders, the Court may consider the parties who support such appointment. *Id.* at *17.

B. *Cause Exists for the Appointment.*

33. A trustee should be appointed to administer this estate. Such administration will require a neutral third party to: (a) compose and execute a plan that maximizes the value of the Property for all stake holders; (b) resolve disputes over claims against and equity interests in the Debtor; and (c) pursue causes of action against third parties and insiders.

34. Ms. Reese is wearing too many hats. She is not only the Debtor's sole manager and director, but she is also the principal of the Debtor's largest creditor and the principal of SDL, an entity alleged to hold nearly a third of the membership interests in the Debtor. Because of the overwhelming conflicts of interest in this case, Ms. Reese is incapable of fulfilling her role as manager for the Debtor. Such a role would require investigating causes of actions against herself, her relatives and other entities which she controls. It may also require Ms. Reese to investigate and potentially object to the claim asserted by Madison Pacific and interest alleged to be held by SDL Partners. These overwhelming conflicting roles prevent Ms. Reese from serving the best interests of all creditors and members.

35. In addition to these overwhelming conflicts of interest, there is evidence of gross mismanagement and dishonesty. The Debtor has held the Property for over 15 years. During that time, the Debtor has incurred professional fees to survey and develop a portion of the property for residential use and sales. Yet, the Debtor has never ordered an appraisal or obtained studies to determine the value of the Property, either as raw or as developed land. Further, such efforts and costs have produced no tangible results, and Ms. Reese has admitted to having no way of knowing what additional steps may be required or how long it may take to complete these efforts.

36. Additionally, the Debtor has done virtually nothing to pursue a recovery of the receivable scheduled to be due from Big Island. This receivable is the largest asset scheduled by the Debtor other than the Property.

37. The next largest asset scheduled by the Debtor is a $250,000 receivable alleged to be due from OCT Kohala. During the 341 Creditors' Meeting, Ms. Reese knew remarkably few details about this transaction. Her failure to be more forthcoming about the nature of this transaction demonstrates that Ms. Reese is either dishonest or incompetent.

38. Ms. Reese has also been dishonest with the other members of the Debtor. She has continuously denied requests for reports concerning Ohana, the entity believed to be operated by Ms. Reese's son. She refuses to produce reliable financial statements or follow basic rules of corporate governance.

39. Ms. Reese has also deceived, and continues to deceive, the Debtor's members regarding their ownership interests. Deborah Snell, formerly Deborah Brand, held 166 membership units in the Debtor before she passed away in 2007. This accounts for approximately 16.6% of the ownership interests in the Debtor. Under Ms. Snell's last will and

testament, one-half of this interest vested in the Brand Trust and the other half to Mr. Snell. Each should have held 8.3% ownership in the Debtor, or 83 membership units. Ms. Reese apparently contends otherwise. The SOFA provides that the Debtor's ownership is divided as follows:

| | | | |
|---|---|---|---|
| (a) | Susan Reese | 28.537170%; | |
| (b) | Jeffery (sic) Grad | 5.095920%; | |
| (c) | David Fuertes | 3.057550%; | |
| (d) | SDL | 31.39089%; | |
| (e) | Mauna Lisa, LLC (Dr. Brand) | 16.918470%; | |
| (f) | Chaznell, Inc. (Mr. Snell) | 7.500%; | and |
| (g) | The Brand Trust | 7.500%. | |

These statements, signed under penalty of perjury, are inaccurate and misleading. Upon Ms. Snell's death, the Company Regulations required the Debtor to pay the deceased member's heirs for the value of her 166 membership units. Because Ms. Reese caused the Debtor to deny Snell and the Brand Trust those rights, the Snell Litigation commenced. The Snell Agreement purports to grant Mr. Snell and the Brand Trust each a 7.5% interest in the Debtor, but it does not account for the missing .83% that the Brand Trust should have received. Nowhere in the Company Regulations or the Snell Agreement was Ms. Reese authorized to redistribute or reallocate the missing ownership interests to herself or other members. Moreover, the Debtor lists the Snell Agreement as executory and has made no decision concerning the assumption or rejection of such agreement.

40. Finally, Ms. Reese has not adequately accounted for the Debtor's cash expenditures. The Debtor's SOFA discloses that the Debtor received over $400,000 in income during 2010, and over $300,000 during 2011. The Debtor has no operations or significant

recurring expenses. On information and belief, the Debtor has not made distributions to members in many years or paid off any long-term debts. In 2011, Ms. Reese caused the Debtor to transfer $250,000 to OCT Kohala and an additional $50,000 to herself, her father, her son and her controlled entities. This lack of candor and material failures to manage the Debtor and the Property provide sufficient cause to appoint a trustee.

C.    *A Chapter 11 Trustee Would Be in Creditors' and Equity Holders' the Best Interest.*

41.    The majority of the claim holders who are not owned or controlled by Ms. Reese support this Motion. The Debtor's Schedules disclose the existence of only four claims that exceed $10,000. The largest claim, scheduled as $1,651.707.23, is allegedly owed to Madison Pacific. As discussed above, Madison Pacific is owned and controlled by Ms. Reese. The next largest scheduled claim, scheduled in the amount of $550,000, is owed to Mr. Snell, who, on information and belief, supports the appointment of a trustee. Dr. Brand, one of the Movants, holds the third largest scheduled claim, listed in the amount of $111,418.49. Finally, Mr. Bergquist, the father of Ms. Reese, is scheduled as holding a claim in the face amount of $24,913.20. Collectively, these four claims represent 99.9% of the scheduled claims in this case.

42.    Additionally, the majority of equity holders who are not owned or controlled by Ms. Reese support this motion. The Movants collectively hold nearly 25% of the equity securities in the Debtor. Further, an entity controlled by Mr. Snell is alleged to hold 7.5% of the equity securities in the Debtor. The Debtor has listed Ms. Reese as holding, directly or indirectly through SDL Partners, approximately 59.9% of the equity securities in the Debtor.

43.    Because this Motion is supported by the majority of claim and interest holders other than those entities controlled by Ms. Reese, the Court may find that the appointment of a trustee is in the best interest of creditors and equity holders.

## V. CONCLUSION

44. The appointment of a trustee is warranted because of Ms. Reese's gross mismanagement and dishonesty. Such dishonesty and gross mismanagement are evident from the following:

    (a)    Ms. Reese has failed to make material progress in the subdivision of the oceanfront property and has no idea what additional steps are needed or how long they will take.

    (b)    Ms. Reese has failed to manage the tenants of the Property, allowing her son to live on the Property rent-free and failing to maintain a relationship with Big Island, the former zip line operator. Further, she has taken no action to recover damages from Big Island following its material breach of the zip line lease, which occurred nearly one year ago as of the filing of this Motion.

    (c)    Ms. Reese caused the Debtor to borrow funds from her father for unnecessary and unapproved purposes, and the note to her father bears an above-market rate of interest.

    (d)    Ms. Reese has caused a personal obligation of her late husband to be carried by the Debtor and its non-consenting members, and has allowed such obligation accrue an above-market rate of interest for nearly 14 years.

    (e)    Ms. Reese has been dishonest to the Debtor's other members, even taking extreme positions that resulted in costly litigation, and she continues to take extreme and untenable positions against the Debtor's other members; and

    (f)    Ms. Reese caused the Debtor to transfer $250,000 within months of the commencement of this case to a newly created subsidiary in an apparent effort to hinder, delay or defraud other creditors and interest holders.

## VI. PRAYER

WHEREFORE, the Movants respectfully request the Court's entry of an order directing the appointment of a chapter 11 trustee and granting such other and further relief to which they may be justly entitled.

Dated: May 18, 2012         Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**

By: */s/ Aaron M. Kaufman*
     Mark E. Andrews
     State Bar No. 01253520
     Aaron M. Kaufman
     State Bar No. 24060067
     1201 Elm Street, Suite 3300
     Dallas, Texas 75270
     (214) 698-7800
     (214) 698-7899 (Fax)

*COUNSEL TO DR. JIM BRAND, MAUNA LISA, LLC AND THE SARAH ASHLEY BRAND TRUST*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of May, 2012, the foregoing *Motion* was filed with the Court and served via the Court's CM/ECF system to all of the parties registered to receive such notice, and by first class mail and e-mail to the parties listed below.

**Pacific Plains Company, LLC**
Howard Marc Spector
Spector & Johnson, PLLC
12770 Coit Road
Banner Place, Suite 1100
Dallas, TX 75251
(214) 365-5377
hspector@spectorjohnson.com

**Madison Partners, LLC**
**Madison Pacific Development Co., Inc.**
**SDL Partners, Ltd.**
**Walter Bergquist**
**Larry Vineyard**
2622 Commerce Street
Dallas, Texas 7522

**Chaznel, Inc. & Charles Snell**
c/o Walter Williams
Modesett Williams, PLLC
2202 Lake Austin Boulevard
Austin, Texas 78703
Main: 512.472.6097
walter@modwill.com

**Lipscomb & Cathey**
750 North St. Paul, Suite 1400
Dallas, TX 75201

**Thomas, Cinclair & Beuttenmuller**
c/o Rudy Beuttenmuller, Esq.
5335 Spring Valley Rd
Dallas, TX 75254

**Chattahoochee Pines, LLC & Fairfield Realty**
c/o Susan Reese
8626 Douglas Avenue
Dallas, Texas 75225

**Jeffery Grad**
841 Bishop Street
Honolulu, HI 96813

**David Fuertes**
PO Box 896
Honolulu, HI 96813

**Big Island Eco-Adventures, LLC**
PO Box 1665
Kapaau, HI 96755

**Carlsmith Ball, LLP**
PO Box 656
Honolulu, HI 96809-0656

**Ohana Living Farms**
PO Box 198900, PM #103
Hawi, HI 96719

    */s/ Aaron M. Kaufman*
    Aaron M. Kaufman