```
 1              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3

 4   IN RE:                   )   BK. NO:  12-31653-SGJ-11

 5                            )

 6   PACIFIC PLAINS COMPANY, )

 7   LLC                      )

 8        D E B T O R.        )

 9

10

11            *   *   *   *   *   *   *   *   *   *

12              TRANSCRIPT OF PROCEEDINGS

13            *   *   *   *   *   *   *   *   *   *

14

15

16

17

18

19

20       BE IT REMEMBERED, that on the 2nd day of October, 2012,

21   before the HONORABLE STACEY G. JERNIGAN, United States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

1                    A P P E A R A N C E S

2    SPECTOR & JOHNSON, PLLC
     12770 Coit Road, Suite 1100
3    Dallas, Texas  75251
          BY:  Mr. Howard Spector
4
                         APPEARING ON BEHALF OF THE DEBTOR
5
     THOMAS, CINCLAIR & BEUTTENMULLER
6    5335 Spring Valley Road
     Dallas, Texas  75254
7         BY:  Mr. Rudy Beuttenmuller

8                         APPEARING ON BEHALF OF MADISON PACIFIC
                          DEVELOPMENT COMPANY
9
     OFFICE OF THE UNITED STATES TRUSTEE
10   1100 Commerce, Room 976
     Dallas, Texas  75242
11        BY:  Ms. Nancy Resnick

12                        APPEARING ON BEHALF OF THE UNITED STATES
                          TRUSTEE
13
     COX SMITH MATTHEWS INCORPORATED
14   1201 Elm Street, Suite 3300
     Dallas, Texas  75270
15        BY:  Mr. Mark Andrews
               Mr. Aaron Kaufman
16
                          APPEARING ON BEHALF OF DR. JIM BRAND &
17                        THE SARAH ASHLEY BRAND TRUST

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3    Appearances                                      2
     Exhibit Index                                    4

4
     <u>JAMES BRAND</u>
5         DIRECT EXAMINATION
               BY:  Mr. Spector                      20
6              BY:  Mr. Kaufman                       35
          CROSS-EXAMINATION
7              BY:  Mr. Kaufman                       21
               BY:  Mr. Spector                      135
8              BY:  Mr. Beuttenmuller                172
          REDIRECT EXAMINATION
9              BY:  Mr. Kaufman                      200
          RECROSS-EXAMINATION
10             BY:  Mr. Spector                      212

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   E X H I B I T   I N D E X

2                                               PAGE FIRST REFERENCED

3    MOVANT EXHIBITS

4    Exhibit Number 1                                45

5    Exhibit Number 2                                47

6    Exhibit Number 3                                49

7    Exhibit Number 4                                53

8    Exhibit Number 5                                55

9    Exhibit Number 6                                59

10   Exhibit Number 13                               62

11   Exhibit Number 21                              185

12   Exhibit Number 24                              186

13   Exhibit Number 26                              187

14   Exhibit Number 27                               85

15   Exhibit Number 32                               63

16   Exhibit Number 56                              122

17   Exhibit Number 61                               81

18   Exhibit Number 64                               74

19   Exhibit Number 66                               61

20   Exhibit Number 73                               72

21   Exhibit Number 91                               85

22   Exhibit Number 92                              113

23   Exhibit Number 93                               96

24   Exhibit Number 95                              208

25   Exhibit Number 98                              110

1  MOVANT EXHIBITS CONTINUED

2  Exhibit Number 114                                    118

3  Exhibit Number 121                                    124

4  Exhibit Number 122                                    124

5  Exhibit Number 123                                    127

6  Exhibit Number 125                                    130

7  Exhibit Number 126                                    131

8  Exhibit Number 127                                    131

9  Exhibit Number 128                                    132

10  Exhibit Number 129                                   133

11  Exhibit Number 130                                   134

12

13  DEBTOR EXHIBITS

14  Exhibit Number 1                                     135

15  Exhibit Number 3                                     136

16  Exhibit Number 6                                     138

17  Exhibit Number 7                                     139

18  Exhibit Number 9                                     140

19  Exhibit Number 10                                    141

20  Exhibit Number 11                                    142

21  Exhibit Number 12                                    142

22  Exhibit Number 13                                    142

23  Exhibit Number 14                                    143

24  Exhibit Number 15                                    144

25  Exhibit Number 16                                    144

1   DEBTOR EXHIBITS CONTINUED

2   Exhibit Number 18                                    145

3   Exhibit Number 20                                    146

4   Exhibit Number 21                                    150

5   Exhibit Number 24                                    153

6   Exhibit Number 29                                    154

7   Exhibit Number 30                                    154

8   Exhibit Number 31                                    155

9   Exhibit Number 32                                    155

10   Exhibit Number 33                                   156

11   Exhibit Number 34                                   156

12   Exhibit Number 35                                   157

13   Exhibit Number 36                                   157

14   Exhibit Number 37                                   159

15   Exhibit Number 38                                   160

16   Exhibit Number 43                                   162

17   Exhibit Number 45                                   165

18   Exhibit Number 46                                   165

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right.  We have a setting in

3    Pacific Plains Company, LLC.  Case number 12-31653.

4         Let's start by getting appearances from counsel.

5              MR. ANDREWS:  Good morning, Your Honor.  Mark

6    Andrews and Aaron Kaufman with the law firm of Cox Smith.

7    We're here on behalf of Dr. Jim Brand and the Sarah Ashley

8    Brand Trust.

9              THE COURT:  Okay.

10             MR. BEUTTENMULLER:  Good morning, Your Honor.

11   Rudy Beuttenmuller for Madison Pacific Development Company,

12   Inc., a creditor in the case.

13             THE COURT:  Okay.

14             MR. SPECTOR:  Howard Marc Spector for the

15   debtor.

16             THE COURT:  All right.

17             MS. RESNICK:  Good morning, Your Honor.  Nancy

18   Resnick on behalf of the United States Trustee.

19             THE COURT:  Thank you.  We actually have a

20   motion to appoint a Trustee that has been on file since May

21   18th, 2012 set for hearing and continued a couple of times.

22   And then we have an emergency motion to continue today's

23   setting by the debtor filed last week.  So, Mr. Spector, I'll

24   let you present your argument on the emergency motion to

25   continue.

8

```
 1                    MR. SPECTOR:  Thank you, Your Honor.

 2         I have a brief opening and then one witness to call in

 3  support of the motion.

 4                    THE COURT:  Okay.

 5                    MR. SPECTOR:  Your Honor, there are a lot of

 6  fighting among the stakeholders and this debtor.  This debtor

 7  is an extraordinarily unusual debtor to be in bankruptcy.

 8  First of all, it's solvent.  Everybody is going to agree it's

 9  solvent.  If you allow Mrs. Reese's company's claims at the

10  full amount, it's still solvent.  If you allow Dr. Brand's

11  claims at the full amount, it's solvent.

12         Debtor owns two parcels of land in Hawaii.  It's owned

13  and operated by Texas members and managers.  That's the

14  reason it's in a bankruptcy in Texas.  One parcel of property

15  is a traditional residential subdivision that is in the

16  process of being developed.  One parcel is a, for lack of a

17  better word, a wooded forest and pasture that has little to

18  no viable, quick economic use, other than as an amusement, as

19  a zipline or a canopy tour, or an ATV tour, or something like

20  that.  And until 2011, the debtor operated with an operator,

21  a professional zipline operator, an amusement on that site.

22  Now, unfortunately, the debtor is in bankruptcy and does not

23  have an amusement.  It has the prospect of a new operator,

24  but it doesn't have a new operator yet.  And, accordingly, it

25  doesn't have any current revenue.
```

1          What that leads us to is the debtor needs two things.

2     It needs a way of establishing a new amusement, or a canopy

3     tour, or a zipline, and it needs the funds to complete a

4     development.  That's another thing the parties aren't going

5     to disagree on.  The debtor needs money.  And so far,

6     although we're outside exclusivity, there's only one party

7     that's come forward with a plan to raise that money.  That's

8     Mrs. Reese and Mr. Beuttenmuller.  Ms. Reese, as the manager

9     of the debtor, has authorized me to file a plan that she had

10    committed to back.  That's not to say that that's the only

11    plan for the debtor.  But that is the only plan that's been

12    filed.

13         The reason for the continuance, Your Honor, is it

14    doesn't make any sense to us to burden a solvent debtor with

15    the administrative expense of a Trustee prior to the

16    potential of plan confirmation.  Oh, let out an important

17    detail.  The plan that Mrs. Reese has proposed treats all

18    existing creditors and owners as un-impaired.  All of the

19    owners keep their equity interests.  All of the creditors

20    come to this Court and have their claims decided by one

21    efficient claims adjudication process.  If Mrs. Reese -- she

22    claims a large unsecured claim against the debtor.  If that's

23    right, it's allowed.  If it's not, it's disallowed and the

24    debtor has the finality of knowing that that is the right

25    amount of her claim.

1       Same thing with Dr. Brand's claim.  He has a note

2   executed by the debtor.  If there's some argument by

3   Mr. Reese or by some other creditor, we can have a claims

4   objection hearing, decide what the appropriate interest rate

5   is.  Have that adjudicated.  And know that we have a final

6   number for the debtor to operate under.  But that doesn't

7   solve the problem I was talking about a minute ago.  We still

8   need money.

9       Whatever Your Honor decides about the right numbers on

10   the claims, we still need money.  And at the moment, there's

11   one plan on the table that permits the debtor to raise that

12   money.  It allows all of the investors, all of the current

13   equity holders to buy an additional share of the debtor and

14   to contribute enough capital to fund the development and

15   lots.  Simultaneously, it has a component that allows all of

16   the members to fund, if they wish, a zipline to generate

17   ongoing income for the debtor.

18       Ms. Reese doesn't get any sort of preference in the

19   bidding.  She doesn't get any first rights.  She doesn't get

20   any stalking horse protections.  If anyone wants to match her

21   offer, they get an equal share of the pie.  If they want to

22   better her offer, they get it all.  We just have an auction.

23   So it doesn't make any sense to us to burden the debtor for

24   the next 30 or 45 days -- confirmation is set at the

25   beginning of November -- with a Trustee when nothing is going

1   to be different 30 days from now than it is now.  The Trustee

2   is not going to start up a zipline in the next 30 days.  The

3   Trustee is not going to develop the lots materially in the

4   next 30 days.  And the Trustee is not going to run the

5   company post-confirmation, as a matter of law.  We're going

6   to need new management, or we're going to need management on

7   a post-confirmation basis.

8        So what does the -- assuming for a moment that the

9   movant were able to win, what would the Trustee accomplish?

10  We would have the administrative burden of 30 days.  We would

11  still be looking at plan confirmation in 30 days.  And we

12  would still have all of the problems that we have today.

13  What's the down side of the continuance?  As far as I can

14  tell, nothing.  Number one, Dr. Brand can propose a plan in

15  the interim.  That would be one advantage, if he wants to.

16  Number two, it gets the debtor out of the mess it's in, which

17  is it gives the debtor the opportunity to raise capital.  And

18  it lowers, it lessens any administrative expense associated

19  with a Trustee.

20       There's no allegation that the debtor is using funds

21  outside the permitted purposes.  There's no allegation that

22  the debtor is paying management some excessive compensation,

23  because management isn't getting paid at all.  All we're

24  doing right now is paying professionals out in Hawaii to

25  continue on the developmental track.  So I don't see any

```
 1   negatives to a 30 day continuance.  And I see potential

 2   benefits to a 30 day continuance.  Not, incidentally, Your

 3   Honor, the fact that you wouldn't have to hear the same

 4   evidence twice.  If Dr. Brand opposes confirmation, he's

 5   going to oppose it based on much of the same reasons he's

 6   moving for the appointment of the Trustee; conflicts, his

 7   lack of faith in management, all the things you see in the

 8   Trustee motion.  And those, I guess, could be probative of

 9   good faith.  And we can address that in 30 days.  But nothing

10   is going to be different in the interim between now and then

11   if we move this hearing.

12        Finally, Your Honor -- I'll keep that for closing.

13   Thank you.

14              THE COURT:  Other arguments?

15              MR. ANDREWS:  Your Honor, just for ease of

16   reference today, I'll refer to the Sarah Ashley Brand Trust

17   and Dr. Jim Brand as the Brand parties, throughout.

18        Your Honor, on behalf of the Brand parties, we oppose

19   the motion to continue.  As the Court set out at the

20   beginning, the motion to appoint a Trustee was filed May the

21   18th of this year.  After that motion was filed, there were

22   some unopposed continuances by both sides.  We attempted to

23   work out an arrangement.  We had a mediation.  Judge

24   Felsenthal came and mediated it.  We were not successful.

25   The fact of the matter is, Your Honor, that my clients desire
```

13

1  a business divorce.  We don't want to go forward with debtor

2  management.  We have serious concerns about debtor

3  management.  And we're not going to agree to a plan and there

4  will be a fight over the plan if, in fact, on November the

5  1st or 2nd a confirmation hearing is even able to go forward.

6      Let me talk a little bit and respond to what

7  Mr. Spector argued in connection with the motion to continue.

8  He says first, Well, Your Honor, you're going to have a plan

9  confirmation hearing in early November.  It's only 30 days.

10 Why not go ahead and just wait for the plan confirmation

11 hearing and aren't you going to have to hear the same

12 evidence twice.  And to that, Your Honor, I would suggest

13 that you're going to end up hearing much of the evidence

14 that's being presented today either today or at the

15 confirmation hearing.  But certainly the record doesn't have

16 to be made twice.  We can take the record from today if, in

17 fact, they're able to go forward on a confirmation in 30 days

18 and use it at that hearing.  There's nothing to restrict

19 that.  So I don't think it's wasteful of the Court's time.

20     Second, Your Honor, I think it's important for the

21 Court to understand that the plan that is on file has not had

22 an approved disclosure statement.  Now, Mr. Spector

23 apparently will argue that no one is impaired, no disclosure

24 statement is necessary.  The Court will be unsurprised to

25 learn that we will take issue with that and believe that a

1  disclosure statement is necessary.  And there are things that

2  you will hear during the course of the day today that will

3  suggest to you that a disclosure statement would be desirable

4  in a case like this one.

5       Your Honor, this is a situation where the facts

6  demonstrate a wide range of conflicts of interest which are

7  troubling.  For example, Ms. Reese, who is the manager of the

8  debtor, is the owner and manager of Madison Pacific

9  Development Company, the largest creditor in this case.  She

10 is the sole signatory on many, if not all, of the meeting

11 notices.  She is the signatory on the notes.  She is the

12 person who effectively would have been negotiating, if there

13 were a negotiation, over the terms of the note and the

14 indebtedness between the debtor company and her other

15 company.  These facts are troubling.

16      In addition, Your Honor, Ms. Reese is the owner and

17 president of Madison Partners, which is providing accounting

18 and/or financial services to the debtor, or has been.  She is

19 the mother to Lou Reese, who is a principal of Ohana Living

20 Farms, which is a lessee which controls certain property that

21 the debtor has under lease which, by the way, no lease

22 payments have been made.  She is the daughter of Walter

23 Berkowitz, who is a creditor in this case and who is owed

24 money for an expenditure which was not approved by the other

25 members.

1          In addition, Your Honor, this is a situation where we

2    have principals who are involved with the debtor who have

3    criminal background.  Mr. Vineyard was convicted of bank

4    fraud.

5               MR. SPECTOR:  Objection, Your Honor.

6               MR. ANDREWS:  Adjudicated --

7               MR. SPECTOR:  There's no evidence of this, and

8    there's not going to be in the record.

9               MR. ANDREWS:  Oh, we'll get to that, Your

10   Honor.  We'll connect that up.

11              THE COURT:  Overruled.  Overruled.

12              MR. ANDREWS:   In any event, Your Honor, there

13   is a question about the fitness of this management team, a

14   serious question.  That's what we want to put on for Your

15   Honor today.  We think that's going to relate to both the

16   plan and to the motion to approve the appointment of a

17   Trustee.

18          This has been on file for some time.  We have our

19   witness here today ready to go, Dr. Brand.  They have their

20   witnesses here.  We've subpoenaed them.  And, Your Honor, we

21   don't see any reason that this should be continued at this

22   juncture.

23          Thank you.

24              THE COURT:  All right.  Any other opening

25   statements?

1             MR. BEUTTENMULLER:  Your Honor, I wanted to

2   add one other insight into this case.

3        From my perspective, the problems of this debtor really

4   arise from two deaths.  They arise from the death of Deborah

5   Snell, which triggered a buyout requirement by the debtor and

6   litigation that you'll hear about at some point called the

7   Snell litigation.  The company was required to buy out

8   Deborah Snell's interest under its regulations.  Deborah

9   Snell got her interest in the process of divorcing Dr. Brand.

10  She was formerly Deborah Brand.  She acquired her interest in

11  the divorce.  She passed away untimely.  And as a result, the

12  company had to buy her out.

13       There was a huge dispute about how much the company

14  would be required to pay to buy her out.  And this led to

15  some very expensive litigation.  The company originally took

16  the position that because the company's net worth was

17  negative, there was no value, there was no book value for the

18  company to buy out, there were all kinds of accounting

19  arguments, all kinds of difficulties arising from that.  A

20  lot of money got spent on litigation.  Ultimately got

21  settled.

22       The company took on several financial responsibilities

23  in that settlement.  One was to pay Charlie Snell, whom she

24  had married in the mean time, a total of $550,000 over a

25  period of, I believe it was four years.  And the company when

1 | it was confronted with the need to pay that really had no
2 | source of funding.  These -- the financial responsibility to
3 | buy out Mrs. Snell, therefore, was one reason that this --
4 | these dissidences started to come about among the members.
5 |     The other death that I'm referring to is the death of
6 | Lou Reese III.  Mr. Reese was a very, very good friend of
7 | Dr. Brand and they basically carried out most of the
8 | functions and operations of the company prior to his death.
9 | Mr. Reese and Mr. Brand were involved in almost all of the
10 | decision making for the company prior to Mr. Reese's death.
11 | After Mr. Reese's death, the members of the company became
12 | less harmonious and problems started to arise.  Challenges
13 | came about to transactions that had taken place 15 years
14 | earlier.  All kinds of new issues, or issues that maybe had
15 | been put aside and held aside for a long time had come to the
16 | forefront.  And Dr. Brand has basically decided that he wants
17 | to break up the company.
18 |     Mrs. Reese's view is, No, I don't want to break up the
19 | company.  I want to continue funding the company.  I want to
20 | provide the money to buy out Mr. Snell, to finish that
21 | company obligation.  I want to get the company going with a
22 | new zipline.  I want to have the company continue as an
23 | ongoing entity.  So you're confronted with these two visions;
24 | Dr. Brand's vision that he wants the company to end.  I think
25 | he's made it extremely clear.  I think Mr. Andrews basically

1   just said that.  And Mrs. Reese wants the company to

2   continue.  So I think ultimately you're going to be

3   confronted with that decision either in the context of a

4   Trustee motion, or in the context of a plan as to which

5   vision is correct for this particular company.

6       I will point out that it's been Mrs. Reese who has

7   funded this company almost all of its capital from the

8   outset.  She has a dominant interest either through herself

9   directly or through entities or through family-related

10  companies, provided almost all of the capital that created

11  this enterprise, that funded its initial acquisition of the

12  property, and that has funded it on an ongoing basis as to

13  its activities through today.  So I think to that extent, we

14  need to give her a chance to present a plan to the Court.

15  You need to actually hear about the plan, as well as hear

16  about these complaints about conflict, et cetera.

17      Given that Mrs. Reese is owed a bunch of money at some

18  point by the company, we believe, Judge, you can handle all

19  of these, quote, conflicts and adjustments that need to be

20  made through a hearing about the fairness of the various

21  affiliate transactions that have taken place up to this

22  point.  In other words, we don't need a Trustee.  We need a

23  plan and a confirmation hearing.  We need to be able to do

24  something constructive with the company.  And we need to deal

25  with claims objections separately, so far as Mrs. Reese's

19

1   claims, Dr. Berkowitz' claim.  Most all of this has been

2   financed with loans.  I mean, it's not like money has been

3   taken out of the company.  In any case, a great deal more has

4   been put in than has been taken out.

5         So in that context, it's certainly within your power at

6   claims hearings, and Mr. Andrews can object to Dr. Berkowitz'

7   claim, he can object to Madison Pacific's claim, he can

8   object to all of those things in the context of the claims

9   process.  And we don't really have a problem with you

10  deciding those things, Judge.  We came here because we needed

11  a solution.  We needed somewhere to come that we would have

12  somebody here that says, Okay, here's the answer, guys.

13  Here's what's fair in this context.  And we knew we were

14  going to have to go litigate somewhere, and we basically

15  chose to come to the Federal Bankruptcy Court because we

16  thought we'd get a fair and efficient solution to the

17  company's problems.

18        Thank you, Your Honor.

19              THE COURT:  All right.  Anything else?

20        All right.  Mr. Spector, it's kind of unusual to have a

21  witness on a motion to continue, so let's keep it brief.

22  Okay?

23              MR. SPECTOR:  That's fine, Your Honor.  I just

24  have a few questions for Dr. Brand.

25              THE COURT:  Okay.  Dr. Brand, if you could

1  approach the witness stand and raise your right hand.  The

2  court reporter will swear you in and then you'll take a seat.

3          (The witness was sworn by the courtroom deputy.)

4                    JAMES BRAND

5  The witness, having been duly sworn to tell the truth,

6  testified on his oath as follows:

7                  DIRECT EXAMINATION

8  BY MR. SPECTOR:

9      Q.    State your name for the record.

10     A.    James Brand.

11     Q.    Okay.  And you're a physician, correct?

12     A.    Correct.

13     Q.    You are the owner of approximately 22, 23, 24

14  percent of the debtor, correct, you and a trust that is

15  related to, I think, your daughter?

16     A.    Correct.

17     Q.    Okay.  Have you reviewed the plan debtor filed?

18     A.    Not in detail.

19     Q.    Have you skimmed it?

20     A.    Yes.

21     Q.    Do you understand that it would provide you the

22  opportunity to either take a pro rata share of new capital

23  contributed to the debtor, or contribute it all yourself?

24     A.    Yes.

25     Q.    And do you support the plan?

```
 1        A.    No.

 2        Q.    Do you have any intention of proposing another

 3   plan?

 4        A.    Possibly.

 5        Q.    Okay.  Do you understand that you could do that at

 6   any time?

 7        A.    I do now.

 8        Q.    And what's the reason you haven't done that to

 9   date?

10              MR. KAUFMAN:  Objection, Your Honor.  I don't

11   see the relevance of this line of questioning to the motion

12   to continue.

13              THE COURT:  Overruled.

14        A.    Repeat the question, please.

15        Q.    What's the reason you haven't proposed a plan to

16   date?

17        A.    I just haven't.  I'm not sure -- I really haven't.

18              MR. SPECTOR:  Okay.  Pass the witness.

19              THE COURT:  Mr. Kaufman?

20              MR. KAUFMAN:  Just a few questions.

21              CROSS-EXAMINATION

22   BY MR. KAUFMAN:

23        Q.    Dr. Brand, have you discussed with management for

24   the debtor other alternatives to a plan?

25        A.    Yes.
```

22

1    Q.   Are any of those discussions incorporated in the

2  plan that's currently on file?

3    A.   No.

4          MR. KAUFMAN:  No further questions.

5          THE COURT:  Any other questions of this

6  witness?

7     All right.  Thank you, Dr. Brand, you're excused.

8     Anything else?

9          MR. SPECTOR:  No, Your Honor, just closing.

10         THE COURT:  All right.

11         MR. SPECTOR:  Your Honor, at the beginning of

12 the hearing I said the debtor needs money.  I don't think

13 that's, again, in dispute.  Mr. Andrews raises all of these,

14 quote, conflict issues; there are inter-company loans between

15 Mrs. Reese's companies and the debtor; how is the debtor to

16 wear the hat of deciding what's fair.  Well, that's what the

17 claims process is for.  The Code gives creditors the right to

18 object to claims.

19    The Trustee is not going to do a different job than the

20 second largest owner is going to do.  Dr. Brand has the

21 largest stake in this case, other than Mrs. Reese.  It's

22 completely appropriate -- and they've already filed a motion

23 to sue Mrs. Reese on behalf of the debtor.  It's completely

24 appropriate for Dr. Brand to take the laboring oar.  I've

25 heard Your Honor say, Folks need to put their money where

1   their mouth is.  That is exactly what needs to happen in this

2   case.  The debtor has proposed a plan that tries to force

3   current owners to put their money where their mouth is.  If

4   you want the company -- if you want a stake in the ongoing

5   operation, it needs funding.  The owners aren't entitled to

6   liquidation under the regulations.  They aren't given an

7   interest in property.  They're only members.  Dr. Brand is a

8   minority member.  If he wants to move for liquidation, I

9   guess he could move to convert.  But a Chapter 11 Trustee is

10  not going to do anything different, other than develop the

11  land and face an impending confirmation hearing in which

12  Mr. Beuttenmuller is going to prosecute the plan on

13  Ms. Reese's behalf.

14       Again, I think we all need to be headed in the

15  direction of forcing creditors and stakeholders to pony up.

16  Mrs. Reese has offered to do that.  If Mr. Brand doesn't like

17  the plan, he can file his own plan.  If the Court wants to

18  consider both plans simultaneously, the Court can do that.

19  But a Trustee is simply a Band-aid for 20, or 30, or 45 days.

20  And it's not going to -- intrinsically it offers no solution

21  to the debtor, other than additional baggage.

22              THE COURT:  Okay.  Mr. Andrews.

23              MR. ANDREWS:  With problem with the dilemma

24  that's been posed by counsel is this.  There are alternatives

25  that do not involve anything that looks like the plan that's

1    proposed by the debtor.  And it is not necessary that the

2    company raise cash and then use that cash and let it remain

3    in control of management that is suspect.  The other

4    alternative is, in fact, to liquidate.  It is to sell off the

5    land.  The Court hasn't heard all of the evidence yet.  But

6    the Court, I suspect, is aware that this revolves around 634

7    acres of land in Hawaii.  It is all sellable.  There are

8    obstacles to the sale of it.  And there will be some

9    discussion of that at any hearing, whether today or in the

10   future, that the Court will hear.  But the idea that is being

11   proposed by the debtor is simply a squeeze out, nothing more,

12   nothing less.  An effort to squeeze out the participation of

13   minority is part of the pattern and practice by this

14   management team.

15        Your Honor, we oppose a continuance and ask that the

16   Court take up the motion to appoint a Trustee.  Thank you.

17             THE COURT:  All right.  The Court is going to

18   deny the motion to continue this hearing.  The Court does not

19   believe on balance there is good cause.  Foremost in the

20   Court's mind is the fact that this is a 6 1/2 month old case

21   now.  This motion to appoint a Trustee has been on file for

22   much of the case, since May 18th.  It's been continued.

23   We've had mediation.  And it does not appear we're closer to

24   a consensual resolution than we were early on.  So I think

25   the movants are entitled to their day in court now on their

1   motion to appoint a Trustee.  And so we will go ahead and

2   push forward on that.

3        With that, Mr. Andrews, I turn to you.  Do you have a

4   brief opening statement on the motion to appoint a Trustee?

5            MR. SPECTOR:  Your Honor, I have one

6   housekeeping matter to take up with the Court.

7            THE COURT:  Okay.

8            MR. SPECTOR:  The debtor and Mr. Williams have

9   made a Rule 11 Agreement, which I'd like to read into the

10  Court record, because it impacts Mr. Williams and the Trustee

11  motion.

12           THE COURT:  All right.  You may do so.

13           MR. SPECTOR:  The debtor has agreed to modify

14  the plan that it has proposed with respect to Mr. Williams'

15  client, Charles Snell.

16           THE COURT:  Okay.

17           MR. SPECTOR:  The debtor is agreeing to modify

18  its plan to provide Mr. Snell and his company, Chasnell, a

19  first lien security interest subject only to current ad

20  valorem tax liens in one lot defined, as I will define it

21  below, located within the confines of the Makai property to

22  secure the allowed Class 2 claims of Mr. Snell.

23       The debtor will include Chasnell, Inc., within the

24  definition of Snell in Section 1.1 of the plan.  For purposes

25  of the agreement, a lot will be defined with the meets and

1   bounds description of one of the ocean view residential lots

2   under the debtor's current development plan, such plan

3   providing for a total of six residential lots.

4        In the event that the subdivision map finally approved

5   by the State of Hawaii or Hawaii County requires the debtor

6   to alter the lot boundaries from those described, the parties

7   agree to provide replacement collateral to Mr. Snell in the

8   form of the same lot with different boundaries, or a

9   different lot within the same subdivision.  In either case,

10  to be agreed upon by both parties as reasonably equivalent

11  value at the time that any change is to be made.

12       Snell would then release his lien on the lot provided

13  initially.  In the event the parties are unable to agree on

14  replacement collateral, the parties would agree to submit the

15  dispute to binding arbitration to be held in Austin, Texas

16  before one arbitrator, or that the debtor will have the right

17  to prepay any remaining obligations to Snell.  If the matter

18  is submitted to arbitration, the debtor will pay all expenses

19  associated with the arbitration.  The consideration herein

20  expressed shall fully satisfy the claims of Snell against the

21  debtor.  The debtor's agreement to provide this treatment is

22  conditioned upon Snell's support of the plan, Snell's

23  agreement to accept the past due payment of $137,500 as a

24  cure and ratify the redemption provision of the settlement

25  agreement with the debtor, Snell's withdrawal of support of

1   the pending Trustee motion; agreement by Snell to shorten any

2   deadline by which the debtor is required to provide a

3   disclosure statement to Snell in connection with confirmation

4   of the plan.  And the debtor is agreeing that reasonable

5   attorney's fees for Mr. Snell prior to the petition date are

6   in the amount of $20,000.

7           THE COURT:  All right.  Mr. Williams, do you

8   confirm that?

9           MR. WILLIAMS:  I do, Your Honor.  I do confirm

10  that.

11          THE COURT:  All right.  Well, the record will

12  so note that there has been this agreement for the debtor to

13  modify the plan.  And if the debtor does so modify the plan,

14  Mr. Snell does not support the Trustee motion and, in fact,

15  would support the plan.

16      All right.  With that, Mr. Andrews, we'll hear from you

17  on an opening statement.

18          MR. ANDREWS:  Your Honor, the Court is no

19  doubt aware from reviewing the pleadings that have been filed

20  in the case so far that this is a matter that involves, for

21  the most part, undeveloped land in Hawaii.  The schedules and

22  statements don't reflect a value of that land.  And, in fact,

23  to date no document filed by the debtor in this case reflects

24  a value in that land.

25      The liabilities that are asserted in the case are

1    approximately $550,000 owed to Snell, that was the subject of

2    the matter you just heard; an allegations that $1.7 million

3    is owed to an entity controlled by Ms. Reese that is hotly

4    disputed by the Brand parties.  You can also see,

5    objectively, by things that have been filed, including the

6    monthly operating reports, that this debtor doesn't really

7    have employees, doesn't really have any cash flow, has been

8    negative during the course of the case.  And we'll introduce

9    exhibits later to walk you through all of that.

10           That the debtor, in essence, really has only a few

11   roads to go down.  It can either attempt to raise money and

12   reinvigorate the existing entity.  And we oppose that because

13   of the existing management.  It can simply determine to lease

14   the land for some of the activities that Mr. Spector

15   mentioned earlier.  There have been zipline operations, and

16   the like, on this land.  But, again, we're not in favor of

17   that without dramatically changing management.  Or, third, it

18   can simply determine to sell off the land.  It's our view

19   that a Trustee can take all of those steps and the Trustee

20   will be free from the taint of the conflicts.  And it will be

21   much more confidence inspiring to the Brand parties that

22   future decisions that are made are not made with regard to

23   attempts to gain the upper hand in terms of control, but

24   instead will be made in recognition that this is a viable

25   real estate tract that can be sold, developed, or what not,

1   but not under the conditions that we have currently.

2        Your Honor, originally, you will hear, that this debtor

3   was operated somewhat as if it were a family business.  And

4   there are elements of Mr. Rudy Beuttenmuller's speech to you

5   earlier that I would agree with.  In fact, a couple of things

6   that caused dispute and dissention in the history of this

7   case are that Dr. Brand was a childhood friend of Lou Reese,

8   who is now deceased.  He and Lou Reese found this opportunity

9   in Hawaii.  They came together and ultimately were able to

10  create a significant real estate transaction that resulted in

11  earnings and resulted in this 634 acre tract coming into an

12  entity that was formed.  You'll hear all of the history of

13  that in a little bit.

14       But over the period of time, Dr. Brand believes, and I

15  think the record will reflect that while the view of

16  Dr. Brand had been that the operations were, while somewhat

17  loose, perhaps appropriate in the early days, that over time

18  as he learned more and more about the way the operations

19  worked and saw the conflicts that were evidence in the form

20  of the operations, he became increasingly concerned.  And

21  over the last several years, in fact, actively was opposing

22  things that were being done by the member manager.  And

23  throughout, Your Honor, you will hear that that was Susan

24  Reese, who was in control of the entity.

25       Your Honor, these allegations that we're going to go

1   through in just a minute really fall into five or six

2   categories.  And the categories, to me, meet the tests in

3   1104.  Your Honor has had, no doubt, numerous motions to

4   appoint a Trustee in your time on the bench.  The one I

5   remember the most, because our firm was involved on the

6   sidelines of it, was Patman Drilling.  And in Patman Drilling

7   this Court ruled that cause exist in that case to appoint a

8   Trustee because of overwhelming conflicts of interest of

9   debtor's management, as well as convincing evidence of some

10  commodation of dishonesty, incompetence, gross mismanagement

11  of the affairs by the debtor.

12       Your Honor, it is our contention that under the

13  evidence that you will hear today that there is ample

14  evidence of each of the elements that exist under 1104.

15  There are conflicts of interest.  I went through them with

16  you briefly in responding to the motion to continue, but

17  we'll develop that.  Those conflicts have to do with familial

18  relationships that Susan has.  While understandable, those

19  relationships have led to actions on behalf of the company

20  that are inappropriate and demonstrate clear conflicts.

21  There's been, in our view, fraud and dishonesty in the

22  operations that relates to everything from what amounts to us

23  to being inaccurate financial statements produced to the

24  members, to actual transfer of a quarter million dollars on

25  the eve of the bankruptcy to an entity that is a subsidiary.

1   While they have an explanation for that, Your Honor, it's our

2   contention that that is evidence of an effort to avoid the

3   reach of creditors.

4        There are a number of items that have to do with

5   transactions that simply were not disclosed to the members

6   that Dr. Brand will testify about.  There are -- there is a

7   long record of a failure to do much to develop the property.

8   In fact, part of the property has been under control of this

9   management since 1997.  The key pieces of property next to

10  the ocean have been under control of the debtor since, I

11  believe, 2006.  At no time has the development of those

12  properties advanced to a point where, in fact, you could do a

13  subdivision.  At no time were they able to do much with the

14  so-called Makai land, the land that's the land behind the

15  ocean front area, the approximately 400 plus acres, other

16  than at one point they ran a zipline.  They received gross

17  revenues of over a million dollars off the zipline.  All of

18  that money went to settle a dispute which was ill-advisedly

19  undertaken by the debtor and which, we think, will point out

20  some of the other aspects of this debtor's poor management

21  style.

22       With that, Your Honor, we'll look forward to presenting

23  the evidence and I'll stand down for Mr. Spector's opening.

24            THE COURT:  All right.  Mr. Spector.

25            MR. SPECTOR:  Your Honor, I think I'm going to

32

1    reserve until I put on my case.

2              THE COURT:  Okay.  Any other opening?

3              MR. BEUTTENMULLER:  Judge, this is a closely

4    held entity.  And from what we've learned from our

5    investigation so far, no one is going to put money into this

6    company, other than the people who own the land.  In other

7    words, this is not an attractive investment opportunity

8    through outside third parties.  There's not available

9    financing, particularly for this kind of land because of its

10   remoteness.  People perceive that development or actual

11   improvement by way of roads and utilities would be decades

12   away.  And so what you could do is you could develop and

13   sub-divide for people who want that kind of very rural estate

14   that sits on an ocean view Hawaii cliff.  That's the target

15   market for this particular property.  It's not as if

16   developers are out there actively seeking to acquire this

17   land.  It's not as if home builders are out there trying to

18   buy lots for this type of land.  And so, therefore, your

19   conventional sources of financing simply are not available.

20   That's the reason that Mrs. Reese and Mrs. Reese's family

21   have funded whatever needs of the company there have been,

22   aside from some additional capital that has been provided by

23   the other members.

24        The loan here that Mr. Andrews is complaining about as

25   Madison Pacific being the largest creditor, was something

33

```
1    that everyone knew about since 1996.  Again, since
2    Mr. Reese's death, it's become a problem for Dr. Brand.
3    Dr. Brand had notes to the company in much smaller amounts
4    that bore the same exact rate.  So to the extent that there's
5    a conflict, we're trying to treat everyone the same.
6         Furthermore, to the extent that there are apparent
7    conflicts, we've tried to build into the plan that
8    Mr. Spector has prepared clear equality among all the
9    members.  All of the members are given exactly the same
10   rights, exactly the same participation in whatever the debtor
11   is going to do.  That's been the philosophy of this company
12   from the beginning.  Dr. Brand has been actively involved
13   from the beginning in the subdivision process.  He's had
14   direct access to all of the professionals who have
15   participated in the process.  The process just takes an awful
16   long time in Hawaii.  The process just takes time to get
17   done.
18        Dr. Brand has been advised of all of the material
19   aspects of this company, all of the material transactions.
20   It was operated as a closely held company largely funded by
21   the Reese's, because that's the only way it could operate.
22   And that's really the only viable way that this company can
23   go forward, that the Reese's step back up and put the money
24   in to take care of the Snell problem.  You heard the Rule 11
25   Agreement.  That money is coming from the Reese's to take
```

34

```
 1  care of a creditor of this company.  The money for a possible
 2  new zipline will come from the Reese's.  They are the support
 3  of this company.  They are the life line to this company.
 4  The other option is to liquidate.
 5      I think we're now getting this issue very clearly
 6  framed.  I don't think a Trustee is going to go do a private
 7  offering to go raise money for a zipline.  I don't think
 8  Trustees behave that way.  I don't think Trustee is going to
 9  go out and get a development loan to go create more value for
10  the property.  So, again, I don't know that there's source of
11  a development loan by way of conventional financing.  I don't
12  know who you could go to to try to find money to do something
13  on this particular property.
14      So, again, we're going to have conflicts, Judge,
15  because the only people who can put money in are the members
16  of the company.  That's simply the bottom line now and go
17  forward.  And so we have to create some mechanism through the
18  Court to say, yeah, this is fair.  This is how you guys can
19  do it.  And so we came here with a plan to say, Okay.  Here's
20  our vision of what we want to do.  Here's our vision of what
21  we want the judge to approve, so far as resolving any
22  conflict, because the judge has said it's fair.  So you have
23  to live with it, Dr. Brand, because the judge said it's fair.
24  That's where we are.  We think that the idea is anathema, or
25  it's so contradictory to any productive purpose at this
```

 1   point, that we feel that the Court should clearly decline to

 2   appoint a Trustee.

 3        Thank you.

 4              THE COURT:  All right.  Mr. Andrews, you may

 5   call your first witness.

 6              MR. KAUFMAN:  Your Honor, we'll call

 7   Dr. Brand.

 8              THE COURT:  All right.  Dr. Brand, we'll bring

 9   you up to the stand.  You have been sworn in already.  I

10   remind you, you're still under oath.

11        All right.

12              <u>DIRECT EXAMINATION</u>

13   BY MR. KAUFMAN:

14        Q.   Good morning, Dr. Brand.

15        A.   Good morning.

16        Q.   Could you please state and spell your last name for

17   the record.  State your full name and spell your last name.

18        A.   James Brand, B-r-a-n-d.

19        Q.   And, Dr. Brand, where do you currently reside?

20        A.   Austin, Texas.

21        Q.   And how long have you resided there?

22        A.   For the last 22 years.

23        Q.   And where did you live prior to living in Austin?

24        A.   In -- well, actually last 24 years.  In Hawaii in

25   the District of North Kohala.

1        Q.   Dr. Brand, tell me a little bit about your

2   educational background.  Where did you go to school as a

3   child?

4        A.   I went from the 7th grade to the 12th and graduated

5   from St. Mark's School here in Dallas.

6        Q.   Here in Dallas?

7        A.   In Dallas.

8        Q.   Did you attend college?

9        A.   I did.

10       Q.   Where?

11       A.   Duke University in North Carolina.

12       Q.   And did you graduate from Duke?

13       A.   I did.

14       Q.   In what year?

15       A.   1971.

16       Q.   And what did you do after graduating from Duke?

17       A.   I went to medical school.

18       Q.   Where did you attend medical school?

19       A.   University of Texas Health Science Center of San

20   Antonio.

21       Q.   And did you complete your medical schooling?

22       A.   I did.

23       Q.   In what year did you finish medical school?

24       A.   1976.

25       Q.   And what followed medical school?  Did you go into

1  a traditional residency directly after medical school?

2      A.   I didn't.  In those days in the State of Texas it

3  was possible to go into practice after finishing medical

4  school.  And so I took a leave from formal education and I

5  worked in small rural emergency rooms and public health

6  clinics for a period of time.  I spent a period of about a

7  year in South America working in hospitals in primarily Peru.

8      Q.   Did you eventually do your residency?

9      A.   I did.  I did one year of OBGYN residency in New

10  York City, 1979 to 1980.

11      Q.   And in 1979, 1980, were you married at the time?

12      A.   Yes.  I was --

13      Q.   Who -- who was your spouse at the time?

14      A.   Deborah Brand, Deborah Halsom Brand.

15      Q.   When did you two marry?

16      A.   June 21st, 1979.

17      Q.   And how did you -- you said you lived in Hawaii.

18  How did you end up in Hawaii?

19      A.   After Deborah and I were married, we took a

20  honeymoon to Hawaii and we spent about a month there

21  traveling all around the State.  And we had the idea that we

22  maybe wanted to live there, live in a rural area, perhaps.

23  And after, shortly after we arrived in Honolulu I went to the

24  State Department of Health and found out where the physician

25  shortage areas were in the State.  And as we toured the

1  islands, we would visit different areas.

2      Q.   Did you come upon any opportunities to practice

3  medicine in Hawaii?

4      A.   Several opportunities.  But we fell in love with

5  North Kohala.  And it was one of those areas where they

6  needed a doctor.  I met the young doctor who was there at the

7  time and made plans to come back and practice with him.  But

8  I had to go do at least a year of residency before doing

9  that.

10     Q.   So did you end up taking this young doctor up on

11  his proposal to practice in Kohala, North Kohala?

12     A.   I did.

13     Q.   When did you begin your practice in North Kohala?

14     A.   I believe it was September of 1980, August or

15  September of 1980.

16     Q.   And how long did you practice in Hawaii?

17     A.   Eight years.

18     Q.   So from 1980 until about --

19     A.   '88, Summer of '88.

20     Q.   Tell me a little bit about life in North Kohala.

21  What was it like?  How big was the community in North Kohala?

22     A.   There were, at that time, 3,500 residences, more or

23  less.  Very local population.  The community had been a very

24  large sugar cane plantation.  And the sugar cane plantation

25  had closed in the late '70s.  So it was a community in

1  transition.  And most of the workers of the plantation had

2  become hotel staff at the nearby hotels.

3      Q.   What was your practice like there?  What kind of

4  procedures or patients did you see?

5      A.   Well, it was a great practice, actually.  I

6  delivered babies and I did house calls.  I took care of old

7  people that were dying.  I was -- it was a general practice.

8  I saw everything from the beginning of life to the end.  It

9  was a great opportunity for a young doctor, because we were

10  on our own.  It was a small area.  We had a small hospital.

11  The nearest operating room was 60 miles away.  The nearest

12  cardiologist was 90 miles away.  So it was a great

13  opportunity.

14      Q.   And did this -- this opportunity allow you to feel

15  close with the community in North Kohala?

16      A.   Very much so.  Because I was their doctor.  I was

17  one of two doctors taking care of them.  And it gave me an

18  entry into their community I wouldn't have had otherwise.

19      Q.   Did -- tell me about the land in North Kohala.

20  What's the topography like?  Or what -- just generally

21  describe the land for me.

22      A.   Well, it's the -- basically the northern tip of the

23  island of Hawaii, the big island.  So it transitions from the

24  western side of the island to the eastern side of the island.

25  It's all gently sloping land up to a mountain top of about

1    5,500 feet.  And the rainfall varies from 15 inches a year to

2    maybe 75 or 80 inches a year, as you move from west to east.

3    It's beautiful land.  The forests were cut hundreds of years

4    ago and then sugar cane was planted.  So a lot of it's

5    pasture land now.  There are not, not many beaches, but

6    cliffs onto the Pacific.  Very beautiful.

7         Q.    During your eight years living in Hawaii, did you

8    and Deborah have any children?

9         A.    We adopted a child, Sarah.

10        Q.    Is this the Sarah of the Sarah Ashley Brand Trust?

11        A.    Yes.

12        Q.    When was she born?

13        A.    She was born January 2nd, 1984.

14        Q.    And did you adopt her from birth?

15        A.    Right.  We were there at delivery and took her home

16   that day.

17        Q.    I want to talk a little bit about the property that

18   is now the debtor's 634 acres.

19         How did the debtor come to acquire the land?  What's

20   the original genesis of the transaction?

21        A.    Through a, basically through a sale of the property

22   to a Japanese company called Chalon.  Basically Lou Reese had

23   a contract to purchase this land from Castle & Cooke, who is

24   a large landowner.  And it became apparent after he had the

25   contract that he wasn't going to be able to raise the money

1  as he had hoped and thought that he would.  And so ultimately

2  a second buyer came into what amounted to buying his

3  position.  So the property was transferred to one of

4  Mr. Reese's entities and then simultaneously transferred to

5  the Japanese entity.  And in that transaction there was what

6  effectively was a commission of the 634 acres.

7      Q.   You mentioned a company called Castle & Cooke.

8  Tell me about that company.

9      A.   Castle & Cooke is a very large landowner.  Probably

10 the largest private landowner in Hawaii.  And internationally

11 they own Chiquita Banana's and Dole Pineapple.  They had just

12 been sold to a gentleman from New Jersey named Murdoch.  And

13 so their long-term ownership had changed.  Mr. Murdoch had

14 decided to invest a lot of his resources in the Island of

15 Honi, which he owned the entirety of.  And a friend of mine

16 who was a broker found out that he was interested in selling

17 the 19,000 acres that constituted their holdings in North

18 Kohala.

19     Q.   So Castle & Cooke at the time held 19,000, or so,

20 in North Kohala?

21     A.   Yes.

22     Q.   And about what time was this that you were hearing

23 that Castle & Cooke was looking to sell the property?

24     A.   It would probably have been in early 1987.

25     Q.   And were you in the real estate business that you

1  could organize a transaction to acquire or broker a deal at

2  the time?

3      A.   No.

4      Q.   What was your practice then at that time?

5      A.   Basically it was a very modest, general practice.

6      Q.   How much were you earning?

7      A.   I probably averaged $42,000 a year for those eight

8  years I was there.

9      Q.   Did you know anyone, other than your broker friend

10  in Hawaii, that could organize a transaction large enough to

11  acquire or broker this kind of a deal?

12      A.   Well, I thought I did.  My step-brother was a real

13  estate developer in Texas.  So he came to mind.  And also I'd

14  heard, I think even from my dad, that Lou had gone on to be a

15  well-known real estate developer in Texas.

16      Q.   And Lou Reese, you mentioned that you knew him from

17  childhood.  Tell me about your relationship with Lou.  When

18  did you first befriend Lou Reese?

19      A.   Well, in the seventh grade.  I started St. Mark's

20  in the seventh grade.  I was a scholarship student.  Many of

21  the students had been there many years.  And Lou just

22  embraced me when I started school there.  He became a very

23  close friend very quickly.  We had similar senses of humor.

24  And he was the first kid to invite me over to his house to

25  spend the night and visa versa.  And so he just really

1   welcomed me into that community and was really a good friend.

2   We spent many nights playing ping pong all night and talking

3   and having 13 year old fun.

4        Q.   Did your friendship continue through high school

5   with Lou?

6        A.   It did.  It did.  It was really at its best in the

7   seventh and eighth grades.  And then as we entered high

8   school, I played soccer and he played football, I took French

9   and he took Spanish.  So our classes diverged a little bit.

10  We were still good friends.  We didn't hang quite as much

11  together, but I considered him a close friend throughout.

12       Q.   Did you stay in touch with him after high school

13  when you attended Duke?

14       A.   Intermittently.  Christmas vacations, summer

15  vacations I would see him some.  I would say throughout

16  college.

17       Q.   And by the 1980's when you were in Hawaii, were you

18  still keeping in touch with him?

19       A.   Not really.  Probably didn't see or talk to him in

20  at least ten years, at that point.

21       Q.   What -- what brought you back in contact with Lou

22  in the 1980s?

23       A.   Well, serendipitously we had our 20th high school

24  reunion.  I had not been to any prior reunions, and so my

25  wife and, let's see, Sarah was 3, and Sarah and I came back

44

1   to Texas for the reunion.  Immediately sought our Lou and our

2   friendship started right up and we still shared the same

3   sense of humor and many of the same interests.  And, you

4   know, we just re-bonded again.

5       Q.   Did you discuss this Castle & Cooke opportunity

6   with Lou?

7       A.   I did.

8       Q.   Around the time of the reunion?

9       A.   About that time.

10      Q.   Why did you seek out Lou as a person to discuss

11  this opportunity with?

12      A.   Well, because he -- well, I told him about it and

13  he was interested.  And I sought him out because he had a

14  reputation of being a successful real estate developer and

15  had done what, the best I could gather, large transactions.

16      Q.   What happened after you brought this opportunity to

17  Lou's attention?

18      A.   He thought it was a great opportunity.  And some

19  months after the reunion, I don't remember exactly when, he

20  came out to Hawaii and I showed him the land.  He was

21  familiar with Hawaii.  I showed him the land.  And I took him

22  around town and introduced him to people and sort of

23  introduced him to the community.  And he saw the potential of

24  the project and pursued it vigorously.

25      Q.   You mentioned that there was a back-up buyer and

1  that Lou was unable to acquire the property for himself.

2  Tell me a little bit more about that.  Who's Hartford Realty?

3      A.   One of Lou's entities.  I'm not sure if it was the

4  original entity that closed on the land or not.  I don't

5  recall.  But it was one of several real estate entities that

6  was involved.  And it was one of Lou's entities.

7      Q.   And who was the ultimate purchaser for the 19,000

8  acres of property?

9      A.   I think it was Fairfield, another one.  It may have

10  been Hartford.

11      Q.   Subsequent to Lou's acquisition of the property,

12  who ultimately took possession and closed on the sale?

13      A.   Oh, sorry.  Chalon Corporation from Japan.

14      Q.   And as part of the deal between whatever entity

15  Hartford, Fairfield, or whichever Reese entity and Chalon,

16  was Lou and his -- the other brokers of the deal, were they

17  paid a commission for the sale?

18      A.   They -- yes.

19      Q.   Was this property, the 634 acres that the debtor

20  now owns, part of that --

21      A.   Yes.

22      Q.   -- that commission?

23      I want to turn to Exhibit 1 in the movant's binder.

24  It should be in front of you.

25      Have you seen this document before?

1          THE COURT:  I'm sorry, which number?

2          MR. KAUFMAN:  Exhibit 1 in the movant's book.

3     A.   Yes.

4     Q.   Could you briefly describe this document to the

5  Court?

6     A.   Basically this is the document that defines the

7  land that will be conveyed to Lou, or Fairfield, in this

8  case, from Chalon at the time of the closing of the larger

9  transaction.

10    Q.   And what is the date of the document?

11    A.   November 13th, 1988.

12    Q.   Who are the signatories on the document?

13    A.   Lou Reese, III, Ed Sherrill, and Yoshi Hiro Kumon.

14         MR. KAUFMAN:  Your Honor, I offer Exhibit 1.

15         THE COURT:  Any objection?

16         MR. BEUTTENMULLER:  No objection.

17         THE COURT:  It's admitted.

18    Q.   Exhibit 1, does it describe the property that is

19  now the debtor's property?

20    A.   Yes.

21    Q.   How is this land, the 634 acres, how was it chosen?

22    A.   I chose it.  I told Lou that I thought this was the

23  property.  I was the most familiar with the property.  I had

24  lived there eight years.  I was in love with the property,

25  the Makai property with the 484 acres.  It was a particular

47

1   beautiful part of the land.  And the Makai, or ocean

2   property, was also a particularly beautiful part of the land

3   in Kohala.  It had a beautiful beach, rock beach.  So I told

4   him we should ask for that land and he agreed.

5       Q.   Turn, if you would, to the next exhibit, Exhibit 2

6   in the movant's binder.

7        And just briefly, would you describe this document for

8   the Court?

9       A.   This is the trust agreement between Fairfield

10  Realty and Jeff Grad, David Fuertes, Lou Reese, and myself.

11      Q.   Who are the signatories to the document?

12      A.   Lou, Lou Reese, Jeff Grad, David Fuertes, myself,

13  and I think this is Reggie.

14      Q.   Someone on behalf of Fairfield Realty Corporation?

15      A.   Yes.

16              MR. KAUFMAN:  Your Honor, I offer Exhibit

17  Number 2.

18              THE COURT:  Any objection?

19              MR. BEUTTENMULLER:  No objection.

20              THE COURT:  2 is admitted.

21      Q.   And you mentioned that there were five signatories

22  to this document; Fairfield, Jeff Grad, Lou Reese, David

23  Fuertes, and yourself.

24       Who is Jeff Grad?

25      A.   Jeff Grad is an attorney in Honolulu in the area of

 1    real estate.  And he had been contacted by Lou to help with

 2    the large real estate transaction between, initially, Castle

 3    & Cooke and Lou and then in turn Lou and Chalon Corporation.

 4         Q.    And who is David Fuertes?

 5         A.    David Fuertes is an -- he's actually retired now.

 6    At the time he was an ag teacher in Kohala and a local

 7    community leader, kind of a community developer kind of guy.

 8         Q.    Was he involved in the Chalon transaction?

 9         A.    He was not.

10         Q.    Why was he made a beneficiary of this document?

11         A.    Well, when the transaction ended fruition, Lou and

12    I had a conversation.  And I don't remember whose idea it

13    was, but the idea was that I had already moved back to Texas

14    at that point, and we felt like it would be helpful to us to

15    have somebody who had -- was local be involved in this, in

16    the development and ultimate use of the land.  And just to

17    have their eyes and ears in the community and also be a voice

18    for us in the community when we weren't there.

19         Q.    Now, turn, if you would, to the last page in that

20    exhibit.

21          Tell me, what's described here on this last page that

22    says Exhibit A at the top?

23         A.    The percent interest of each of the four initial

24    property owners.

25         Q.    And what is your percentage interest under this

```
 1   trust agreement?

 2        A.    50 percent.

 3        Q.    And Jeffrey Grad's?

 4        A.    4.7.

 5        Q.    And David Fuertes'?

 6        A.    3.1.

 7        Q.    And Lou Reese's?

 8        A.    42.2.

 9        Q.    And do you recall when was this document executed?

10   Do you recall?

11        A.    Let me look at see.

12        Q.    Was it -- well, I'll let you say what it's

13   effective as of.

14        A.    December 29th, 1988.

15        Q.    And do you recall that that was -- that this was

16   signed effective, or contemporaneously with the closing of

17   the Fairfield -- I'm sorry, the Hartford/Chalon transaction?

18        A.    Yes.

19        Q.    Now, turn, if you would, to the next exhibit,

20   Exhibit 3 in the movant's binder.

21         And could you identify or briefly describe this

22   document?

23        A.    I believe this is the agreement for the property

24   then held in Fairfield.  This is a trust agreement to be

25   placed into a to-be-formed corporation.
```

1      Q.   Who are the signatories to this document?

2      A.   Jeff Grad, David Fuertes, Lou Reese, III, and

3   myself.

4      Q.   So, effectively, the beneficiaries from the trust

5   agreement we just discussed?

6      A.   Yes.

7              MR. KAUFMAN:  Your Honor, I offer this Exhibit

8   3.

9              THE COURT:  Any objection?

10              MR. BEUTTENMULLER:  No objection.

11              THE COURT:  3 is admitted.

12      Q.   What's the date of this agreement?

13      A.   8th of June, 1990.

14      Q.   And if you could turn to the bottom of page 2 of

15   this document, paragraph 4.

16       Could you just read the first portion of paragraph 4,

17   the first sentence?

18      A.   Each beneficiary shall be issued stock in the

19   corporation and the percentage necessary to maintain the

20   proportionate voting rights and ownership of the corporation

21   is equal to the percentage of ownership of the 634 acres as

22   set forth in Exhibit A to the said trust agreement.

23      Q.   So this is referencing the trust agreement

24   effective 1988, December 1988?

25      A.   Yes.

1        Q.    And the next paragraph 5, can you read that for me?

2        A.    The initial board of directors of the corporation

3    shall be comprised of all of the beneficiaries or their

4    designated representatives with each beneficiary being

5    entitled to one seat on the initial board of directors.

6        Q.    Does the debtor have a board of directors?

7        A.    No.

8        Q.    Does it have multiple managers?

9        A.    No.

10       Q.    Are you a manager?

11       A.    No.

12       Q.    Could you look down at the bottom of page 3,

13   paragraph 9?  And that second sentence there that begins at

14   the very bottom of page 3, could you read that for me?

15       A.    The beneficiaries shall reimburse Fairfield for all

16   expenses relating to the transfer of the 634 acres and the

17   incorporation of the corporation excluding, however, any cost

18   incurred by Fairfield in connection with the lawsuit referred

19   to below.

20       Q.    What lawsuit is referred to below?

21       A.    It's the Stockbridge, what we call the Stockbridge

22   lawsuit.  It was a suit that two of Lou's associates in

23   Dallas brought against him subsequent to the closing of the

24   land in Kohala.

25       Q.    Were you a defendant in that lawsuit?

1        A.    I was.

2        Q.    Was Chalon a defendant in that lawsuit?

3        A.    Yes.

4        Q.    And do you recall when that lawsuit was filed, what

5    year?

6        A.    I don't know.  I guess 1989.

7        Q.    What was -- what was happening around that time?

8    Were you still practicing in Hawaii?

9        A.    No.  I had moved back at the end of 1988.  And in

10    1989 I spent much of the year traveling with Lou.

11        Q.    Why did you travel with Lou that year?

12        A.    When I came back to Texas, moved back to Austin, I

13    did not come back to a regular position.  I just came back

14    and was going to look for work.  And I did work in some local

15    (indecipherable word) jobs at Texas A&M Health Care Facility,

16    or Student Health.  And about that time Lou said, Well, why

17    don't you spend a year traveling with me and we'll go and see

18    if we can do some more real estate transactions.

19        Q.    Did he pay you to travel with him?

20        A.    I had a contract and I was paid.

21        Q.    What were you paid?  Do you recall?

22        A.    I was paid $29,000 over the course of the year.

23        Q.    Where did you travel with Lou during this year of

24    travel?

25        A.    We traveled to Europe a couple of times, and

1  California a number of times, and Japan a couple of times.

2      Q.   Why were you traveling to Japan?  What kinds of

3  people were you meeting with?  And what kinds of transactions

4  were you discussing?

5      A.   Well, we met with a variety of businessmen.  And

6  we, Lou had the idea that Japan would be a good buyer for

7  real estate in this country or in Europe.  And the first time

8  we went was actually to go and meet, among others, Mr. Kamon,

9  who was the owner of Chalon.

10     Q.   And why did you go meet with Mr. Chalon (sic)?

11     A.   Well, honestly, I think Lou was embarrassed by the

12  lawsuit that had reigned down on all of us from his

13  associates.  And he wanted, I think, to apologize to, or at

14  least try and make amends to, directly to Mr. Kumon.

15     Q.   And what resulted from this meeting with Mr. Kumon

16  and Japan?

17     A.   Well, at one of the meetings with Mr. Kumon,

18  ultimately Lou offered to cover his legal bills that were

19  related to the Stockbridge.

20     Q.   He did this on his own behalf?

21     A.   He did.

22     Q.   Could you turn in your exhibit book to Movant's

23  Exhibit Number 4?

24      Have you seen this document before?

25     A.   Yes.

1    Q.    Could you describe it briefly for the Court?

2    A.    This is the agreement on the 15th day of August,

3    1992 whereby, I believe, Lou promises and commits to covering

4    the legal fees of Chalon, or Mr. Kumon.

5              MR. KAUFMAN:  Your Honor, I offer Exhibit 4.

6              THE COURT:  Any objection?

7              MR. BEUTTENMULLER:  No objection, Your Honor.

8              THE COURT:  4 is admitted.

9    Q.    Could you look at paragraph 3 on page 3 of Exhibit

10   4?

11     What is being promised in this paragraph 3?

12   A.    Reese does hereby agree to reimburse Chalon for its

13   reasonable attorney fees incurred in connection with the

14   lawsuit aforementioned in the amount of $139,140.

15   Q.    You mentioned a lawsuit.  Is this referencing the

16   Stockbridge --

17   A.    This is the Stockbridge lawsuit, yeah.

18   Q.    Did you review this document when it -- prior to it

19   being signed?

20   A.    No.

21   Q.    Are you a signatory to this document?

22   A.    No.

23   Q.    Who signed this document?

24   A.    Lou and I think Mr. Kumon and his -- Mr. Kumon.

25   Q.    Did Lou sign this on his own behalf personally?

1      A.    He signed it as president of Fairfield Realty.

2      Q.    And individually?

3      A.    And individually.

4      Q.    Did the other beneficiaries of the 1990 trust

5   agreement -- I'm sorry, the 1988 trust agreement, did the

6   other beneficiaries agree to allow Fairfield to execute this

7   document?

8      A.    No.

9      Q.    Was it discussed among the other beneficiaries?

10      A.    It wasn't discussed.

11      Q.    Did you realize in 1992 that the condition was

12   being imposed by Chalon on its obligation to convey the 634

13   acres, conditioned upon Lou's payment of its legal fees in

14   the Stockbridge litigation?

15      A.    Not in 1992.

16      Q.    When did you first discover that?

17      A.    Some years later.  I'm not sure exactly.  I

18   actually thought that the condition for the release of the

19   money was the land and not visa versa.

20      Q.    You mean you understood that Lou wouldn't pay

21   Chalon until it conveyed the land?

22      A.    Right.  Right.

23      Q.    Turn, if you would, to Exhibit 5, which is the next

24   exhibit in the movant's book.

25        And describe this document for the Court.

1     A.    This is the agreement between basically myself and

2    the Reese parties that had to do with the transfer of an

3    interest in my share of the land in exchange for Reese

4    entities paying the, I think $200,000 that was required to

5    settle the Stockbridge lawsuit.

6                    MR. KAUFMAN:   Your Honor, I offer Exhibit 5.

7                    THE COURT:   Any objection?

8                    MR. BEUTTENMULLER:   No objection, Your Honor.

9                    THE COURT:   5 is admitted.

10     Q.    As the result of this agreement, what were your

11    holdings in the property to be conveyed?

12     A.    They were -- went from 50 percent to 33 1/3

13    percent.

14     Q.    And what were Lou's holdings as a result of this

15    agreement?

16     A.    I think --

17     Q.    Did Lou have any holdings after this agreement?

18     A.    I think Lou no longer had any holdings.  They were

19    transferred, I believe, at this time to Susan and other Reese

20    entities.

21     Q.    You mentioned that you only traveled with Lou for

22    about a year.  Why did you stop?

23     A.    Well, I had some medical studies I wanted to

24    pursue.  I discovered that I really didn't have the

25    disposition for the real estate, nor the expertise, but

57

 1   definitely the disposition for real estate business.  And it

 2   just was time to get back down to my vocation.

 3        Q.   So what did you do once you returned from your

 4   travels, what did you do to return to your vocation?

 5        A.   I started working in emergency rooms, small

 6   emergency rooms throughout Texas.  I did a number of years of

 7   study of psychoanalysis at an institute in New York.

 8        Q.   Were you certified for any boards?

 9        A.   I -- because of all my hours, thousands of hours of

10   experience in Hawaii and subsequently and even prior to going

11   to Hawaii, I was eligible to take the Emergency Medicine

12   Boards, which I did in 1993.  And became a board certified

13   emergency physician in '93.  That enabled me to work in large

14   hospitals.

15        Q.   And so what have you done since?  What hospitals

16   have you worked at since --

17        A.   I've worked -- for a number of years I worked at

18   St. David's Hospital in downtown Austin.  And most of my work

19   has been at a community hospital in Victoria, Texas.  And

20   I've been there, basically, for the last 20 years.  I would

21   leave there part-time and work there part-time and work at

22   St. David's or another hospital in Austin.  But I've had a

23   relationship with that facility for over 20 years.

24        Q.   What facility is that?

25        A.   It's Detar Hospital -- it's Detar Health Care

1    System.   Actually there's two hospitals there; a general

2    medicine hospital, also, a limited children's hospital.

3        Q.    And what's your position at those hospitals?

4        A.    I'm the medical director of the emergency

5    department.

6        Q.    Let's return -- returning back to the land in

7    Hawaii.  By the mid to late 1990s, what was going on with the

8    land in Hawaii?

9        A.    Well, mid to late 1990s we were finally in that

10   time frame able to take title to the mountain portion of the

11   property.  And --

12       Q.    Was the -- had the debtor been formed by this time,

13   Pacific Plains Company, LLC?

14       A.    In '97 --

15       Q.    1997.

16       A.    Yeah.

17       Q.    Did you visit Hawaii during this span of time in

18   the '90s before the debtor was formed?

19       A.    Yeah.

20       Q.    How frequently?

21       A.    I tried to spend 30 days a year there during those

22   years.

23       Q.    And what did you do during your trips to Hawaii?

24       A.    Well, I would meet with the surveyor.  I would

25   spend a lot of time just hiking and exploring the land.  I

59

```
 1   would meet with local community leaders.  We had an idea, Lou
 2   and I had an idea to develop a project called Kohala Mountain
 3   Camps.  And that was basically to be a high-end camp ground
 4   with sort of simple cabins.  But -- and the idea was for
 5   people going back and experiencing the simplicity and beauty
 6   of the land.  And every treat -- we had big ideas.  We wanted
 7   to change the world.
 8        Q.   Now, during this time before the debtor was formed
 9   and before anyone acquired -- before Chalon committed title
10   to the property, how did you and the other beneficiaries
11   communicate about the status of the land conveyance?
12        A.   Either by telephone or in person.
13        Q.   Who did you communicate with?
14        A.   Lou.
15        Q.   Any of the other beneficiaries?
16        A.   And David Fuertes on a regular basis.  And regular,
17   though occasional basis, Jeff Grad.
18        Q.   Did you discuss the developments with Susan Reese?
19        A.   Yes.  I mean, not as extensively.
20        Q.   Was Larry Vineyard involved in any of the
21   management at this time?
22        A.   Not to my knowledge.
23        Q.   Now, you mentioned the debtor was formed in 1997.
24   I want -- I'd like for you to turn, if you would, to Exhibit
25   6 in the movant's book.
```

```
 1          Have you seen this document before?

 2     A.    Only recently, yes.

 3     Q.    Could you describe it for the Court?

 4     A.    These are escrow instructions for the North Kohala

 5  property.

 6     Q.    And who is the writer of this letter?

 7     A.    Susan.

 8     Q.    In what capacity?

 9     A.    President of Madison Pacific Development Company.

10     Q.    And what's the date of the letter?

11     A.    November 10th, 1996.

12               MR. KAUFMAN:  Your Honor, I offer Exhibit 6.

13               THE COURT:  Any objection?

14               MR. BEUTTENMULLER:  No objection.

15               THE COURT:  6 is admitted.

16     Q.    What are the instructions in this letter?

17     A.    I think the instructions are to place this amount

18  of, this $182,054 into an escrow on behalf of Madison

19  Pacific.

20     Q.    Do you see in the third paragraph there that

21  begins, These funds are to be held?

22     A.    Yes.

23     Q.    Why is Susan wiring these funds to the title

24  company?

25     A.    So that Chalon can be paid these -- these are the
```

```
 1   funds that are help for the legal fees.

 2        Q.   These funds are being paid to satisfy Lou's

 3   obligation --

 4        A.   Yes.

 5        Q.   -- to Chalon?

 6        A.   Yes.

 7        Q.   Did you know that Madison Pacific was escrowing

 8   these funds?

 9        A.   Yes.

10        Q.   Did you know that these funds were being wired to

11   satisfy condition for the debtor's ability to obtain title to

12   the property?

13        A.   I didn't -- no, I didn't know that.  I mean, I knew

14   that there was an agreement.  But I didn't think that was the

15   condition.

16        Q.   Would you turn to -- and we're going to jump a

17   little bit -- to Exhibit 66 in the movant's book?

18        Have you -- I'm sorry.  Let me know when you're there.

19        Could you identify this document?

20        A.   It's a promissory note dated May 29th, 1996.

21        Q.   Who is the maker of the note?

22        A.   Pacific Plains.

23        Q.   And who is the beneficiary, the payee?

24        A.   Susan Reese and related entities.

25             MR. KAUFMAN:  Your Honor, I offer Exhibit 66
```

NATIONAL COURT REPORTERS (214) 651-8393

1   for admission.

2                    THE COURT:  Any objection?

3                    MR. BEUTTENMULLER:  No objection, Your Honor.

4                    THE COURT:  66 is admitted.

5        Q.   When's the first time you recall seeing this

6   document?

7        A.   The first time I recall seeing this was during the

8   Snell lawsuit.

9        Q.   What period was that?

10       A.   That was 2008 to 2009.

11       Q.   So did you know it existed at the time in 1996?

12       A.   No.

13       Q.   Had the debtor even been formed at this time?

14       A.   No.

15       Q.   Now, flip back in your book to Exhibit 11, if you

16   would.  I'm sorry, Exhibit 13.

17        Have you seen this document, these pages before of this

18   document?

19       A.   Yes.

20       Q.   What is it?

21       A.   It's the rules, or it's the regulations of Pacific

22   Plains.

23                    MR. KAUFMAN:  Your Honor, I offer Exhibit 13

24   for admission.

25                    THE COURT:  Any objection?

1          MR. SPECTOR:  No, Your Honor.

2          MR. BEUTTENMULLER:  No, Your Honor.

3          THE COURT:  13 is admitted.

4     Q.   Do you know who prepared this document?

5     A.   John Brody.

6     Q.   Who's John Brody?

7     A.   John Brody is an attorney in Fort Worth who was

8  also a classmate of Lou's and mine at St. Mark's and was also

9  a very good friend of Lou's.

10    Q.   Did you have any opportunity to give your input

11 into the formation of this document?

12    A.   I didn't give any input.  I don't know if I had any

13 opportunity.  I wasn't aware of an opportunity.

14    Q.   And I think I may have asked this before.  But does

15 this document give you a seat on either a board of directors

16 or as a manager for the company?

17    A.   No.

18    Q.   Who is the manager under this document?

19    A.   Susan.

20    Q.   What's the date of this document?

21    A.   March 18th, 1997.

22    Q.   Do you recall if that was the date that the debtor

23 was formed?

24    A.   As far as I recall.

25    Q.   Now, turn in your book to Exhibit 32, Movant's

1  Exhibit 32.

2      Could you just describe what you see identified as the

3  document for the Court?  What's the title of it?

4      A.   It's the resolution of the sole manager of Pacific

5  Plains Company, LLC.

6      Q.   And down at the bottom, what is the date, the

7  effective date of the document?

8      A.   18th of March, 1997.

9      Q.   And who signed it?

10     A.   Susan.

11     Q.   In what capacity?

12     A.   Sole manager of Pacific Plains.

13             MR. KAUFMAN:  Your Honor, I offer Exhibit 32

14  for admission.

15             THE COURT:  Any objection?

16             MR. BEUTTENMULLER:  No objection.

17             THE COURT:  32 is admitted.

18             MR. KAUFMAN:  For that matter, Your Honor, I'd

19  like to offer a series of exhibits, which are all of the

20  debtor's -- Exhibits 31 through 56, which are resolutions of

21  the manager of Pacific Plains.

22             THE COURT:  All right.  31 through 56 have

23  been offered.  Any objections?

24             MR. BEUTTENMULLER:  Judge, may I take a minute

25  to look at these?

65

```
 1                    THE COURT:  Okay.

 2                    MR. SPECTOR:  31 through 56?

 3                    THE COURT:  Yes.

 4                    THE WITNESS:  Judge, may I stand up and blow

 5   my nose?

 6                    THE COURT:  All right.  Let's --

 7                    MR. KAUFMAN:  Take a brief recess?

 8                    THE COURT:  -- just go ahead and take a --

 9                    MR. KAUFMAN:  And, Your Honor, this may be a

10   good time for housekeeping to see -- because there are a lot

11   of exhibits that are one page at a time that I'll offer for

12   admission.  And if there are no objections, we'll get that

13   taken care of.

14                    THE COURT:  All right.  Well, they're going to

15   at least be reviewing 31 through 56 in the break.  Let's take

16   a 10 minute break.

17                    MR. KAUFMAN:  Yes, Your Honor.

18                    THE WITNESS:  Thank you.

19                        (Brief recess ensued.)

20                    THE COURT:  All right.  Please be seated.

21        We're going back on the record in Pacific Plains

22   Company, LLC.  You may resume with your questions of

23   Dr. Brand.

24                    MR. KAUFMAN:  Your Honor, we left off, I

25   believe we were looking at Exhibit --
```

1                    THE COURT:  31 through 56 you had offered.

2         Any objection to those?

3                    MR. BEUTTENMULLER:  No objection.

4                    MR. SPECTOR:  No, Your Honor.

5                    MR. KAUFMAN:  And I've also asked Mr.

6    Beuttenmuller and Mr. Spector if there were any objections to

7    the admission of 14 through 30, and 56 through 87.

8                    MR. SPECTOR:  I'm sorry.  56 through?

9                    MR. KAUFMAN:  14 through 31.

10                   MR. SPECTOR:  Right.

11                   MR. KAUFMAN:  56 through 87.

12                   MR. BEUTTENMULLER:  I have problems, Your

13   Honor, with 25 and 63.  They appear to be mis-compiled.

14                   THE COURT:  All right.  Let's take this in

15   chunks.  First, I'm admitting 31 through 56.  There were no

16   objections.

17        So do I understand with the exception of number 25,

18   there are no objections to 14 through 30?

19                   MR. BEUTTENMULLER:  Correct, Your Honor.

20                   THE COURT:  All right.  So 14 through 24 and

21   26 through 30 will be admitted.

22        What about -- what is your response to number 25,

23   Mr. Kaufman?

24                   MR. KAUFMAN:  They say it's mis-compiled.

25   This is what was produced.  I even left the Bate labels on

1   them.  This is all that was produced to me.  So it's the

2   debtor's document and that's why I'm offering it.

3                 THE COURT:  All right.  Well, for now I won't

4   admit it.  And if you want to prove up the admissibility,

5   accuracy, whatever later, you may attempt to do so.

6        56 through 62 and 64 through 87 there's no objection

7   to, correct?

8                 MR. SPECTOR:  Your Honor, I wasn't here when

9   Mr. Kaufman asked us to look at 56 through 84, so I'm

10  flipping through them right now.

11                THE COURT:  Okay.

12                MR. KAUFMAN:  Which one is there an objection

13  to, I'm sorry?

14                THE COURT:  He said 63.

15                MR. BEUTTENMULLER:  63 is apparently missing

16  pages.

17                MR. KAUFMAN:  Okay.  I'll prove that up as

18  necessary.

19                THE COURT:  Okay.

20                MR. SPECTOR:  Your Honor, I'm going to agree

21  through 75.

22                THE COURT:  All right.  So 56 through 62

23  there's no objection, so those will be admitted.  And then 64

24  through 75?

25                MR. SPECTOR:  Except for Mr. Beuttenmuller's

1   issue with, I think it was --

2              THE COURT:  No.  That was 63.

3              MR. SPECTOR:  That was 63, I'm sorry.

4              THE COURT:  So 64 through 75 will be admitted.

5   And then 76 through 87 you're going to reserve the right to

6   object on a prove up?

7              MR. SPECTOR:  Your Honor, I don't think this

8   witness knows anything about these documents.  But if he

9   does, then he's free to ask him about them.

10             THE COURT:  All right.  So 76 through 87

11  you'll have to prove up.

12        All right.  You may proceed.

13     Q.   All right, Dr. Brand, let's turn to Exhibit 31 --

14  I'm sorry, 32.

15        Could you describe what this resolution is resolving?

16     A.   It's resolving that Susan Reese be the sole

17  manager.  It's the resolution of Susan Reese resolving --

18     Q.   In that last paragraph?

19     A.   Yeah.  It's resolving some initial expenses to

20  be -- that were --

21     Q.   Is it ratifying that note of May 29th, 1996?

22     A.   Yes.

23     Q.   Is it allowing an interest rate to be accrued on

24  the debt in that promissory note?

25     A.   Yes.  At a rate of 12 percent per year

1   compounded -- accruing and compounded annually.

2       Q.   Do you recall if this resolution or this concept

3   was discussed with the other members of the company upon its

4   formation?

5       A.   No.

6       Q.   Do you recall authorizing it as a member of the

7   company?

8       A.   No.

9       Q.   Do you recall if any of the other members, other

10  than Susan Reese and SDL Partners agreed with it?

11      A.   No.

12      Q.   Did you realize that the 182,000 or so that was

13  escrowed for the payment of the Chalon fees was being born by

14  the company as a debt?

15      A.   Not at that time.

16      Q.   Now, who were the initial members of the company

17  when it was formed in 1997?

18      A.   Initially it was --

19      Q.   And to help you, you can turn to Exhibit 13 and

20  flip to the last page.

21      A.   Exhibit 13?

22      Q.   Yes.

23      A.   Susan B. Reese, Jeff Grad, David Fuertes, SDL

24  Partners, Deborah Brand, and myself.

25      Q.   Now, we discussed how Susan Reese and SDL Partners

1   came to earn -- came to acquire their interest.  How did

2   Deborah Brand acquire her interest?

3       A.   Well, unfortunately, in the early '90s Deborah and

4   I got a divorce.  And as part of the divorce settlement, she

5   received half of my interest.

6       Q.   And did Deborah go on to re-marry?

7       A.   She did.

8       Q.   Who was her spouse after your divorce?

9       A.   Charles Snell.

10      Q.   You mentioned that Susan was the sole manager of

11  the company upon its formation.  Why was she appointed as the

12  sole manager instead of Lou?

13      A.   I don't think Lou wanted to be an official in the

14  company.  I think that he was concerned about some of the

15  other issues that were going on in his life.

16      Q.   What were those issues?

17      A.   I think in '97 he had returned from a stint in

18  prison and at some time thereafter there was -- he had to

19  declare personal bankruptcy.  I'm not sure it was --

20      Q.   Did he file that here in Dallas; do you recall?

21      A.   I think so.

22      Q.   When did Pacific Plains first receive title to any

23  of the 634 acres?

24      A.   1997.

25      Q.   What did it receive at that time?

1      A.     At that time it received the 484 acres that, what

2    we call the Mauka portion, or the mountain portion.

3      Q.     And what was the plan used for the Mauka land?

4      A.     Well, at that point --

5      Q.     You mentioned a Kohala Mountain Camp.  Tell us

6    about that effort.

7      A.     Well, Kohala Mountain Camp was an idea that

8    basically Lou and I had to take the land and use it as a

9    place for there to be a retreat center and camp, basically a

10   fancy campground.  And we worked on that diligently for a

11   period of a couple of years and spent (indecipherable word)

12   amount of money developing a concept and then presented the

13   concept before the County Planning Commission.  And they

14   ultimately refused us the permit.

15     Q.     Why were you permits refused?

16     A.     Well, my belief is that the larger landowner in

17   the, in North Kohala, who at that point was Chalon, did not

18   want us to have something going on at that moment, that they

19   felt competition from us and, in a sense, we had outshone

20   them by trying to do something with the land.  And they

21   basically had enough influence over the County Planning

22   Commission that it was -- we went through the motions of a

23   pretty elaborate presentation and did all that we felt we

24   could do, but it was clear from the get go that we -- at the

25   meeting that --

1    Q.   So there were some disputes between Chalon, or its

2  successor, and Pacific Plains in its venture to use the

3  property?

4    A.   Just opposition.  Not even an overt dispute.  There

5  was quite an opposition that manifested by the denial of our

6  request.

7    Q.   Could you turn in your book to Exhibit 73, which I

8  believe has been admitted.

9     What is this document?

10   A.   This is a promissory note.   The maker is Pacific

11  Plains.  And the payee is myself.

12   Q.   What's the date of the document?

13   A.   November 26th, 1997.

14   Q.   And who's the signatory to the document?

15   A.   Susan.

16   Q.   In what capacity?

17   A.   As the manager of Pacific Plains.

18   Q.   When is the first time you saw this document?

19   A.   The first time I recall seeing this document was in

20  the Snell lawsuit.

21   Q.   Which was, I'm sorry, when?

22   A.   2000 -- some time in 2008, 2009.

23   Q.   So you didn't know this document was being executed

24  in your favor?

25   A.   I was not aware of it.  Actually, the attorney

1  called me and said he had a promissory note there.  And I

2  said -- and I didn't know whether it was in my favor or to

3  my detriment.  And he said, No, it's in your favor.  I said,

4  Oh, great.

5      Q.   Do you recall when the efforts to -- I'm sorry, let

6  me back up.

7       In the efforts to build the Kohala Mountain Camp, who

8  was involved in those efforts?

9      A.   It really was Lou and myself and David Fuertes.

10 And then we hired several local consultants and an architect

11 from New York who designed the basic -- what now has become

12 the eco cabin on the land.  That was the prototype.

13     Q.   So -- I'm sorry, where is this eco cabin?

14     A.   It's on the mountain portion of the land.  It was

15 built in about 1996.

16     Q.   Who built it?

17     A.   Local guys built it.  Basically Lou had it built,

18 and I participated somewhat in that.

19     Q.   And you mentioned this was to be a prototype for

20 additional developments for the Kohala Mountain Camp?

21     A.   Exactly.

22     Q.   When did the efforts ultimately fail for Kohala

23 Mountain Camp; do you recall?

24     A.   I don't recall.  But it was probably in '98, '99.

25 I really don't recall.

74

1          Q.   Turn in your book, if you would,  to Exhibit 64.

2           Have you seen this document before?

3          A.   I don't recall seeing this.  I might have, but I

4    don't recall.

5          Q.   Who are the signatories on this document?

6          A.   Me.  Obviously I saw it.

7          Q.   Who else?

8          A.   Me and Lou and Susan and two attorneys that were

9    hired by Pacific Plains, Bud Quidiquit and Steve Lim.  And

10   then the vice president -- Chalon had changed names by then.

11   They had their own financial problems -- A Surety Kohala.

12   Their vice president signed.  Lou signed on behalf of

13   Fairfield.  And Susan signed on behalf of Madison Pacific.

14         Q.   And when was this agreement signed?

15              MR. SPECTOR:  I'm going to object.  The

16   witness has said he doesn't recall seeing this agreement.

17              THE COURT:  Sustained.

18         Q.   Do you recall seeing it now?

19         A.   Yes.  I signed it.  I recall seeing it.

20              MR. SPECTOR:  I'll object to the form.

21   Obviously he recalls seeing it now because it's been shown to

22   him.

23              THE COURT:  Sustained.

24         Q.   Do you recall a settlement agreement in 2003 being

25   signed by yourself, Susan, Lou, and Chalon, or the successors

1    to Chalon?

2          A.    Yes.

3          Q.    Do you remember what was going on around that time

4    concerning the property?  Did the debtor have the Makai land

5    yet?

6          A.    Well, no.  We were -- did not yet have the Makai

7    land.

8          Q.    Why not?

9          A.    It was an even more complicated process than the

10   Mauka land, because it was a consolidation, a re-subdivision,

11   re-subdivision of a -- there were a number of preexisting

12   lots contained in the property described here.  And the

13   process whereby we were able to consolidate those tax

14   (indecipherable word) keys and then redefine the actual lots

15   that they apply to.  It's a very lengthy process.

16         Q.    So was there an agreement that ultimately resulted

17   in the debtor being able to get the Makai land?

18         A.    Yes.

19         Q.    And do you remember signing it?

20         A.    Yes.

21         Q.    You do remember signing it?

22         A.    I don't -- well, I actually don't remember signing.

23   This is my signature, so I signed it.  But I don't

24   specifically remember signing this, I'll admit.

25         Q.    Were any of the other members of the debtor

1   signatories to that document?

2                   MR. BEUTTENMULLER:  Objection, Your Honor.

3   The witness doesn't recall the document.  How would he know

4   who the other signatories are.

5                   THE COURT:  Overruled.  You an answer, if you

6   know.

7        A.    Repeat the question.

8        Q.    David Fuertes, Deborah Brand --

9        A.    Jeff Grad, yeah.

10       Q.    -- the other members, were they signatories to this

11   document?

12       A.    No.

13       Q.    Do you recall if this agreement was ever discussed

14   or if the content of the agreement was ever discussed with

15   the other members of the debtor?

16       A.    Not specifically.  I'm sure that we discussed

17   generally what was going on.  But I don't remember the

18   conversation.

19       Q.    When did the debtor ultimately get title to the

20   Makai land?

21       A.    2006.

22                   MR. KAUFMAN:  And, Your Honor, I'm going to

23   offer Exhibits 144 -- I'm sorry, I've got the wrong book --

24   143 and 144.

25                   THE COURT:  143 and 144, any objections?

1           MR. SPECTOR:  No objection.

2           MR. BEUTTENMULLER:  No objection.

3           THE COURT:  143 and 144 are admitted.

4      Q.   I'm sorry, can you repeat when the debtor obtained

5  title to the Makai land?

6      A.   2006, I believe.

7      Q.   And what was the plan for the land, once it was

8  acquired?

9      A.   The plan was to complete the subdivision, or

10 consolidation and re-subdivision process.  And to create a

11 number of lots that would be desirable for sale.

12     Q.   Who was in charge of that process on behalf of the

13 company?

14     A.   Well, I think Lou was in charge of that process.  I

15 was involved in the -- some of the process, as well.

16     Q.   Did the debtor hire any professionals to assist in

17 that process?

18     A.   Yes, we did.  We hired a guy named Bill Moore, who

19 was kind of a land planner/consultant kind of guy.  In that

20 process we had to do early on an analysis, an assessment of

21 the biological resources there, birds, animals,

22 (indecipherable few words) kind of survey.  We had to do an

23 archeological survey.  I was involved with finding the people

24 to do those, to do those surveys.

25     Q.   And when was that process undertaken; do you

```
 1   recall?

 2       A.   I don't recall.  It was about the same time.  It

 3   all happened pretty much the same.  I would guess 2006 or

 4   early 2007 would be when we started.

 5       Q.   And did you obtain or receive status reports of the

 6   process -- of the progress of that process?

 7       A.   Periodically, yes.

 8       Q.   From whom?

 9       A.   Well, it -- either from the consultants that we had

10   hired or from Lou, if he had spoken with them more recently

11   than I had.

12       Q.   And would these communications be distributed?

13       A.   Sometimes in email, I think.  And more typically on

14   the telephone or in person.  A lot of this -- a lot of this

15   work we would do when we would go to Hawaii together and

16   spend time there and sort of --

17       Q.   Was Susan involved in this process in 2006?

18       A.   Somewhat.  Peripherally, I would say.

19       Q.   Was Larry involved in the process, Larry Vineyard

20   involved in the process during this time?

21       A.   Not to my knowledge.

22       Q.   What's the status of the consolidation and

23   re-subdivision right now; do you know?

24       A.   It's been just around the corner for several years.

25   I think they actually have made some significant progress
```

1  recently.  And the exact status, I don't know right this

2  second.  But I have -- believe that is a reasonable chance

3  the subdivision will be completed within six months.

4        Q.    I'm going to turn to the corporate governance of

5  the company.  You mentioned before Lou's passing -- when did

6  Lou pass away?

7        A.    June of 2008, late June.

8        Q.    And before that time, how did business get done for

9  the debtor?

10       A.    Most of it was done in -- when Lou was the lead.

11 And he and I would talk about whatever issue or the next step

12 in the subdivision, for example, or when we were going to do

13 Kohala Mountain Camps, or we did a kid's camp on the land for

14 several summers for kids that were having trouble in school.

15 All of those decisions were -- we would talk about together

16 and see what made the most sense and agree on it.  If we

17 disagreed, his opinion would be the dominant opinion.

18       Q.    Did you know who the officers of the company were

19 before Lou passed away?

20       A.    I knew that Susan was the manager.

21       Q.    Did you know if the company had any presidents,

22 vice presidents?

23       A.    Not that I knew of.  I mean, I assumed she was the

24 president, because I just figured that was --

25       Q.    Did you believe that you were an officer of the

1    company?

2        A.   No.

3        Q.   Do you recall executing any documents on behalf of

4    the company?

5        A.   I did.  I did.  And --

6        Q.   Can you give me an example?

7        A.   2004 Lou and David -- and David Fuertes was also

8    involved in this process.  He was always involved in the

9    conversations and thinking about what to do next and how to

10   proceed.  And he spoke to a lot of local people, including

11   the law offices from time to time.

12       In 2004 we were in Hawaii and David was using one of

13   the pastures for his family farm, his livestock.  And Lou had

14   agreed to let him have a lease on the land.  I think it was a

15   25 year lease.  And that was -- the terms were certainly

16   constructed, or agreed to while we were in Hawaii.  And Lou

17   asked me to sign that lease as vice president of Pacific

18   Plains.

19       Q.   Did you see any problem in doing that?

20       A.   No.  I didn't -- I didn't really think much about

21   it.

22       Q.   Why not?

23       A.   Because we were all in agreement that David should

24   use the pasture.  And I guess the feeling was that an

25   official from Pacific Plains should sign the document.  So

```
 1   Lou said, Just sign it as vice president and stuff.

 2        Q.   Did the company in those early days, I guess 1997

 3   through the end of 2000, early 2000s, did the company

 4   circulate any financial statements that you recall seeing?

 5        A.   Not that I recall.  I've seen some subsequently.

 6        Q.   When was the first financial statement?  When is

 7   the -- what's the earliest financial statement that you

 8   recall seeing?

 9        A.   Well, I recall seeing one some time around the time

10   of the Snell lawsuit.

11        Q.   Could you turn in your exhibit book to Exhibit

12   Number 50 -- I'm sorry, 61?

13         Could you describe this document?

14        A.   This is a letter dated November 13th, 2003.  And it

15   appears to be kind of a summary of where things are --

16        Q.   Who wrote the letter?

17        A.   -- in term of Pacific Plains -- Susan.

18        Q.   And who is the letter addressed to?

19        A.   Me.

20        Q.   Could you look at paragraph 7 there, which is at

21   the bottom of, I guess the second page, that says, Debtor 437

22   at the bottom there?  The paragraph that starts with,

23   Finances.

24         What's being discussed in that paragraph?

25        A.   The outstanding debt to Pacific Plains -- or from
```

1    Pacific Plains to Susan and myself.

2        Q.    What's the outstanding debt, according to this

3    paragraph?

4        A.    It looks like the outstanding debt is $659,711.

5        Q.    Skip down.  You see where there's a highlighted

6    number down about a little more than halfway down that

7    paragraph?

8        A.    Yes.

9        Q.    What does that say, that paragraph that starts,

10   Jim, you owe?

11       A.    It says, Jim, you owe $62,362.

12       Q.    Did that concern you?

13       A.    Yeah.

14       Q.    Why?

15       A.    Well, I didn't really understand -- I mean, I don't

16   remember seeing this letter at that point in time.

17       Q.    When's the first time you recall seeing this

18   letter?

19       A.    When -- I clearly recall it, because I reviewed it

20   a few days ago.  I would think that I probably -- there's a

21   good chance that I saw it in connection with the Snell

22   lawsuit.

23       Q.    Do you see on the third --

24       A.    But I did -- go ahead.

25       Q.    No, go ahead.

```
 1        A.    I mean, I had a sense that there was a debt out
 2   there.  It's not that I wasn't aware of that.
 3        Q.    So this letter is asking you to pay Susan
 4   $62,362.11; is that correct?
 5        A.    Yes.
 6        Q.    Was there a meeting after this letter was sent?
 7        A.    Not that I recall.
 8        Q.    On the page 3 and 4 appears to be -- well, could
 9   you describe what that is?
10        A.    This looks like a list of the monies advanced, the
11   actual monies advanced on the cost of subdividing the land
12   and taking title of the land.
13        Q.    What's the total amount of advances listed in this
14   schedule?
15        A.    298 -- almost $299,000.
16        Q.    And who -- according to this document, who advanced
17   that money?
18        A.    Susan Reese, or her entity or entities.
19        Q.    And on that first part of the schedule on the first
20   page, do you see an entry that's dated 11 -- November 25th,
21   1996?
22        A.    Yes.
23        Q.    What is that entry?
24        A.    That's the wire transfer to Island Title Company.
25   That's the $182,000 that was to pay the legal bills of
```

1  Chalon.

2      Q.    So of the almost $300,000 advanced as of this 2003

3  letter, 182,000 had been advanced to pay Chalon's fees?

4      A.    Yes.

5      Q.    And how much interest had accrued on this debt?

6      A.    Quite a lot.  I think it's another -- well, it

7  looks like it's at $384,000.

8      Q.    And, again, your testimony is you don't recall

9  seeing this prior to the Snell litigation?

10     A.    I don't recall seeing this prior to the Snell

11 litigation.

12     Q.    Now, the Snell litigation happened after Deborah

13 passed away; is that correct:

14     A.    Yes.

15     Q.    When did Deborah pass away?

16     A.    March 23rd, I think, 2007.

17     Q.    Describe briefly what happened.  What happened to

18 Deborah?

19     A.    Well, she had been rather sickly for a period of

20 time.  And then she got dramatically ill with sclerosis in

21 her patarenal, or kidney and liver failure and died very

22 precipitously.  She was only 57, I think.

23     Q.    Were you with her at the time?

24     A.    Well, we hadn't been married for a long time.  I --

25 Sarah was the decision maker.  And so I was at the -- Deborah

 1  never knew I was there, but I was at the hospital with Sarah

 2  when she was sorting through the end of life decisions for

 3  her mom.

 4      Q.   What, if anything, did Susan or Lou or the debtor

 5  do in response to Deborah's death in 2007?

 6      A.   Well, I think we went through the process of the

 7  rules and regulations.  I think there was notice a judge has

 8  reviewed recently of possible termination of the entire

 9  company if we didn't all agree that we wanted to keep the

10  company going.  And so all of the remaining members agreed to

11  that.  Then there was --

12      Q.   Well, I'll stop you.

13       Can you turn to Exhibit 27?

14       Is this the notice that Susan sent out to the other

15  members of the company?

16      A.   Yes.

17      Q.   And do you recall signing this document?

18      A.   Yes.

19      Q.   Does this document say anything about paying or not

20  paying Deborah or her survivors?

21      A.   No.  I don't think that's -- I think this is only

22  to continue the business of the company.

23      Q.   And then turn to Exhibit 91.  That should still be

24  in this book.

25       Describe this letter for the Court.

1          MR. SPECTOR:  Objection, Your Honor.  There's

2  no foundation where this exhibit --

3     Q.   Could you identify this document?

4          THE COURT:  Overruled.

5          MR. SPECTOR:  I'd like to voir dire the

6  witness on this document.

7          THE COURT:  Overruled at this time.  You can

8  try to lay the foundation.

9      So go ahead.

10    A.   This is the letter that was sent from John Brody to

11  Charles Snell in October of 2007.

12    Q.   Who is John Brody again?

13         MR. SPECTOR:  Your Honor, I'm sorry.  I don't

14  know how the witness is testifying that this is a letter that

15  he neither received nor sent.  I would like to voir dire the

16  witness on his personal knowledge about this letter before he

17  testifies as to what it is.

18         MR. KAUFMAN:  That's fine with me, Your Honor.

19         THE COURT:  All right.  I'll give you the

20  opportunity to voir dire.

21      Go ahead.

22              <u>VOIR DIRE EXAMINATION</u>

23  BY MR. SPECTOR:

24    Q.   Did you write this letter?

25    A.   No.

1      Q.    Did you receive this letter?

2      A.    No.

3      Q.    Okay.  So someone, and I'm not asking who, but

4   someone has told you what this letter is, correct?

5      A.    I've seen the letter.

6      Q.    I understand you've seen the letter.  But you don't

7   know that it was sent, correct?  You didn't personally

8   witness it being sent.

9      A.    I didn't personally witness it being sent.

10      Q.    And you didn't personally receive it?

11      A.    I didn't receive it.

12      Q.    So you have no idea whether it was ever sent,

13   correct?

14      A.    Incorrect.

15      Q.    Well, do you have any personal knowledge that it

16   was ever sent, other than through what someone else told you?

17      A.    I didn't receive nor send the letter.

18      Q.    Thank you.

19      A.    If that's what you're asking me.

20            MR. KAUFMAN:  Regardless of whether Dr. Brand

21   testifies about this document or not, I offer it for

22   admission as a document sent on behalf of the debtor.

23            MR. SPECTOR:  Until he lays the foundation

24   that shows it was sent on behalf of the debtor --

25            THE COURT:  Okay.  I sustain the objection.

1    It will not be admitted.

2                    DIRECT EXAMINATION CONTINUED

3    BY MR. KAUFMAN:

4    Q.   Was the debtor involved in any litigation following

5    Deborah's death?

6         A.   Yes.

7         Q.   How do you know that?

8         A.   I was named a defendant in the litigation.

9         Q.   And what was the substance of the -- what were the

10   substance of the allegations made against you and the other

11   defendants?

12        A.   The allegation basically was that we were refusing

13   to honor our -- give consideration for Deborah's share,

14   membership share in Pacific Plains upon her death.

15        Q.   Who was bringing the litigation?  Who was the

16   plaintiff?

17        A.   Charles Snell.

18        Q.   In what capacity?

19        A.   Her -- the widower.

20        Q.   Do you recall any discussion among the other

21   members, yourself and the other members of Pacific Plains to

22   respond to any demands that may have been made by Charlie

23   Snell?

24        A.   Yes.

25        Q.   What was the substance of those discussions?

1        A.    That would -- that's a discussion I would have had

2   with Lou.   And Lou's take on this was that the rules and

3   regulations called for a distribution at a person's death

4   based upon, I believe, the assets of the company and the land

5   basis -- and the basis of the land value was what he referred

6   to as the basis, which was zero.

7        Q.    Did you understand that?  Did you understand what

8   he was describing?

9        A.    I thought I did, yes.

10       Q.    Did you support -- so, effectively, was he saying

11  we're not going to pay Charlie anything?

12       A.    Effectively -- yes.

13       Q.    Did you support that position?

14       A.    I did.

15       Q.    Why?

16       A.    Well, it made legal sense the way it was presented

17  to me.  And I -- I went along with it.

18       Q.    Are you in the real estate business?

19       A.    No.

20       Q.    Do you regularly deal with basis and land?  Do you

21  understand -- did you understand what Lou was conveying to

22  you at the time?

23              MR. SPECTOR:  Objection; asked and answered.

24              THE COURT:  Overruled.

25       A.    I understood what explained, that what a basis was

```
 1   was the -- the -- what you paid for the land in the first

 2   place.  I understood that as a concept.  So I followed that.

 3        Q.   When did Charlie Snell commence this litigation

 4   against you and the others, the other members of the debtor?

 5        A.   Some time in 2008.

 6        Q.   Was Lou still alive at the time?

 7        A.   He was.

 8        Q.   Did you discuss the lawsuit with lour.

 9        A.   I did.  I did.

10        Q.   Where did that conversation occur?  Was this in

11   person?  On the phone?

12        A.   Perhaps both.  In person, for sure.

13        Q.   Where?

14        A.   For sure we discussed it somewhat in Montana in

15   June, shortly before his death.

16        Q.   What was in Montana?

17        A.   The Reese's had a home up there that they went to

18   every summer.  And I went there with my family to spend a

19   week in late June of 2008.

20        Q.   Did you feel at any point in discussing this

21   lawsuit with Lou, did you feel like he was trying to squeeze

22   you out or other members out of the company?

23             MR. SPECTOR:  Objection; relevance.

24             THE COURT:  Overruled.

25             MR. BEUTTENMULLER:  Objection; calls for
```

1   speculation by the reference and there's not any reference to

2   their conversation.

3                   THE COURT:  Overruled.

4        A.   I didn't -- no, I didn't feel that way, that I was

5   being squeezed out.

6        Q.   Did you ever discuss the growing debt of the

7   company with Lou?

8        A.   Only in general terms.

9        Q.   What was the substance of those discussions?

10       A.   Just that there was debt growing and that, you

11  know, we needed to look at it and deal with it.

12       Q.   Did you ever object to the debt specifically while

13  Lou was still alive?

14       A.   No.

15       Q.   Why not?

16       A.   Because I just felt like whatever was going on

17  would get worked out.  I mean, I really felt that way.  I

18  didn't realize it was at 12 percent interest.  And I also was

19  confident that I had put in, you know, enough money to cover

20  my sixth of the survey expenses, the land development, and --

21       Q.   Has your view of Lou changed since the Snell

22  lawsuit?

23       A.   Well --

24                   MR. SPECTOR:  Objection; relevance.

25                   THE COURT:  Overruled.

1      A.   Well, you know, he was a dear friend of mine for

2  most of our lives, really.  I've been disappointed as I -- as

3  I went through the process in that lawsuit and fully had to

4  come to terms with what the rules and regulations really

5  meant and then also the terms of what this large debt and

6  this high interest rate meant, I was disappointed that he

7  didn't, that the rules and regulations really just took care

8  of the majority owner.  And that was made clear to me by our

9  attorneys in Austin.  They suggested to us that we should

10  look at the rules and regulations and should modify them,

11  because they thought they were very poorly done.  And this

12  whole lawsuit grew out of the way we dealt with death.

13      I mean, subsequent to that, I moved my interest in an

14  LLC so in case I died, my wife wouldn't go through the same

15  thing that --

16      Q.   What's the entity that now holds your interest in

17  the debtor?

18      A.   Mona Lisa, LLC.

19      Q.   Are you the sole manager -- sole member and sole

20  manager of that entity?

21      A.   Yeah.  Well, my wife may be a member, as well.  But

22  I'm not sure.

23      Q.   Okay.  Did you -- when did Lou pass away?

24      A.   Late June 2008.

25      Q.   So shortly after the Snell litigation was

1   commenced?

2       A.   Uh-huh.

3       Q.   Throughout the process of the Snell litigation --

4   well, first of all, when was the Snell litigation resolved?

5       A.   The very end of 2009.

6       Q.   And during this process, were there any efforts to

7   address the debt and the company's regulations among the

8   members?

9       A.   The -- there were conversations when the debt was

10  sort of fully revealed that were on record.   There were some

11  conversations.   And those conversations were started during

12  that process and continued after the lawsuit was settled.

13      Q.   After Lou's -- after Lou passed away, did things

14  change in the way that the company was managed?

15      A.   Dramatically.

16      Q.   How so?

17      A.   Well, prior to Lou's death, although he was the

18  lead decision maker and a very strong personality, we did

19  have conversations about things and sort of decided together

20  and included David Fuertes sometimes in those conversations

21  and in that decision making process.   And that all changed

22  dramatically after Lou died.

23      Q.   Who became -- who took Lou's place?   Who was in

24  control, or who were you talking to subsequent to Lou's

25  passing about the debtor's affairs?

94

1        A.    Susan and Larry Vineyard.

2        Q.    When's the first conversation you recall having

3   with Larry Vineyard about the company's management?

4        A.    The first thing I clearly recall would have been in

5   December of 2009.  There may have been some earlier.  But I

6   clearly recall we had breakfast on the morning of the

7   mediation for the Snell lawsuit.  Susan and Larry and I had

8   breakfast.

9        Q.    And what was the substance of that discussion?

10       A.    Well, we -- already I had raised questions based on

11  this, what I viewed as kind of a forbidding debt, as well as

12  the rules and regulations just not being fair and not being

13  clear, from my perspective and from the perspective of the

14  lawyers who were helping us.  And those questions had been

15  raised.  So there was some discord between -- or

16  disagreement, I would say, between Susan and myself and our

17  perception of these things.  And we had breakfast.  And at

18  the breakfast, after we spoke briefly and talked, we said,

19  We'll get together soon and talk about these issues.  But I

20  re-assured them that in the settlement mediation that we were

21  together, that I was -- I had no intention of doing anything

22  except what I thought was going to be best for all of us.

23  And at that point in time, that was for us to stick together

24  and get through this lawsuit.

25       Q.    Now, was the company earning revenue at this time

1   in December of 2009?

2        A.    No.

3        Q.    In December of 2009?

4        A.    December of 2009 -- oh, yes, excuse me.   In

5   December 2009 it was.

6        Q.    How was it earning revenue at that time?

7        A.    It leased some land to a zipline operator, an

8   operation called Big Island Eco Adventures.

9        Q.    How did that agreement come to fruition?

10        A.    That was -- in late 2007 I received a letter from a

11   man who lived in Kohala who I didn't know, but he had found

12   me.  And he said that he wanted -- was interested in leasing

13   some land from us.  He knew which land was our's.  And he

14   wanted to develop a zipline enterprise up there.  And so I

15   communicated with him and I told Lou about it.  And we set up

16   a meeting to meet with -- his name was Randy Andrews -- to

17   meet with him in April of 2008 when Lou and I already had a

18   trip planned out there for a week.  And he and David Fuertes,

19   and I met with -- and Lou met with Randy Andrews one day for

20   several hours and talked about his ideas and talked about

21   what he wanted to do.

22        Q.    And what resulted from that meeting in April of

23   2008?

24        A.    Shortly thereafter we -- after the meeting Lou and

25   I and David agreed that we should pursue this opportunity.

1    Andrews was willing to do the -- bear all of the expenses of

2    putting the project up.  And fairly shortly thereafter the

3    skeleton of a lease arrangement was negotiated and a letter

4    of intent was written, or was written as --

5         Q.    There was a letter.  I'm sorry you said there was a

6    letter of intent?

7         A.    I believe so, yes.

8         Q.    What was the substance of that letter of intent?

9         A.    As I recall, it generally described the land that

10   was to be used by the operator.  And it described the general

11   lease terms, in terms of payment that would be due and a

12   certain start date by when he had to be started and some of

13   the other specific conditions, which I don't recall.

14        Q.    So there wasn't a lease in place around this time

15   after the April 2008 meeting?

16        A.    No.  No.

17        Q.    When was a lease ultimately executed between -- was

18   there a lease ultimately executed?

19        A.    Ultimately there was one executed.

20        Q.    When was it executed?

21        A.    I believe it was probably executed like November, I

22   would guess, maybe December.

23        Q.    You don't have to guess.  Turn to Exhibit 93 in

24   your exhibit book.

25        A.    Yeah, September 30th.  There you go.

1      Q.   Have you seen this lease before?

2      A.   Yes.

3      Q.   Who are the parties to this lease?

4      A.   Big Island Eco Adventures -- DeLisa Andrews is the

5    wife of the gentleman I mentioned -- and Pacific Plains with

6    Susan as the manager.

7                MR. KAUFMAN:  Your Honor, I offer Exhibit 93.

8                THE COURT:  Any objection?

9                MR. SPECTOR:  No, Your Honor.

10                MR. BEUTTENMULLER:  No, Your Honor.

11                THE COURT:  93 is admitted.

12      Q.   Did you help in the negotiations of this lease?

13      A.   Yes.

14      Q.   How so?

15      A.   Well, I was there for the initial meetings.  The

16    initial contact with Mr. Andrews was through me.  And I

17    maintained constant contact through him throughout the

18    process.  After Lou passed away, the letter -- as I recall,

19    the letter of intent had been signed and Mr. Andrews had --

20    was already working on the property to clear the pass for

21    ziplines and had done an extensive amount of work.  And then

22    after Lou passed away there was great resistance on the part

23    of Susan and particularly her son, Beau, about going through

24    with the lease with --

25      Q.   Why was there resistance?

1      A.    The -- I believe they were concerned about issues

2  of liability.

3      Q.    Did you discuss their concerns with them?

4      A.    I did.  I did.  They said, Absolutely we're not

5  going to do this deal because it's too much risk.  And so I

6  actually few to Dallas and scheduled a meeting and met with

7  them in their offices and --

8      Q.    Who was present at that meeting?

9      A.    Susan and Beau and Larry and I think Bernie

10 Grennan.

11     Q.    Who's Bernie Grennan?

12     A.    Bernie Grennan was an associate of Reese Holdings

13 who is an attorney who worked in-house.

14     Q.    And about what time frame was this meeting in

15 Dallas?

16     A.    I would guess it was -- well --

17     Q.    Was it before this lease was executed?

18     A.    Yes.  It was definitely before the lease was

19 executed.  So earlier that -- it was about the time, shortly

20 before the lease --

21     Q.    What was the result from that meeting?  Were you

22 able to convey upon Larry, Beau, and Susan --

23     A.    Yeah, it was primarily Susan and Beau, really.  I

24 was able to convince them that, A, we had made a commitment

25 to this guy.  And that, B, it's what Lou wanted to have done.

1   And he believed in it.  And, C, we had a moral commitment

2   because the guy had been doing the work based on our

3   reassurances.  And I offered to find an expert in the

4   industry who would do a quality assessment of the project and

5   go out there and be instrumental in training the employees

6   and found the association of zipliners that you can be a

7   member of and be vetted by that particular association.

8        Q.   How much did the company have to expend to put up

9   this zipline with Randy Andrews and his company?

10       A.   They bore all the expense.

11       Q.   They being Randy Andrews and his company?

12       A.   They being Randy Andrews, right.

13       Q.   So the company didn't have to spend anything to get

14   the zipline up and running?

15       A.   No.

16       Q.   When did the revenue stream begin from Randy's

17   operations; do you recall?

18       A.   Around January of 2009.  I don't recall exactly.

19   But maybe December.  I think he opened in December of 2008.

20   So I guess the --

21       Q.   Had the debtor earned any revenue prior to the

22   commencement of that zipline?

23       A.   The only revenue that had been earned was in 2005.

24       Q.   Tell me about that revenue.

25       A.   There was -- in the Makai, or the oceanside

1    property, which is 149 contiguous acres, there was a one acre

2    carve out parcel in there that had a house on it.  And real

3    estate was at a very high level right then at that point in

4    time.  And the fellow who owned the house had -- had the

5    house under contract with a wealthy buyer.  And the wealthy

6    buyer wanted to be assured that his view of a pond and a

7    waterfall, which was near his house, would not be obstructed.

8    So the guy that was the seller contacted me -- I had known

9    him -- and said, You know, I want you to promise this guy you

10   won't build a house there.  And I'd be willing to pay

11   something.  And so I said, Well, okay.  Let me talk to my

12   associates about this.  And so I carried on several

13   conversations with the guy and set it up, made

14   arrangements -- Lou made arrangements when he was going to be

15   in Hawaii soon thereafter on other business to meet with the

16   current landowner and strike a deal with him whereby we,

17   Pacific Plains, would assure the new landowner we would not

18   build an obstruction -- a building that would obstruct his

19   view of the waterfall.

20        Q.   And how much did the debtor receive as a result of

21   this transaction?

22        A.   200,000 bucks.

23        Q.   And did the debtor even have possession or title of

24   the property at that time?

25        A.   It didn't.  Somehow we got permission from Chalon

1 | to --

2 |     Q.   So $200,000 revenue in 2005.  Was there any revenue

3 | prior to that time?

4 |     A.   Not that I'm aware of.  Not that I can recall.

5 |     Q.   And then the zipline, your testimony was the

6 | zipline began operating in late 2008, beginning of 2009; is

7 | that correct?

8 |     A.   Yes.

9 |     Q.   When did it stop?

10 |     A.   I think the last month of operation was July of

11 | 2011.

12 |     Q.   Was this early under the lease, early termination

13 | under the lease?

14 |     A.   Early termination under the lease.

15 |     Q.   Whose decision was it to terminate the lease early?

16 |     A.   The lessor -- the lessee.

17 |     Q.   Mr. Andrews?

18 |     A.   Mr. Andrews, yeah.

19 |     Q.   Why did Mr. Andrews terminate the lease early?

20 |           MR. BEUTTENMULLER:  Objection, Your Honor.

21 | Calls for hearsay.

22 |           MR. SPECTOR:  And speculation, Your Honor.

23 |           THE COURT:  Sustained, unless you lay a

24 | foundation.

25 |     Q.   Did you visit -- did you visit -- how often were

1  you visiting Hawaii around this time in 2008, 2009?

2       A.   Regularly, several weeks a year.  Usually two

3  visits.

4       Q.   You mentioned a trip to Hawaii in April of 2008 to

5  visit with Mr. Andrews.  Did you visit subsequently in 2008;

6  do you recall?

7       A.   In -- yes.  In late -- maybe either January of 2009

8  or early December of 2008.  I think it was early December

9  2008.

10      Q.   Who is Beau Reese?

11      A.   Lou and Susan's son.

12      Q.   Did Beau travel -- did Beau go out to visit the

13  property in 2008 or 2009?

14      A.   Yes.

15      Q.   When did Beau move out, or when did Beau go to

16  Hawaii?  When did Beau first go to Hawaii?

17      A.   In that time frame, I'm not sure.  But I would

18  think early 2009.

19      Q.   Do you recall a conversation with Beau in early

20  2009?

21      A.   I know that he made a plan to go out there and

22  pursue a sustainable farming operation.

23      Q.   When was that?

24      A.   I believe he went out there in early 2009.

25      Q.   Was this after Lou passed away?

1        A.   After Lou passed away.

2        Q.   What was the -- what's the sustainable farm

3   concept?  Describe that for the Court.

4        A.    Well, it was an idea that Lou was very taken with.

5   And basically it is a means of farming that is basically

6   organic and utilizes the best farming methods taking

7   advantage of wherever you are and -- we visited a farm in, I

8   believe, April of '08, a large group of us, that's kind of an

9   example of that.  It's a poly graze farm in Virginia.  And

10  that's kind of a famous model of this type of farming.  So

11  it's basically organic farming with an eye towards the best

12  possible use of the land.

13       Q.   Did Beau seek out to build that kind of a farm on

14  the property in Hawaii?

15       A.   Beau's original intentions were to -- or his

16  intentions were to build a farm modeled largely on the poly

17  graze model.

18       Q.   Did the other members of Pacific Plains Company

19  know that Beau was moving out to Hawaii --

20            MR. BEUTTENMULLER:  Objection.  Speculation

21  about --

22       Q.   -- for that purpose?  Did you know?

23            THE COURT:  Overruled.

24       A.   Yes, I did.

25            THE COURT:  Overruled.

```
 1        Q.    Did you know that Beau was moving out there?

 2        A.    Yes.

 3        Q.    When did you first learn that?

 4        A.    I think in early 2009.

 5        Q.    Was Beau already in Hawaii at the time?

 6        A.    I don't think so.  He had been living in Dallas at

 7   the time.

 8              THE COURT:  Mr. Kaufman, are we getting close

 9   to a stopping point?  About how much longer do you have?

10              MR. KAUFMAN:  Probably another 20 minutes.

11   But this is a fine stopping point, if you'd like.

12              THE COURT:  Let's go ahead and stop then.

13   It's about 8 minutes after 12.  I'm thinking we'd come back

14   at 1:30.  Is that good?

15              MR. KAUFMAN:  Yes.

16              THE COURT:  All right.  We'll reconvene at

17   1:30.

18                   (Lunch recess ensued.)

19              THE COURT:  We're ready to resume the motion

20   to appoint a Trustee hearing in Pacific Plains Company.

21   Where we left off, we had Dr. Brand on the witness stand.

22        Are we ready to resume, or do we have housekeeping

23   matters?

24              MR. SPECTOR:  We have a small housekeeping

25   matter.
```

1              THE COURT:  Okay.

2              MR. SPECTOR:  I have just been advised -- I

3    have a -- part of my practice is as a Receiver for companies

4    and businesses.  And I was advised over the lunch hour that

5    one of them plans to subpoena me to a hearing that was

6    scheduled this morning for tomorrow morning.  So I just

7    wanted to sort of let everybody know that the minute I knew

8    that.  When I walked into court there was no hearing

9    scheduled.  And as of noon, one of the people who scheduled

10   the hearing wants me to appear in Denton County tomorrow.

11             THE COURT:  All right.

12             MR. SPECTOR:  So that clearly throws a monkey

13   wrench into tomorrow.

14             THE COURT:  Well, it throws a monkey wrench.

15   You have another matter, though.  I mean, is it not

16   appropriate, perhaps, to pursue a motion to quash under --

17             MR. SPECTOR:  It would be, except I'm -- I'm

18   sitting here and I can't really do anything while I'm in

19   trial here.  I mean, I can draft up a motion to quash

20   tonight, but I don't know that it's going to be granted.

21             THE COURT:  Well, let me get it straight.  You

22   haven't been served with a subpoena yet.

23             MR. SPECTOR:  No, correct.  They've told me

24   they're going -- this was just a courtesy call, We're going

25   to serve you with a subpoena today.

106

```
1              THE COURT:  All right.  Well, they'll either
2   serve you during court or not.  I've never --
3              MR. SPECTOR:  I just don't want to -- I mean,
4   if I get served tonight at my house, I have a real problem,
5   because I have a requirement to be up in Denton, unless
6   there's a motion to quash granted.  So I just wanted to be as
7   up front about this as I could.
8              THE COURT:  Well, I understand.  But, you
9   know, we're in the middle of a hearing.  And so --
10             MR. SPECTOR:  Right.  And I will do my best to
11  get out of it.  And if Mr. Johnson has to come down and ask
12  the Court to continue the hearing on the basis that I've been
13  subpoenaed, I'm the only one ready for trial.  I hope the
14  Court will consider that.
15             THE COURT:  Okay.  Can he not take over in
16  this matter?
17             MR. SPECTOR:  He is not familiar with any of
18  this case.  He has not worked literally an hour on this case.
19             MR. ANDREWS:  Judge, for what it's worth on
20  the schedule.  I know this has been long this morning.  It's
21  our belief, depending upon the length of cross, that we'll be
22  done and that we can have the cross-examination of Susan and
23  Larry probably done in real short order.  I don't think it's
24  going to take the entire afternoon.  I don't know how long it
25  will take for them to put on their case.  But my point is, we
```

```
 1  may well be done by the end of the day.

 2              MR. SPECTOR:  That's great, Your Honor.  I

 3  didn't know how long they intended to go with their case in

 4  chief.

 5              MR. ANDREWS:  Yeah.  It's not going to take

 6  that much longer.

 7              THE COURT:  All right.  Well, we'll just hope

 8  we make very prompt progress so we don't have conflicts

 9  tomorrow.

10      All right.  I'm required to remind you you're still

11  under oath, Dr. Brand.

12      You may proceed, Mr. Kaufman.

13              MR. KAUFMAN:  Thank you, Your Honor.

14      Q.   Dr. Brand, before we took a recess for lunch we

15  were talking about Beau Reese and his involvement with Ohana

16  Farms.

17      Let's back up a minute.  You mentioned that after Lou

18  passed away and after -- through the process of the Snell

19  litigation a lot changed in the way that the debtor's

20  management was handled.

21      Can you give the Court a few examples of those

22  instances of the debtor's management or mis-management after

23  Lou passed away?

24      A.   Well, there were several things.  First of all, the

25  whole 20 year history of collaborative approach to this was
```

1   no longer adhered to.  The pasture lease that I mentioned

2   earlier with David Fuertes, our local partner, where he was

3   running his cattle was precipitously and without any

4   consultation, or warning, or anything cancelled by Susan one

5   day.  And he called me and asked me if I knew about it and I

6   said, No, I had no idea.  And so he sent me the email that

7   she sent him cancelling his lease, which at that point still

8   had 18 years, or so to run on it.

9        So I got involved and called Susan and said, you know,

10  why are we doing this?  We shouldn't do this.  We -- first of

11  all, it's pasture land.  We're not using it any way.  And,

12  secondly, why would we make an enemy, or potentially make an

13  enemy of, A, one of our members, and also someone who is the

14  only guy who is local that's there actually in the community

15  working on our behalf.

16      Q.   And did Susan back off of her position to cancel

17  that lease?

18      A.   She did.  She did.

19      Q.   What are some additional examples of instances

20  where management was handled differently post 2008?

21      A.   Well, the whole process whereby Ohana Farms came in

22  to have -- take a lease on the land was not done really in a

23  collaborative session -- fashion.  Beau went out there pretty

24  much on his own, or as far as I was concerned on his own

25  started this project.  And all of us supported it and

1    attempted to communicate with him and give him our support

2    and advice.  I'd been there for many years.  And he just sort

3    of barreled on on his own.  And then -- and I still supported

4    the lease.  I said, Okay.  Well, let's do this.  Lou had an

5    interest in this and I don't have a problem with it.  And so

6    then I received a proposed lease that supposedly had been

7    entered in between Susan and Beau.  And the first lease was

8    ridiculous.

9        Q.    Why was it ridiculous?

10       A.    Well, called for Pacific Plains to pay Beau to

11   lease the land and in exchange he was supposed to do some

12   fence maintenance and things that ordinarily would be the

13   duty of the lessee.  And so I protested.  And ultimately a

14   lease was negotiated that I was more comfortable with.  But

15   there's never been a follow-up on that lease.  And in spite

16   of my request for financial records, none of them

17   forthcoming.

18        Then -- and a function of the lawsuit with Snell was I

19   then got interested.  I saw this debt and I saw these things

20   and I was being told the rules and regulations were

21   manifestly unfair and needed to be changed.  And so I started

22   this process of trying to sort back through old records.  And

23   in the midst of that discovery that unbeknown to me, we had

24   borrowed money from Susan's father to purchase a photovoltaic

25   system that Beau had put in on his own nickel when he went

1  out to start this farm project.  And there was no

2  consultation with me, any way, or the other members about I

3  want to put in a photovoltaic system.  I think it would be

4  great.  He just did it.  And then he -- part of his lease was

5  to move over to another part of the land.  And the report

6  from Susan was that he was kind of running out of money and

7  she called me and said, You know, we should buy -- maybe we

8  could buy Beau's photovoltaic system.  I said, I'm not sure

9  we should do that.  He did that on his own and now he's

10  leaving.  And, you know, I don't think that's necessary or a

11  good idea.

12       And then as I requested financial records, I discovered

13  several years later that even after the conversation that she

14  had gone out and borrowed the money from her father --

15  Pacific Plains had borrowed the money from her father to

16  purchase this photovoltaic system.  Which it may have been

17  fairly priced, I don't know, but it had a 12 percent

18  interest.  And it wasn't until I got the complete tax records

19  that I saw this debt we were paying off.  Never any mention

20  of that whatsoever.

21       Q.   Would you turn in your exhibit book to Exhibit 98?

22  It's towards the end of Volume 1 of the movant's exhibits.

23       Could you identify this document?

24       A.   It's a promissory note between Pacific Plains and

25  Walter Berkowitz.

1        Q.    And who's Walter Berkowitz?

2        A.    Susan's father.

3        Q.    What's the date of this document?

4        A.    December 18th, 2009.

5        Q.    Does that coincide with the settlement of the Snell

6    litigation?

7        A.    It does.  It's about the same time.

8        Q.    And who signed this document?

9        A.    Susan.

10        Q.    In what capacity?

11        A.    As manager of Pacific Plains.

12              MR. KAUFMAN:  Your Honor, I offer Exhibit 98

13    for admission.

14              THE COURT:  Any objections?

15              MR. SPECTOR:  I don't have any, Your Honor.

16              MR. BEUTTENMULLER:  No objection.

17              THE COURT:  98 is admitted.

18        Q.    Was a draft of this promissory note circulated to

19    the members before it was executed?

20        A.    No.  This is actually the first time I think I've

21    seen this.

22        Q.    Was the concept of a loan from Mr. Berkowitz ever

23    discussed with other members, other than a brief phone call

24    between you and Susan?

25        A.    Well, this -- the concept of borrowing money to buy

1   the photovoltaic system was never discussed.  The concept of

2   buying the photovoltaic system from Beau was discussed.  And

3   I didn't think it was necessary to spend money at the tail

4   end of a huge lawsuit.  I didn't see why that would be a good

5   idea.

6        Q.   So no notice to members?

7        A.   No.

8        Q.   Did the company have a need for financing of any

9   equipment at the time?  Didn't it have cash on hand?

10                  MR. SPECTOR:  Objection, Your Honor,

11  foundation.

12                  MR. KAUFMAN:  I'm happy to lay --

13                  THE COURT:  Sustained.

14                  MR. KAUFMAN:  -- a foundation.

15                  THE COURT:  Sustained.

16       Q.   And at the time that this promissory note was

17  executed, was the company generating revenue?

18                  MR. SPECTOR:  Objection; foundation.

19                  THE COURT:  Sustained.

20       Q.   Are you -- was there a zipline running on the

21  debtor's property in 2009?  I think we already --

22       A.   Yes.

23       Q.   Was that operation generating revenue for the

24  benefit of the company?

25       A.   Yes.

113

```
 1        Q.   Was that continuing as of December 2009?

 2        A.   Yes.

 3        Q.   Did the debtor have cash on hand based on this

 4   revenue?

 5        A.   Yes.

 6        Q.   How was the Snell litigation resolved?

 7        A.   It was resolved by settlement at mediation.

 8        Q.   Would you turn to Exhibit 92 in your book?

 9         Is that the settlement agreement that was executed to

10   resolve the Snell litigation?

11        A.   Yes.  Yes.

12        Q.   Who are the signatories on that document?  Let me

13   phrase it this way, are you a signatory on this document?

14        A.   Yes, I am.

15        Q.   Is Susan Reese a signatory on this document?

16        A.   Yes, she is.

17        Q.   Is Pacific Plains a signatory on this document?

18        A.   Yes.

19             MR. KAUFMAN:  Your Honor, I offer Exhibit 92

20   for admission.

21             THE COURT:  Any objection?

22             MR. SPECTOR:  I have no objection.

23             MR. BEUTTENMULLER:  No objection, Your Honor.

24             THE COURT:  92 is admitted.

25        Q.   What was the ultimate resolution?  What were the
```

1   terms that were agreed upon to resolve the Snell litigation?

2       A.    Ultimately Mr. Snell's attorney fees were paid,

3   some at that moment and some over time.  And then Mr. Snell

4   was to be paid a total of $550,000 in four annual payments of

5   $137,500.

6       Q.    When was the first installment due?

7       A.    January 1st of this last year -- of this year.

8       Q.    2012?

9       A.    Yes.

10      Q.    You mentioned that following -- or beginning during

11  the Snell litigation and then subsequent to the resolution of

12  that litigation you had raised some concerns about the

13  regulations for the company and the growing debt.

14       Did you meet with Susan and any other representatives

15  of the company about this concern?

16      A.    Yes.

17      Q.    When did you -- when was the first -- when did

18  these meetings occur?

19      A.    Well, we -- you know, in the course of the lawsuit

20  we would have sort of side conversations about it.  But we

21  had a rather formally scheduled meeting, or a planned meeting

22  in Austin in February of 2010.

23      Q.    Who attended the meeting?

24      A.    Leon Komkauf, who is an attorney who is not my

25  attorney, but is a friend of mine and who was aware of

1   Pacific Plains since its creation and sort of aware of this

2   transaction and somebody who I have confidence in, as did

3   Susan, I think.  He's a smart, sort of rational guy.  It was

4   at his offices.  He was just there to sort of help us.

5        Q.   Who else attended?

6        A.   Sophia Collier, who is now the Trustee of Sarah's

7   Trust, Susan, and Larry Vineyard.

8        Q.   Did you understand that Larry was appearing in any

9   capacity for the debtor at the time, for Pacific Plains at

10  the time?

11       A.   No.  No.

12       Q.   What capacity did you believe he was appearing?

13       A.   I, at that point in time, regarded Larry as sort of

14  the (indecipherable word) of the Reese Holdings.  And I knew

15  that Susan -- I'd come to figure out that Susan relied

16  heavily on his opinion on matters and regarded him as a

17  trusted advisor for her.

18       Q.   Did you regard him as a trustworthy person?

19       A.   Not for me.

20       Q.   What was the substance of these discussions in

21  Austin in 2010?

22       A.   Well, the discussions, really, we addressed several

23  issues about concerns about the rules and regulations and

24  possible ways to create more than one manager, or super

25  majority necessary to expend X -- you know, some of the nuts

```
 1  and bolts of how the rules and regulations might be changed.

 2  We talked about the genesis of what was then -- everybody

 3  knew this huge debt that Pacific Plains was facing.  We

 4  talked about the origins of that and the reasonableness of

 5  that and whether each party felt they were reasonable.  Of

 6  course --

 7       Q.   Were there proposals on how to resolve it?

 8       A.   There were some general proposals.

 9       Q.   Were any of these proposals acceptable -- was there

10  any resolution to the concerns that you raised?

11       A.   There was no resolution.

12       Q.   Why not?

13       A.   Well, I think that -- ultimately I think that there

14  was a proposal, which was that this $182,000 debt would be

15  reduced --

16            MR. SPECTOR:  Your Honor, I'll object.  This

17  sounds a lot like (indecipherable word) material.

18            MR. KAUFMAN:  I'm sorry?

19            MR. SPECTOR:  It sounds like settlement

20  discussions.

21            THE COURT:  Response?

22            MR. KAUFMAN:  There was no litigation pending

23  at the time.  And I don't know that there was any privilege

24  attached to it or any admission of liability on any part.

25  And I don't intend to get into that.
```

```
 1              THE COURT:  Okay.  I'll overrule the
 2   objection.
 3        A.   Basically it was a proposal that Larry put forth
 4   that the interest rate be reduced to 10 percent, in exchange
 5   for which the note would be secured by the land.  It was an
 6   unsecured note at that point.  And this was the debt, the
 7   $182,000 --
 8        Q.   Concerning the Chalon debt?
 9        A.   Yes.  And so I protested that.  And at that meeting
10   it was suggested that we look at dividing up the assets.  And
11   I even told Susan at that meeting, or shortly after that I
12   thought we'd make better neighbors than partners.  And I
13   wanted to pursue that and look at that.  The talks didn't go
14   too far.  I think the problem was they were unwilling to come
15   off more than 10 percent, as I recall.  And I wasn't willing
16   to accept that.
17        Q.   Did the members eventually meet to discuss this
18   debtor all together?
19        A.   We did.
20        Q.   Would you turn to -- I'm sorry.  When was that
21   meeting?
22        A.   That was in April of 2010.
23        Q.   Who attended that meeting?
24        A.   Susan --
25        Q.   You said April 2010.  Did you mean April 2011?
```

```
 1        A.    No.  It was at the wedding in Hawaii.

 2        Q.    Okay.

 3        A.    That was April 2010.

 4        Q.    And who attended this meeting?

 5        A.    Susan and Larry and Jeff Grad and David Fuertes and

 6   myself.  It was the only time in all of the years we've all

 7   actually been in the same place to have a meeting.  We

 8   gathered in the morning at the hotel and talked about some of

 9   the issues.  One of the issues was this debt of the -- dating

10   back to the Chalon legal expenses.  And Jeff Grad stated at

11   that point that he thought that was Lou's responsibility and

12   was part of the Stockbridge lawsuit and it really didn't have

13   any place in Pacific Plains' responsibilities.  And --

14        Q.    Was there any resolution as a result of that

15   meeting?

16        A.    No.  Some months later I flew up to Dallas, again

17   to have lunch with Susan and try and talk about ways we could

18   work through this.  And what I told her was that if we all

19   came to the table in good faith, that we would find a way to

20   satisfy everybody, or come close to satisfying everybody.

21        Q.    Did you request, in connection with resolving this

22   concern about the debt, additional financial information from

23   the debtor?

24        A.    Yes.

25        Q.    Was that provided to you?
```

1          A.    Some of it was.

2          Q.    Would you turn to Exhibit 114, which will be in the

3     second volume of your book?

4           Can you identify this exchange?  Who's involved in this

5     exchange?

6          A.    Well, there's some exchanges between Susan and

7     Larry.  And then there's exchanges between me and Susan.

8          Q.    What's the date of this exchange, dates?

9          A.    Mine is July 16th, 2010.

10                    MR. KAUFMAN:  Your Honor, I offer Exhibit 114.

11                    THE COURT:  Any objection?

12                    MR. BEUTTENMULLER:  No objection, Your Honor.

13                    THE COURT:  114 is admitted.

14         Q.    In this email between Susan and Larry, Susan

15     appears to be saying, I say we just give him the financials

16     after your -- after you review.

17          What financials were you requesting?

18         A.    I was requesting the actual details of the

19     financial transactions of Pacific Plains.  In the meeting in

20     February of 2010 where we did request them at that time, we

21     were told, I think by Larry, that there was an accounting

22     system, Yardi, that kept all of these records.  And it was

23     impossible to go back and alter them in any way and suggested

24     that would be a good way for us to --

25         Q.    Do you know who owns or controls the Yardi System?

1      A.   No.

2      Q.   Would the Yardi System be managed by any member of

3    Pacific Plains?

4      A.   Possibly.

5      Q.   What managers or members of Pacific Plains would be

6    in control of the Yardi System?

7                MR. SPECTOR:  Objection, Your Honor.  He just

8    testified he doesn't know who manages the Yardi System.

9                THE COURT:  Sustained.

10     Q.   Did you understand that Madison Partners controlled

11   the Yardi System?

12               MR. SPECTOR:  Objection; leading.

13               THE COURT:  Sustained.

14     Q.   Did you ultimately receive the Yardi financial

15   documents that you requested?

16     A.   Never did receive the tax forms that were --

17   historically I would just receive a K-1 form each year.  I

18   think --

19               MR. BEUTTENMULLER:  Objection; non-responsive.

20               THE COURT:  Overruled.

21     Q.   Now, we talked a little bit about the secession of

22   the zipline operations.  When did that occur?

23     A.   July of 2011.

24     Q.   What happened?

25               MR. BEUTTENMULLER:  Objection; calls for a

1   narrative.  Calls for hearsay.  Calls for speculation.

2                    THE COURT:  Overruled.

3       A.   Basically we just -- Pacific Plains received notice

4   that effective, probably immediately, Big Island Eco

5   Adventures was ceasing operations on our property.

6       Q.   How much time was left on the lease?

7       A.   About 2 1/2 years, I think.

8       Q.   How much had the debtor earned in the 2 1/2 years

9   that had progressed under the lease?

10      A.   Somewhere around a million dollars.  I don't know

11  exactly how much.

12      Q.   In gross revenue?

13      A.   Gross revenue.  No, us, you mean the debtor?

14      Q.   How much had Pacific Plains received from Big

15  Island Eco Adventures?

16      A.   Close to a million dollars.

17      Q.   Was there any other source of revenue during that

18  time?

19      A.   No.

20      Q.   So when the lease effectively was terminated, did

21  the debtor have any source of income?

22      A.   Action against the operator.  But, no, no ongoing

23  business.

24      Q.   Did you meet or confer in any way with management

25  or the other members of Pacific Plains to discuss options for

1  future revenue following the termination by Big Island?

2       A.    Yes.

3       Q.    When did you meet with management or other members?

4       A.    In September of 2011.

5       Q.    Where was that meeting held?

6       A.    In Dallas.

7       Q.    And who attended that meeting?

8       A.    Larry and Susan and myself for part of the meeting.

9  Much of the meeting was a representative for the Original

10 Canopy Tours out of Costa Rica, San Jose, Costa Rica, a guy

11 named Darren Rank.

12      Q.    What was discussed at that meeting?

13      A.    The -- several things.  But primarily the zipline

14 operator sort of gave me his pitch and showed me his plans

15 and showed me, I think, some initial financial projections.

16 Susan said that she was confident we were going to make a

17 bunch of money.  And then also at that meeting Larry made the

18 statement that there's no way we can pay Charlie Snell.

19      Q.    Did you know at that time that Larry was an acting

20 officer of the company?

21      A.    No.

22      Q.    Have you since learned that Larry was an acting

23 officer of the company?

24      A.    When I read his deposition.

25      Q.    Could you turn to Exhibit 56 in your book?

```
 1        What is this document?

 2        A.    Resolution of the manager.  It appears to be

 3   electing Larry to the position of vice president of the

 4   company.

 5        Q.    Was that action ever discussed with other members?

 6        A.    No.

 7        Q.    Were the other members ever notified of that

 8   action?

 9        A.    Not that I'm aware of.

10        Q.    And was Larry at that time an officer of another

11   Reese entity?

12        A.    Possibly.

13              MR. SPECTOR:  Objection; foundation.

14              THE COURT:  Overruled.

15        Q.    Your answer was?

16        A.    Well, it says here he's an employee of Madison

17   Partners.

18        Q.    And who's Madison Partners?

19        A.    Madison Partners is one of the Reese management

20   companies.  And I think it's -- I believe that it holds the

21   promissory note that some of the money is owed to, I think.

22   It's a management company that is owned and run by Susan.

23        Q.    You said you came to Dallas to meet with Larry and

24   Susan and members of OCT on September 12th.  Were there any

25   subsequent meetings among the members or the management of
```

 1   Pacific Plains to discuss future generation of revenue?

 2        A.   It was September 11th.

 3        Yes.  We -- a few days -- a short -- I guess a couple

 4   of months later, early November, I think -- and subsequent to

 5   that meeting Larry had circulated a pro forma and we

 6   subsequently had a phone conference in November of 2011, a

 7   conference call whereby we discussed the -- some of the terms

 8   of the proposed lease and proposed business plan.  And we

 9   kind of shared our opinions about whether individual members

10   wanted to participate in this venture.

11        Q.   Could you turn to Exhibit 121 in Volume 2 of the

12   movant's exhibit binder?

13        And identify this document for me.

14        A.   This -- without reading it, this is an email Larry

15   sent to me sort of catching me up to date.

16        Q.   When was the email dated?

17        A.   October 17th, 2011.

18        Q.   And who did he send this email to?

19        A.   To me and to Susan.

20             MR. KAUFMAN:  Your Honor, I offer Exhibit 121.

21             THE COURT:  Any objection?

22             MR. SPECTOR:  I have no objection.

23             MR. BEUTTENMULLER:  No objection, Your Honor.

24             THE COURT:  It's admitted.

25        Q.   And turn to Exhibit 122.

1         What's the date of this exchange?

2    A.    November the 4th, 2011.

3    Q.    And who was involved in this exchange?

4    A.    This is from Larry to Susan, myself, Jeff Grad, and

5  David Fuertes.

6    Q.    And is this -- is the substance of this email

7  concerning the zipline, the proposed zipline?

8    A.    Yes.

9              MR. KAUFMAN:  Your Honor, I offer Exhibit 122.

10             THE COURT:  Any objections?

11             MR. BEUTTENMULLER:  No objection.

12             MR. SPECTOR:  No.

13             THE COURT:  122 is admitted.

14   Q.    Turn, if you would, in Exhibit 122 to what looks

15 like the fourth page.  At the top it says, OCT Hawaii

16 projects sales overview first year projections.

17   A.    Yes.

18   Q.    Do you see -- what's the total profit, I guess,

19 assumed or proposed under this document?

20   A.    It looks like $1.36 million for the first year.

21   Q.    And turn back to the second page of that exhibit,

22 which says, Pacific Plains, LLC ownership.

23      What's the proposed participation in that document for

24 you?

25   A.    For me?

1      Q.    Yes.

2      A.    You mean the 10/5/2011?

3      Q.    Yes.

4      A.    16.6 percent.

5      Q.    And so it's proposing that you would contribute how

6   much?

7      A.    $83,000.

8      Q.    And what's the total that would be -- what's the

9   total that's proposed to be invested under this --

10     A.    $500,000.  This is to raise $500,000.  The total

11  investment was set up to be about a million dollars.

12     Q.    And if you'd turn back, if you would, to Exhibit

13  121.  And I'm not going to ask you to read it, but if you

14  need it to refresh your memory, what was proposed under

15  Larry's proposal in October of 2011 to be contributed by

16  Pacific Plains to this venture?

17     A.    Pacific Plains was to -- was to contribute

18  $200,000, which I think may have been structured as a loan.

19  And then was also to contribute $150,000 in the form of

20  deferred rent payment.

21     Q.    Do you know how much cash the company had at the

22  time?

23     A.    Probably about, between 250 and $300,000.

24     Q.    Did you -- did you support the debtor contributing

25  money to this new venture?

1      A.   No.

2      Q.   Did you raise an objection to Susan and Larry?

3      A.   I did.  And on this telephone call, in fact, I said

4  I did not want the money that we had to go into this because

5  we had a debt to pay coming up soon.

6      Q.   Turn, if you would, to Exhibit 123.

7       Is this an email from you to Susan and the other

8  members of the company?

9      A.   Yes.

10     Q.   What's the date of the email?

11     A.   November 11th, 2011.

12     Q.   Is this basically restating some of your objections

13 that you stated on the phone?

14     A.   Yes.

15          MR. KAUFMAN:  Your Honor, I offer this Exhibit

16 123.

17          THE COURT:  Any objections?

18          MR. SPECTOR:  No.

19          MR. BEUTTENMULLER:  No objection, Your Honor.

20          THE COURT:  123 is admitted.

21     Q.   When was the first time, if at all -- did Susan or

22 Larry ever propose to just not pay Snell on January 1st,

23 2012?

24     A.   The first time I recall hearing it was in the

25 September meeting in Dallas.

1      Q.   And what was your position on that?

2      A.   I said, We have to pay him.  I said, I'm not crazy

3  about paying him, either.  But we lost that lawsuit and we

4  have to pay him.

5      Q.   How many payments could the debtor have made under

6  the Snell settlement agreement?

7      A.   At this point in time, we had cash for two.

8      Q.   Two payments?

9       Are you familiar with an entity called OCT Kohala, LLC?

10      A.   I've come to be familiar with it, yes.

11      Q.   What's your understanding of this entity?

12      A.   My understanding of the entity is that it was set

13  up to be the management or operations and owner of the

14  zipline, proposed zipline operation on our land.

15      Q.   And who -- based on what your understanding is, who

16  owns this entity?

17      A.   Susan.

18      Q.   Susan, or does the company --

19           MR. SPECTOR:  Objection; foundation.

20      A.   The --

21           THE COURT:  Overruled.

22      A.   Well, I've come to understand the company, I guess,

23  owns it.

24      Q.   And who manages it?

25      A.   I think Larry Vineyard is the sole manager.

1      Q.   Was the -- was the structure of OCT Kohala ever

2  discussed with the other members, the corporate structure?

3      A.   No.

4      Q.   Was appointing Larry Vineyard as the sole manager

5  of the company ever discussed with the other members of

6  Pacific Plains?

7      A.   No.

8      Q.   When did you first learn that the entity had been

9  formed?

10     A.   I think it was in the spring of this year when we

11  found out that -- we had declared bankruptcy and found out

12  that we had been sued by Snell.  I found out that we hadn't

13  paid Snell.  I assumed that we had paid him in January.

14  Nobody said anything about it.  I assumed that we had.  So

15  some time in that same time frame this all came to light.

16     Q.   Would you --

17          MR. KAUFMAN:  Your Honor, at this time I'm

18  going to offer Exhibits 131, 132, 133, and 134, which are the

19  schedule of assets and liabilities, and statement of

20  financial affairs.

21          THE COURT:  131 through 134?

22          MR. KAUFMAN:  Yes, Your Honor.

23          THE COURT:  I assume there's no objection?

24          MR. SPECTOR:  That is correct, Your Honor.

25          MR. BEUTTENMULLER:  No objection, Your Honor.

1              THE COURT:  Those are admitted.

2      Q.   Dr. Brown, have you reviewed the debtor's statement

3 of financial affairs that were filed in this case?

4      A.   Not in detail.  No, really haven't.

5      Q.   Would you turn to -- have you come to understand

6 that the company transferred $250,000 to OCT Kohala?

7      A.   Yes.

8      Q.   When did that transfer occur?

9      A.   I think it occurred right before the end of the

10 year 2011.

11      Q.   How did you first learn about this bankruptcy

12 filing?

13      A.   In an email from Susan in March of this year.

14      Q.   Could you turn to Exhibit -- well, let's start with

15 Exhibit 125.

16       Do you recall receiving this email?

17      A.   Yes.

18      Q.   What's the date of the email?

19      A.   March 8th, 2012.

20      Q.   Who sent it?

21      A.   Susan.

22      Q.   And what's the subject of it?

23      A.   Pacific Plains call.

24              MR. KAUFMAN:  Your Honor, I offer Exhibit 125.

25              THE COURT:  Any objections?

1          MR. SPECTOR:  No, Your Honor.

2              MR. BEUTTENMULLER:  No, Your Honor.

3              THE COURT:  125 is admitted.

4     Q.   What is Susan proposing in this email?

5     A.   Just a conference call that happened the next day

6  apologizing for the short notice.

7     Q.   Would you turn to Exhibit 126?

8      And, again, identify this document.

9     A.   This is the same day, 40 minutes later.  The

10  subject now is, Cancellation Pacific Plains call.

11             MR. KAUFMAN:  Your Honor, I offer Exhibit 126.

12             THE COURT:  Any objection?

13             MR. SPECTOR:  No, Your Honor.

14             MR. BEUTTENMULLER:  No objection.

15             THE COURT:  126 is admitted.

16     Q.   And turn to the next exhibit, 127.

17      And identify that document.

18     A.   This is the United States Bankruptcy Court Northern

19  District.  I guess it's the --

20     Q.   Is this the voluntary petition filed by Pacific

21  Plains Company?

22     A.   Yes.

23     Q.   What's the -- what's the time stamp up at the top?

24     A.   March 14th, 4 p.m.

25             MR. KAUFMAN:  Your Honor, I offer Exhibit 127.

132

```
1              THE COURT:  Any objection?

2              MR. SPECTOR:  No objection.

3              MR. BEUTTENMULLER:  No objection.

4              THE COURT:  127 is admitted.

5       Q.   And let's turn to Exhibit 128.

6        And please identify that document.

7       A.   This is March 14th, an email from Susan to --

8  regarding Pacific Plains sent March 14th at 4:37 p.m. to

9  myself, Jeff Grad, David Fuertes, Sophia Collier, Larry

10 Vineyard, Rudy Beuttenmuller, and Howard Spector.  And this

11 tells us, Please see attached memo.  I think this is the memo

12 where --

13      Q.   I'll stop you.

14              MR. KAUFMAN:  I'll offer Exhibit 128.

15              THE COURT:  Any objection?

16              MR. BEUTTENMULLER:  No objection.

17      Q.   Is this the memo you --

18              THE COURT:  128 is admitted.

19      Q.   Is this the memo that you referenced receiving from

20 Susan advising you about the bankruptcy filing?

21      A.   Yes.   This was the first word of it.

22      Q.   This is the first time you heard that the company

23 had -- was contemplating bankruptcy?

24      A.   Yes.

25      Q.   Does this reference the second round of litigation
```

```
 1  by Charlie Snell?

 2       A.   Yes.

 3       Q.   Is this the first time you were brought -- notified

 4  of that?

 5       A.   Yes.

 6       Q.   How did that make you feel?

 7       A.   Well, pretty horrible and angry.

 8       Q.   Was this conduct that Lou would have conducted of

 9  the company if he were still around?

10            MR. SPECTOR:   Objection, Your Honor.  Calls

11  for speculation.  Mr. Reese is deceased.

12            THE COURT:   Sustained.

13       Q.   Why did you feel that way?

14       A.   Well, because historically we would have talked

15  about any of these matters that as a matter of course -- this

16  is -- from my naive perspective, this is a dramatic action

17  and a drastic action.  And I would think there's a

18  responsibility and a duty to all of the members of the LLC to

19  talk about something of this nature.  And being sued in

20  January and not even hearing about it until March is crazy

21  making.

22       Q.   Could you turn to the next exhibit, 129?

23        And identify this document.

24       A.   This was an impetuous email that I sent to Susan

25  the next day, two days later.
```

134

```
 1                    MR. KAUFMAN:  Your Honor, I offer Exhibit 129.

 2                    THE COURT:  Any objection?

 3                    MR. BEUTTENMULLER:  No objection, Your Honor.

 4                    MR. SPECTOR:  No, Your Honor.

 5                    THE COURT:  129 is admitted.

 6        Q.    And the following exhibit, 130, please identify

 7   that.

 8        A.    This is an email from Susan.

 9        Q.    What's the date?

10        A.    March 18th, two days later.

11                    MR. KAUFMAN:  Your Honor, I offer Exhibit 130.

12                    THE COURT:  Any objection?

13                    MR. BEUTTENMULLER:  No objection.

14                    MR. SPECTOR:  Nope.

15                    THE COURT:  130 is admitted.

16        Q.    Have you reviewed the plan, the most recent plan

17   filed by Pacific Plains?

18        A.    Not in detail.

19        Q.    Are you familiar with the substance of the

20   proposal?

21        A.    I think so.

22        Q.    What's your view of the plan?

23        A.    Well, my understanding of the plan is it calls for

24   a cash infusion in exchange for a 15 percent ownership of the

25   company.
```

1       Q.    Are you open to making that kind of an infusion

2    under the terms proposed?

3       A.    Well, no.

4       Q.    Why not?

5       A.    Because nothing has changed.  There's no change in

6    management.  There's no change in decision making.  There's

7    no change in leadership.  There's no -- there's still no

8    voice to the other members.

9       Q.    If you were to infuse $500,000 under the currently

10   proposed plan, what would Susan Reese's collective holdings

11   in the company be?

12      A.    Something like 51 percent.

13               MR. KAUFMAN:  Your Honor, I have no further

14   questions.

15               THE COURT:  All right.  Cross-examination?

16               MR. SPECTOR:  Your Honor, may I approach with

17   our binders?

18               THE COURT:  You may.

19                 CROSS-EXAMINATION

20   BY MR. SPECTOR:

21      Q.    You see the red and black binder in front of you?

22      A.    Yes.

23      Q.    Okay.  Could you start with the large red binder

24   for me?

25        These are organized in terms of time.  So I'm just

 1   going to sort of go on a time line through the history of

 2   this project.  Exhibit 1, can you identify that document for

 3   me?

 4        A.   Yes.  This is a letter from me to David Fuertes,

 5   Jeff Grad, and Susan.

 6        Q.   Okay.  And in that you talk about your efforts to

 7   get to work on an eco tourism type of facility, correct?

 8        A.   Yes.

 9        Q.   So that was a development that you supported since

10   at least 1995?

11        A.   Yes.

12        Q.   Let's skip over to Exhibit 3.

13                  MR. SPECTOR:  Debtor offers Exhibit 1.

14                  THE COURT:  You offer 1?  Any objection?

15                  MR. KAUFMAN:  No objection.

16                  THE COURT:  1 is admitted.

17        Q.   Let's skip over to Exhibit 3.

18         Your counsel asked you about this document before,

19   right?

20        A.   Yes, I believe so.

21        Q.   This is the promissory note that the debtor made

22   payable to you dated November 26th, 1997.

23        A.   Yes.

24        Q.   And is it your testimony that you're sure you

25   didn't see this until the latter part of 2007, 8, 9, or you

137

```
 1   might have seen it and you just don't remember?

 2        A.   Well, my first recollection of seeing it was after

 3   the attorney called me and told me he had seen the note.  So

 4   I don't have a recollection prior to that.

 5        Q.   Okay.  You do agree, though, that you loaned

 6   $50,000 to the debtor around 1997, right?

 7        A.   No.

 8        Q.   You don't agree with that either?

 9        A.   No.  I forwarded, I believe, it was about $27,000

10   to the enterprises documented in the other document.

11        Q.   Okay.  So did you get a promissory note then?

12        A.   No.

13        Q.   Okay.  Is it your practice to give $27,000 and not

14   get any sort of promissory note back?

15        A.   Well, it was at that time.  And it wasn't $27,000

16   at one time.  I was paying some of the survey costs and some

17   of the land development, consultant costs.  And I kept

18   mediocre records of that and trusted that we would account

19   for it eventually.

20        Q.   Okay.  And you didn't get any proof, you didn't ask

21   for any proof of any kind that the debtor actually owed you

22   the money back?

23        A.   I didn't.

24        Q.   Okay.  And I assume that it's similarly your

25   testimony that you didn't see Exhibit 5 in 2002 where the
```

138

1   1997 note was renewed?

2        A.   No.  As I said, the first time I saw a promissory

3   note that I was the beneficiary of -- I'm aware of seeing a

4   promissory note was in 2008 or 9.

5        Q.   Okay.  Let's look at Exhibit 6.

6             MR. KAUFMAN:  Your Honor, I'm going to object

7   to any testimony on this since counsel stated clearly that

8   they didn't want any testimony on it on direct.

9             THE COURT:  Response to that?  I'm not sure --

10            MR. SPECTOR:  Well --

11            THE COURT:  I'm not sure what the discussion

12  was.

13            MR. SPECTOR:  I don't remember saying that.

14  But if you'd give me a moment.

15            THE COURT:  Okay.

16            MR. SPECTOR:  This is my 6.

17            THE COURT:  And by the way, let's call these

18  D-1, D-2, D-3, since you both used numbers.  I'm marking them

19  with D's in front of them.

20            MR. SPECTOR:  That's fine.  Okay.

21        I'll come back to D-6.

22            THE COURT:  Okay.

23        Q.   When did the debtor obtain title to the Makai

24  property?

25        A.  Makai was 2006.

139

1    Q.   Okay.  And the Mauka piece?

2    A.   1997.

3    Q.   And from -- when did the debtor first acquire

4  rights to obtain the Makai piece?

5    A.   Very late 1988.

6    Q.   So between 1988 and 2006 it took all of that time,

7  18 years, to just get title?

8    A.   Crazy, right.

9    Q.   Sure is.

10     And from 19 -- from 2006 to now, you estimate that

11  we're about six months away from subdividing the Makai

12  property?

13    A.   I'm hopeful.

14    Q.   That's your expectation?

15    A.   My expectation.

16    Q.   Okay.  And you're as familiar with this property

17  pretty much as Ms. Reese is, right?

18    A.   Probably.

19    Q.   And involved the whole time?

20    A.   Well, I've been sort of cut out of the loop,

21  somewhat, the last few years.  But I had been involved the

22  whole time until recently.

23    Q.   Okay.  Take a look at Exhibit 7.

24     I believe your counsel asked about this document, as

25  well.

MR. KAUFMAN: Your Honor, I'll object. That's not accurate.

THE COURT: Okay. I'm sorry. Which exhibit are we on?

MR. SPECTOR: D-7.

THE COURT: D-7.

Q. Have you ever seen this document before?

THE COURT: We have an objection?

MR. KAUFMAN: The object is just the foundation and referencing that this was brought up on direct, this document.

MR. SPECTOR: I just asked him. He hasn't seen the document before, so I'll move on.

THE COURT: Okay. Proceed.

Q. Let's look at D-9.

Can you describe to the Court what the Mauka land is like?

A. The Mauka land?

Q. Yes.

A. It's 484 acres of land that starts at elevation of 1,200 feet above sea level and slopes gently up to about 1,600 feet above sea level, in general. And it is mostly pasture land divided by forest and gulches with streams in it.

Q. Okay. Is it amenable to being a platted

1   subdivision?

2       A.   Not in the traditional sense, no.

3       Q.   Okay.  You think it's highest and best use is as an

4   amusement, correct?

5       A.   I think that's the greatest bang for the buck.

6       Q.   Okay.  And is there anyone living on all of the

7   acreage?

8       A.   There are some people living on some of the

9   acreage.

10      Q.   On all of the acreage.

11      A.   Person per acre, no.  There is no one living on all

12  of the acres right now.

13      Q.   Okay.  So are you aware that in 2007 Mr. Reese got

14  a letter from, it looks like Mike something --

15      A.   Buse.

16      Q.   -- Buse regarding keeping the gates closed so that

17  ATV's couldn't transition back and forth across the property?

18      A.   This is a different piece of property.

19      Q.   This is a different piece of property?

20      A.   Correct.

21      Q.   Okay.  Let's go to Exhibit 10, D-10.

22       This is a letter from Mr. Fuertes in 2007, correct?

23      A.   Yes.

24      Q.   Agreeing to offer use of the property to a group of

25  business majors at Berkley, correct?

```
 1        A.    Correct.

 2        Q.    Okay.  And is this consistent with utilization,

 3   your and Mr. Reese's goal of utilizing the property, to some

 4   extent for the public good?

 5        A.    This is consistent.

 6        Q.    Exhibit 11, D-11.

 7         It's still your testimony that you did not see D-11 in

 8   2007, correct?

 9        A.    Correct.

10        Q.    Let's go to D-12.

11         Do you recall getting an email from Mr. Fuertes about

12   vandalism to the property?

13        A.    I recall this.

14        Q.    Okay.  And can you describe to the Court what

15   problems were occurring in 2008?

16        A.    Well, I think what was going on here was that there

17   were signs placed about public notification to the

18   consolidation re-subdivision process, which had started, I

19   think, in 2007.  And somebody had torn the signs down.

20              MR. SPECTOR:  Offer D-11.

21              THE COURT:  D-11 or D-12?

22              MR. SPECTOR:  D-12, my apologies, Your Honor.

23              THE COURT:  Any objection?

24              MR. KAUFMAN:  No objection.

25              THE COURT:  D-12 is admitted.
```

143

```
 1        Q.   Let's look at D-13.

 2        You were instrumental in negotiating the lease with

 3   Randy, correct?

 4        A.   Correct.

 5        Q.   And you took, if not the lead, you took a

 6   substantial role in dealing with the various revisions to the

 7   lease prior to its signature?

 8        A.   I definitely took a role, yes.

 9        Q.   Okay.  And this is one of those emails where you're

10   circulating the most recent lease so that everyone could look

11   at it, correct?

12        A.   Yes.

13             MR. SPECTOR:  Offer D-13.

14             THE COURT:  Any objection?

15             MR. KAUFMAN:  No objection.

16             THE COURT:  D-13 is admitted.

17        Q.   D-14, same general time period.  And, again, you're

18   continuing to work on the lease, correct?

19        A.   No.  This is something entirely different.

20        Q.   At the end of your email at the top it says, I'm

21   working with Susan and Beau to get Randy's lease done.  Do

22   you see that?

23        A.   Sorry.

24             MR. SPECTOR:  May I approach?

25             THE COURT:  You may.
```

NATIONAL COURT REPORTERS (214) 651-8393

1      A.   Yes.  That was part of what this was dealing with.

2  But the first -- the main body of this was something else.

3      Q.   Okay.

4             MR. SPECTOR:  Offer D-14.

5             THE COURT:  Any -- D-14 is admitted.

6      Q.   Turn to D-15, please.

7       Have you ever seen this document before?

8      A.   Possibly.  I don't specifically remember seeing

9  this.

10     Q.   Okay.  We'll move on.

11      D-16.  This is an email, actually, two emails, one from

12 Lou Reese, Jr., who we'll refer to as Beau, and a response

13 from you, correct?

14     A.   I think -- yes.

15     Q.   Okay.  And in the bottom of Beau's email it says,

16 We're getting to work on a sustainable farm, right?

17     A.   I don't see that, but I'm sure it does.  I believe

18 that it does.  There we go.  Yeah.

19     Q.   And your response was, Good to hear from you.  I

20 can't wait to speak with you and get a fuller low down.  I

21 think you meant, It all sounds promising.  I'll call in the

22 a.m. some time in the next few days.

23     A.   Correct.

24     Q.   Did you talk to Beau about the sustainable farm in

25 2009?

1        A.   I tried to.

2        Q.   But did you?

3        A.   I don't know that we ever spoke about it, actually,

4   or not.  He was hard to get a hold of.

5        Q.   Okay.

6        A.   I supported their efforts, though.

7        Q.   And later in 2009, now on D --

8             MR. SPECTOR:  I'll offer D-16.

9             MR. KAUFMAN:  No objection.

10            THE COURT:  D-16 is admitted.

11       Q.   D-17, later in 2009 Mr. Fuertes sent around an

12   email -- my mistake.  Skip D-17.

13        D-18.  In August of 2009 Ms. Reese wrote you an email

14   stating, Here's the farm license agreement for Ohana Living

15   Farms.  All terms have been agreed on.  But I wanted you to

16   have a chance to look it over before we talked this weekend.

17   I've not sent to David or Grad, as I don't think that is

18   necessary.  Talk this weekend.  Right?

19       A.   Yes.

20       Q.   And you said, Thanks.  I'll look forward to reading

21   it when not at work.  Talk to you soon.

22       A.   Yes.

23       Q.   So, again, in 2009 you were completely up to speed

24   on the potential and the terms of the lease for the Ohana

25   Living Farms, right?

1        A.    I'm not sure.  I would have -- it's stated here.

2   I'd have to see what was actually sent to me.

3        Q.    Do you have any reason --

4        A.    There are several, several iterations of the lease

5   were sent to me.  I'm not sure where this particular

6   reference where the lease iteration it refers to.

7        Q.    But you don't deny that you were getting copies of

8   proposed leases?

9        A.    I was getting copies of proposed leases.

10       Q.    Okay.  And certainly if Mrs. Reese had said she was

11  sending you a lease in this email and you hadn't gotten a

12  lease, you would have responded, Hey, there's no lease

13  attached, right?

14       A.    I don't know.  I was at work seeing patients.

15  There's a very good chance of that.  But --

16       Q.    Okay.  More likely than not?

17       A.    More likely than not.

18                 MR. SPECTOR:  Offer Exhibit 18, D-18.

19                 THE COURT:  18 is admitted.

20       Q.    Let's turn to Exhibit D-20.

21        And I just want to focus on the bottom of the email

22  from Jim Brand dated Tuesday, September 8th.

23        Do you see that?

24       A.    Yes.

25       Q.    Okay.  Starting at the very bottom of the email,

1   which is the second page, email from Larry Vineyard on

2   Tuesday September 8th at 10:38 a.m.  Here's a red line and

3   final version of the proposed farm lease that I believe

4   incorporates all of the changes Susan and Jim discussed in

5   Austin, as well as the addition items we discussed on Friday.

6   Let me know if you have any questions.

7        And your response to that was, Thanks, Larry.  I'll

8   take a look at it.  I think there may be a few issues to work

9   through, though.  I'm happy our progress the other day.  One

10  issue I can think of right now is the term.  I think a five

11  year lease with two more five year options is probably

12  plenty.  Will look forward to speaking with you and Susan on

13  Friday.  I'd like to make the call time 10 a.m. instead of

14  later in the p.m.  Right?

15       A.   Yep.

16       Q.   So, again, in September of 2009 you're still

17  working on the lease with the debtor?

18       A.   Yes.

19       Q.   Okay.  Now, what responsibility did Ms. Reese have

20  to include you in these decisions?

21       A.   I'm not sure.

22       Q.   Okay.

23                 MR. SPECTOR:  If I might have a moment, Your

24  Honor?

25                 THE COURT:  Okay.

148

1        Q.    Can you go to your own Exhibit 13, which would be

2    in the larger of the two binders, I believe?

3        I'd like you to turn to Brand Exhibit Number 13.   And

4    you identified these as the regulations of the company,

5    right?

6        A.    Correct.

7        Q.    And they're dated March 18th, 1997, right?

8        A.    Right.

9        Q.    And you don't -- you agree you signed these, right?

10       A.    Yes.

11       Q.    Okay.   So let's turn to page 15, paragraph 7.1.

12   Would you read to me the first three sentences?

13       A.    7.1?

14       Q.    Yes.

15       A.    Except where any action or approval on the part of

16   the members is expressly required pursuant to the articles

17   and organization of the company, these regulations are under

18   applicable law.   The powers of the company shall be exercised

19   by and in the authority of the business.   And affairs of the

20   company shall be managed under the direction of the managers.

21       Q.    Are you a manager?

22       A.    No.

23       Q.    Keep reading.

24       A.    The managers shall have the authority to elect

25   officers of the company.   Subject to the direction of the

1   managers, the officers of the company shall have such

2   authority and form such duties as are provided and are

3   pursuant to those regulations -- these regulations.

4       Q.   So since you're not a manager, did you have any

5   legal entitlement to be part of the decision making process

6   with respect to any of the things we've discussed so far?

7              MR. KAUFMAN:  Objection, Your Honor.  Calls

8   for a legal conclusion.

9              THE COURT:  Sustained.

10      Q.   Read me the next sentence, please.  It starts with,

11  The members.

12      A.   The members in their capacity as such shall not

13  have any right, power, authority to take part in the

14  management, operation, or control of the business and affairs

15  of the company.

16      Q.   Okay.  And read me the last sentence.

17      A.   Except as expressly provided in Section 6.46

18  (indecipherable word) to, or elsewhere in these regulations,

19  the vote approval or consent of the members shall not be

20  required in order to authorize any actions by or on behalf of

21  the company.

22      Q.   And is it your testimony that you didn't read this

23  document before you signed it?

24      A.   I didn't read it carefully.  And I did not seek

25  legal opinion about the document.

```
1          Q.    Okay.  Didn't hire a lawyer to ask them?

2          A.    I'm sorry?

3          Q.    Didn't hire a lawyer to ask them their opinion?

4          A.    I didn't.  I didn't.

5          Q.    Let's go to 7.5, which is on page 21.

6           Are you with me?

7          A.    Uh-huh.

8          Q.    Okay.  Do you know what 7.5 relates to?

9          A.    I can read it quickly.  I think it may be, just

10    glancing at it, dealing in which there's a conflict of

11    interest.

12         Q.    Okay.  Interested transactions, do you know what

13    that is?

14         A.    Not specifically.

15         Q.    Okay.  Let's look at September 10th, 2009, which is

16    Exhibit D-21.

17                   MR. SPECTOR:  I'm going to offer D-20, sorry.

18                   THE COURT:  You've offered D --

19                   MR. SPECTOR:  D-20.

20                   THE COURT:  D-20.  Any objection?

21                   MR. KAUFMAN:  No objection.

22                   THE COURT:  D-20 is admitted.

23         Q.    Do you see that document?

24         A.    I'm sorry, 21?

25         Q.    Yes.  Do you see D-21?
```

```
 1        A.    Yes.

 2        Q.    Okay.  And D-21 contains an email from you dated

 3   September 9th, 2009 at 10:23 p.m., correct?

 4        A.    Uh-huh.

 5        Q.    Is that a yes?

 6        A.    Yes.  Sorry.

 7        Q.    Okay.  And I don't mean to be rude, but the court

 8   reporter needs you to say yes and no rather than uh-huh or

 9   huh-uh.

10        A.    Yes.

11        Q.    Okay.  At this point in time, September of 2009,

12   were you at odds with management, Susan and Larry?

13   Dr. Brand?

14        A.    I'm thinking about it.

15        Q.    Okay.

16        A.    I would say that there were some differences.  And

17   I was increasingly aware of what I would view as the illegal,

18   not illegal, but unfair, unfairness of the essential rules

19   and, of the company's rules and regs.  And I was looking for

20   a way to make that better, or what I perceived as more fair.

21        Q.    Okay.  So you knew that the regulations were

22   important at this time?

23        A.    Yes.

24        Q.    And would you read me the last sentence here of

25   your email?
```

1        A.    Yeah.   For me reading the rules and regs would be

2    comparable to you having to read a pathophysiology text.

3        Q.    So what did that mean?

4        A.    That -- that this is a language which I might

5    understand the words and not the implications of the words.

6        Q.    Okay.   Did you seek counsel in 2009 to try to

7    resolve what you perceived as the unfairness in the

8    regulations?

9        A.    Well, at this point in 2009 we were steeped in the

10    lawsuit with Snell.

11        Q.    Did you seek counsel?

12        A.    No.

13        Q.    So you didn't carefully review the 1997

14    regulations.   And then when you knew that they were important

15    in 2009, you still didn't seek a lawyer to try to help you

16    get whatever issues you had resolved at that time?

17        A.    Well, I arranged some meetings with Susan.   I spoke

18    with the lawyers who are our defense lawyers in the lawsuit.

19        Q.    Pacific Plains' lawyers?

20        A.    And I did engage an attorney in Austin some time in

21    that time frame to help me figure out what was possible.

22        Q.    I thought you just said you didn't have a lawyer?

23        A.    I didn't have a lawyer at that moment, no.

24        Q.    Okay.

25        A.    And I'm not sure exactly when I sought the lawyer's

153

1    advice.  But shortly thereafter, or some time around that

2    time I did.

3                    MR. SPECTOR:  I'd offer 21.

4                    THE COURT:  Any objection?

5                    MR. KAUFMAN:  No, Your Honor.

6                    THE COURT:  21 is admitted.

7    Q.    Let's talk about Exhibit D-24.

8          Can you identify this document for me?

9    A.    It's a promissory note.

10   Q.    Payable to?

11   A.    Walter Berkowitz.

12   Q.    And this is the note that you were discussing with

13   your attorney relating to the $30,000 that debtor -- the

14   $35,000 that the debtor borrowed to satisfy, or to pay, or to

15   purchase the solar equipment at the eco hut, correct?

16   A.    Correct.

17   Q.    And your complaint is that you didn't have any --

18   they didn't talk to you about it?

19   A.    Well, we talked about it.  And I resisted the

20   reasonableness or necessity of it.

21   Q.    But you understand that you don't -- you're not a

22   manager, right?

23   A.    I understand that.

24   Q.    Okay.  And you understand that management can made

25   decisions that you don't agree with?

154

```
 1        A.    Correct.

 2        Q.    Your counsel asked you if the debtor had sufficient

 3   cash to just pay for the obligation, or to pay the $35,000.

 4   Remember that?

 5        A.    Yes.

 6        Q.    Okay.  And you said it did.

 7        A.    Yes.

 8        Q.    Would you have supported paying the $35,000?

 9        A.    No.

10        Q.    Exhibit Number 26.  Actually, this is not addressed

11   to you, so we'll skip it and go on to Exhibit Number 29.

12         Have you ever seen this document before?

13        A.    I don't specifically remember seeing this document.

14   It's quite possible that I have.

15        Q.    Exhibit Number 30, D-30.

16         Do you recall receiving Tony Withington's email in

17   2010?

18        A.    Yes.

19        Q.    So at least as of 2010 when a fencing crew showed

20   up, you were included in those discussions, right?

21        A.    By Tony Withington.

22        Q.    Yes.  And then you wrote back to Susan and

23   Mr. Fuertes and Ms. Reese.

24        A.    I responded to her email, yeah.

25        Q.    Right.  You said you never received the financial
```

155

```
 1  information you requested.
 2      A.   What I said is I didn't receive all of the
 3  financial information that I requested.
 4      Q.   Okay.  Let's look at Exhibit Number D-31.
 5              MR. SPECTOR:  And I'll offer D-30.
 6              THE COURT:  Any objection?
 7              MR. KAUFMAN:  No, Your Honor.
 8              THE COURT:  D-30 is admitted.
 9      A.   30 or 31?
10      Q.   31.
11       The part of 31 I want you to focus on is the bottom.
12  It's your July 9th, 2010 email.
13      A.   Yes.
14      Q.   Okay.  And in there you remind the debtor that you
15  needed to receive the financial records of Pacific Plains.
16      A.   Yes.
17      Q.   And about a month later --
18              MR. SPECTOR:  Offer D-31.
19              THE COURT:  Any objection?
20              MR. KAUFMAN:  It's duplicative of our Exhibit
21  114, but no objection.
22              THE COURT:  D-31 is admitted.
23      Q.   Let's look at D-32.
24       You don't deny receiving this financial information
25  from the debtor on August 13th, do you?
```

156

1     A.   No.

2     Q.   And that contains balances sheets going back to

3   1997, correct?

4     A.   Yes.

5              MR. SPECTOR:  Move for admission of D-32.

6              THE COURT:  Any objection?

7              MR. KAUFMAN:  No objection.

8              THE COURT:  D-32 is admitted.

9     Q.   Turn to Exhibit D-33.

10     Do you remember seeing the email from Ms. Withington

11   about the fencing and the, I don't know how to say that word,

12   h-e-i-a-u?

13     A.   Heiau.

14     Q.   Heiau.

15     A.   Heiau.

16     Q.   Do you remember receiving that?

17     A.   I don't specifically remember receiving this, no.

18     Q.   And what's a heiau?

19     A.   It's basically a historically sacred, or place of

20   religious importance.

21     Q.   Okay.  And is it --

22     A.   Only to Hawaii.

23     Q.   And is the existence of a heiau on part of the

24   property an impediment to the development?

25     A.   Somewhat.

```
 1        Q.    Okay.   Exhibit Number 34.

 2         Do you remember seeing this document?

 3        A.    I don't remember specifically seeing this.

 4        Q.    Okay.   Exhibit Number 35, D-35.

 5         Do you remember seeing this document?

 6        A.    I'm sure.   I don't really remember the email.

 7        Q.    But you don't remember this one, either?

 8        A.    No.   I'm sure I read it when I got it.   This is not

 9    a message of huge consequence that I would necessarily commit

10    to memory for a year and a half.

11        Q.    Okay.   But you don't remember seeing it?

12        A.    No.

13        Q.    Okay.   You know that it's only a year old, right, a

14    year and a half?

15        A.    Yes.

16        Q.    About a month after that I think you wrote Exhibit

17    D-36?

18        A.    Yes.

19        Q.    Did you write this email?

20        A.    Yes.

21        Q.    You remember this one?

22        A.    Yes.

23        Q.    And this related to the rumor that Randy was going

24    to terminate his lease?

25        A.    I think so.
```

158

```
 1        Q.    On the zipline.

 2        A.    Yes.

 3        Q.    That was a source of great concern for you, right?

 4        A.    Yes.

 5        Q.    And was there, in fact, a conference call, or a

 6   video conference, or a meeting?

 7        A.    Subsequent to this letter?

 8        Q.    Yes.

 9        A.    Not that I specifically recall.  It definitely was

10   not a video conference.

11        Q.    Do you remember a conference call with the other

12   members regarding termination of Randy's lease?

13        A.    Yes.

14        Q.    Okay.  How many times do you remember talking about

15   that?

16        A.    At least once, maybe twice.

17        Q.    Okay.  Did you recognize that Ms. Reese had no

18   obligation to include you in those discussions, right?

19              MR. KAUFMAN:  Objection; calls for a legal

20   conclusion.

21              THE COURT:  Overruled.

22        A.    What's the question again?

23        Q.    You recognize that Ms. Reese had no obligation to

24   include you in those discussions, right?

25        A.    I'm not sure.
```

1       Q.    She was the manager.

2       A.    Yeah.

3       Q.    And you're just a member.

4       A.    So she has no responsibilities to me?

5       Q.    I didn't say that.  She had no obligation to

6    include you in those discussions, right?

7       A.    Correct.

8       Q.    But she did any way, right?

9       A.    She did any way.

10      Q.    Okay.  Let's turn to Exhibit 37.

11            MR. SPECTOR:  Sorry, I'll admit D-36.

12            THE COURT:  Any objection?

13            MR. KAUFMAN:  No objection.

14            THE COURT:  36 is admitted.

15      Q.    Exhibit D-37.

16       This is an email from Mrs. Reese shortly after you

17   requested updated financials on April 3rd in which she sent

18   updated financials, correct?

19      A.    These were originally requested in February of

20   2010.

21      Q.    Do you have anything showing that?

22      A.    That's the conference that I referenced that we had

23   in Austin.

24      Q.    Flip back to Exhibit 36, please.

25       See your email?

```
 1        A.   Yes.

 2        Q.   Four paragraphs down you say, We could make the

 3   most progress by having some information available to all

 4   prior to a meeting.  We should have information regarding the

 5   complete LLC financials, right?

 6        A.   Yes.

 7        Q.   And you wrote that on April 3rd?

 8        A.   Correct.

 9        Q.   And she responded to that on April 24th with

10   financials?

11        A.   Yes.

12                  MR. SPECTOR:  Move for admission of 37, D-37.

13                  THE COURT:  Any objection?

14                  MR. KAUFMAN:  No objection.

15                  THE COURT:  D-37 is admitted.

16        Q.   Let's look at D-38.

17         Do you recognize this document?

18        A.   Yes.

19        Q.   Okay.  You received Jeff Grad's email either

20   originally or when Susan Reese responded to it, correct?

21        A.   Yes.

22                  MR. SPECTOR:  Move for admission of D-38.

23                  THE COURT:  Any objection?

24                  MR. KAUFMAN:  No objection.

25                  THE COURT:  D-38 is admitted.
```

1      Q.   Can you explain to the Court the importance of an

2  archeological survey for the property?

3      A.   As I understand it and as I know it to be, it's

4  necessary to complete any subdivision process, or zoning

5  change.  And the findings our an archeological survey could

6  be either very helpful, or not so helpful in an effort to

7  affect a subdivision.

8      Q.   Did the debtor employ an archeological surveyor

9  prior to 2011?

10     A.   Yes.

11     Q.   Did you have responsibility for finding that

12  surveyor?

13     A.   Yeah.  I found that surveyor.

14     Q.   Okay.  And was the survey that that surveyor -- do

15  you remember his name?

16     A.   Paul Rosendal.

17     Q.   Do you remember whether that survey was adequate

18  for the debtor's subdivision purposes?

19     A.   It wasn't that adequate in the long run.

20     Q.   Okay.

21     A.   It was asked for early on in the process and

22  subsequently more was requested.

23     Q.   Okay.  So the debtor had to go out and find a new

24  surveyor, correct?

25     A.   Yes.

```
 1        Q.   And ultimately the new surveyor produced a survey
 2   that is adequate for the subdivision, correct?
 3        A.   Correct.
 4        Q.   Do you know when that happened?
 5        A.   Not specifically, no.
 6        Q.   Do you know approximately?
 7        A.   No.  I could just guess.  I don't know.
 8        Q.   Do you know the year?
 9        A.   I guess 2010 or 2011.
10        Q.   Okay.  And was that completed by Mr. Hahn?
11        A.   I believe so.
12        Q.   Turn to Exhibit D-43.
13             THE COURT:  D what?
14             MR. SPECTOR:  43.
15        Q.   Do you remember receiving this email from
16   Ms. Reese?
17             MR. KAUFMAN:  Objection.  I don't see an email
18   from Mrs. Reese in Exhibit 43.
19             THE COURT:  First page.
20             MR. SPECTOR:  First page.
21        Copying error.
22        Q.   Do you remember receiving this email from
23   Mrs. Reese?
24        A.   Yes.
25        Q.   Okay.  Can you explain the context in which you
```

163

1    received this email?

2        A.    To the best of my recollection, this was shortly

3    after we had been led to believe, or been notified by Randy

4    that he was cancelling his lease, or leaving the property.

5        Q.    Okay.  And Ms. Reese had contacted an attorney,

6    Mr. Ducca, right?

7        A.    Correct.

8        Q.    And he had given the debtor a letter summarizing

9    his opinion of your options?

10       A.    Uh-huh.

11       Q.    Is that correct?

12       A.    Yes.

13       Q.    And is that letter attached as Exhibit 43?

14       A.    Yes.

15       Q.    Did you read the letter?

16        I'm not asking you to read it now.  It's very long.

17       A.    I understand.

18        I don't recall reading the entire letter, no.

19       Q.    Do you recall skimming it?

20       A.    I recall looking at it and we had telephone

21    conference in which it was discussed.  That I do recall.

22       Q.    Okay.  Was the conclusion -- was your conclusion

23    that a lawsuit against Randy would be a particularly good

24    source of expenditure for the debtor at this time?

25       A.    At that time I didn't think it was.

```
 1        Q.   Based on this letter?

 2        A.   Based on Randy and this letter.

 3        Q.   Fair enough.

 4         What do you know about Randy?

 5        A.   He proved to be untrustworthy.

 6        Q.   Okay.

 7        A.   That's enough.

 8        Q.   Okay.  You had a number of calls about this

 9   situation with the debtor, correct?

10        A.   Yes.

11        Q.   Okay.  And, again, you had a number of calls,

12   despite the fact that Mrs. Reese had no obligation to call

13   you and solicit your input, right?

14        A.   I guess not.  She seemed to want it.  She sent me

15   an email requesting my input.

16        Q.   Okay.  I'm asking these questions, Dr. Brand,

17   because you said the 20 year collaborative approach adhered

18   to was no longer adhered to.  But here from 2009, 2010, 2011,

19   I see lots of calls between you and the debtor; isn't that

20   right?

21        A.   Lots of calls.  The collaborative approach was not

22   adhered to.  There were lots of calls.

23        Q.   You didn't always agree with one another?

24        A.   Right.

25                  MR. SPECTOR:  Move for Exhibit of -- I'm
```

1  sorry, move for admission of Debtor's 43.

2              THE COURT:  Any objection?

3              MR. KAUFMAN:  No, Your Honor.

4              THE COURT:  D-43 is admitted.

5      Q.   And these discussions among the members continued

6  to August 5th, 2011, right?  Look at Exhibit D-45.

7      A.   Yes.

8              MR. SPECTOR:  Move for admission of D-45.

9              THE COURT:  Any objection?

10             MR. KAUFMAN:  No, Your Honor.

11             THE COURT:  D-45 is admitted.

12     Q.   When the debtor got formal notification that

13 Mr. Andrews was terminating his lease, Ms. Reese scheduled a

14 call in, right?

15     A.   Correct.

16     Q.   And that would have been on August 5th, 2011,

17 Exhibit D-46?

18     A.   Yes.

19     Q.   Counsel asked you how many payments the debtor

20 could have made to Charles Snell in 2012.  Remember that?

21     A.   Yes.

22     Q.   And you said it could have -- the debtor could have

23 paid two?

24     A.   Correct.

25     Q.   Now, the debtor had, we'll agree, somewhere between

1    225,000 and $275,000 in cash at that time?

2        A.   I think more like 275, yes.

3        Q.   Okay.  And Mr. Snell's payments would have been

4    137,500?

5        A.   Correct.

6        Q.   So the debtor could have made two, maybe not quite

7    two, maybe a little more than two, right?

8        A.   Correct.

9        Q.   And you agree with me, that would have left the

10   debtor with no cash, right?

11       A.   Well, that's two years from now.

12       Q.   Well, no.  One was due at the beginning of this

13   year, right?

14       A.   Right.

15       Q.   And one is due at the end of this year?

16       A.   The beginning of next.

17       Q.   Okay.  So at the end -- at the beginning of next

18   year, end of this year, whichever, at the beginning of next

19   year the debtor would have no cash, right?

20       A.   Most probably.

21       Q.   Okay.  Because the debtor has no operations now,

22   right?

23       A.   Correct.

24       Q.   And the only source of income, potentially, is the

25   establishment of a new zipline, right?

1          A.    It's the most visible potential source of income.

2          Q.    Okay.  And that income would be necessary to fund

3     the expenses related to the subdivision, right?

4          A.    Yes.

5          Q.    And Ms. Reese had approached you about funding the

6     zipline, right?

7          A.    Yes.

8          Q.    And you had declined?

9          A.    Yes.

10         Q.    Have you come up with any alternative source of

11    re-establishing the zipline, aside from your own

12    contributions, or her own contributions?

13         A.    No.

14         Q.    And you don't think it's a good idea to deplete the

15    debtor of all of its cash to pay Mr. Snell, do you?

16         A.    I think we need to honor our debts.  And if we have

17    to raise money from the members, then, so be it.

18         Q.    But you weren't willing to invest more money, you

19    told her that.

20         A.    That's correct.  In that venture.

21         Q.    Did you make any other proposals suggesting you

22    were willing to recapitalize the debtor for some other

23    purpose?

24         A.    No.  Because I didn't know that we were in

25    bankruptcy.

1    Q.    Prior to the bankruptcy, you could see that the

2  debtor would have a looming financial -- need for more money,

3  right?

4    A.    Correct.

5    Q.    But you, you used the word, we had a mountain of

6  debt, right?

7    A.    Correct.

8    Q.    Okay.  So did you make any proposal to Mrs. Reese

9  about how to start funding development operations?

10    A.    I agreed with her interest in developing the

11  zipline.

12    Q.    But you didn't agree to fund it?

13    A.    No.

14    Q.    I'm correct?

15    A.    You're correct.

16    Q.    Okay.  And you're the second largest member in the

17  debtor, right?

18    A.    Correct.

19    Q.    Have you gone through the task of looking at all of

20  your old emails?

21    A.    I've looked at some of them.  I haven't gone

22  through the task of looking at all of them.

23    Q.    Okay.  Are there any emails that you've ever

24  gotten, or ever sent out, rather, before 2009 that suggest

25  that you didn't agree with the loans, or the amounts of the

1  debts reflected on the books and records of the company to

2  Mrs. Reese or her entities?

3      A.    Not that I'm aware of.

4      Q.    Are there any emails saying, before 2008, I want to

5  see the books and records?

6      A.    Again, not that I'm aware of.  I don't think I felt

7  a need until that time.

8      Q.    Okay.  Could you look at Exhibit Number 25, your

9  number 25, Brand 25?

10      Do you see that?

11      A.    Yes.

12      Q.    Okay.  That's a memo to all members of Pacific

13  Plains, LLC, correct?

14      A.    Yes.

15      Q.    Do you believe you got that?

16      A.    I have no reason to believe that I didn't.

17      Q.    Okay.  Let's look at under accounting and financing

18  on the second page.

19      A.    Uh-huh.

20      Q.    Could you read the first paragraph to us?

21      A.    Deborah Snell thanked both Susan and Lou for

22  getting Mr. Scott and pulling together all of the financial

23  information for Pacific Plains Company, LLC.

24      Q.    Who's Mr. Scott?

25      A.    I'm not sure.

NATIONAL COURT REPORTERS (214) 651-8393

1      Q.   You don't know that to be Gene Scott?

2      A.   Oh, now that you mention it, it's probably Gene

3  Scott.

4      Q.   Okay.  Keep going.

5      A.   Everyone thought that the numbers presented in the

6  member's packet were understandable.  And there were no

7  questions about specific expenses or the manner in which the

8  accounting was organized.

9      Q.   Mr. Scott was -- is a CPA, correct?

10     A.   To the best of my knowledge.  I don't know him.

11     Q.   You know him to be an accountant, right?

12     A.   Yes.

13     Q.   Read me the next sentence.

14     A.   As far as members paying their debts to Pacific

15  Plains is concerned, let me suggest that members go to their

16  respective banks and see if they can get a loan using their

17  percentage of Pacific Plains Company as collateral.  It was

18  also discussed that perhaps Susan could help arrange for such

19  loans using her bank relation for members who may need the

20  help.

21     Q.   Keep going.

22     A.   The goal here is to have Susan and Jim recover

23  their capital while helping members find a more favorable

24  interest rate for the amounts that they currently owe to

25  Pacific Plains Company without doubling their respective

1   interests.

2        Q.   Okay.  You understand that that paragraph refers to

3   the money that you and Susan had put into Pacific Plains back

4   in 1997, right?

5        A.   It seems to.

6        Q.   Right.  And what this memo wants members to do is

7   go out and get a loan so that you aren't the only ones who

8   had advanced money to Pacific Plains, right?

9        A.   That's what it says, correct.

10       Q.   And this is in 2005, right?

11       A.   Yes.

12       Q.   Mr. -- Dr. Brand, if you disagreed with the amounts

13  owed in 2005, where are the emails that you sent out in 2005

14  saying, Hey, wait a minute.  The interest rate is too high,

15  or the amount is wrong?  Do you have any emails like that,

16  Dr. Brand?

17       A.   I don't think so.

18            MR. SPECTOR:  I'll pass the witness.

19            THE COURT:  All right.  Any questions from

20  Madison Partners?

21            MR. BEUTTENMULLER:  May I proceed, Your Honor?

22            THE COURT:  You may.

23       Can I get a time estimate?  Because at some point I

24  have to take a short break.

25            MR. BEUTTENMULLER:  30 minutes.

1          THE COURT:  30 minutes.  Okay.  I need to take

2     about a 15 minute break.  There's an event here in the

3     building that I need to go appear at for about 15 minutes.

4     So we will come back at 3:25.

5               (Brief recess ensued.)

6          THE COURT:  All right.  Please be seated.

7        We're going back on the record in Pacific Plains.

8     Dr. Brand, I'm required to remind you you're still under

9     oath.

10       Mr. Beuttenmuller, you may proceed.

11         MR. BEUTTENMULLER:  Thank you, Your Honor.

12               CROSS-EXAMINATION

13    BY MR. BEUTTENMULLER:

14       Q.   Mr. Brand, going back to I think 1992, you said

15    that the property at issue, the debtor's real estate at issue

16    in this case, was part of a commission that was generated by

17    a much larger transaction involving the Japanese company.

18        Do you recall that testimony?

19       A.   Yes.

20       Q.   Do you also recall that you or one of your entities

21    received a commission at that closing?

22       A.   Yes.

23       Q.   What was the cash component of the commission that

24    you or your entities received?

25       A.   Well, the entire cash commission was $8 million.  I

1   received $800,000.

2        Q.   800,000, sir?

3        A.   Yes.

4        Q.   Okay.  So you start off in the deal $800,000 ahead,

5   correct?

6        A.   Correct.

7        Q.   Okay.  You testified then that from '88 to '96 and

8   from '96, '97 to 2007 you were actively involved in all the

9   re-subdivision activities on the property; is that right?

10       A.   Correct.

11       Q.   And you testified that over this fairly extended

12  period there were activities related to archeological surveys

13  and regulatory approvals, et cetera, correct?

14       A.   Correct.

15       Q.   And you said the process just takes that long,

16  correct?

17       A.   Takes a long time.

18       Q.   Okay.  And the biggest part of the process is this

19  re-subdivision concept, correct, sir?

20       A.   Consolidation re-subdivision, correct.

21       Q.   Okay.  Could you explain to the Court what

22  consolidation re-subdivision means in the parlance Hawaii

23  development?

24       A.   Well, I can explain it how I understand it.  I

25  wouldn't pretend to know the details nor the --

174

1    Q.   You know more than I do, sir, so take a shot.

2    A.   Okay.  That may well be true.

3       My understanding is that when you have a number of

4   lots, or (indecipherable word) as they're referred to, which

5   apply to a parcel of land, in this case what we're talking

6   about is the Makai parcel of land.  There were preexisting

7   lots that someone went back hundreds of year; old land grants

8   and that sort of thing.  And they were sort of scattered

9   throughout this entire parcel.  And I think there were as

10  many as 10 or 11 of them.

11      And so what we did is we surveyed and came up with a

12  land plan, land plan and then submitted to the County, in

13  some fashion, our desire to take that number of lots and

14  apply them to this newly draw lot lines.  So that's the

15  process, as I understand it.

16   Q.   Okay.  Then -- at any time were you denied access

17  to the debtor's professionals who were working with you and

18  Mr. Reese on that process through 2006?

19   A.   Not that I'm aware of.

20   Q.   Okay.  And you regularly communicated with the

21  professionals and, in fact, since 2006 you've communicated

22  with the debtor's professionals about the subdivision

23  process, correct?

24   A.   Correct.

25   Q.   On the Kohala Mountain Camps you've testified you

1    were intimately involved in that whole process and

2    transaction, correct?

3        A.   Correct.

4        Q.   And, in fact, you were putting up a percentage of

5    the capital through loans needed to fund that project,

6    correct?

7        A.   Correct.

8        Q.   And then the Fuertes lease, this is the lease with

9    David Fuertes on the pasture, it's Exhibit 52 in evidence,

10   you were actively working on that with Mr. Reese, correct?

11       A.   I was involved with Mr. Reese and Mr. Fuertes, the

12   three of us together.

13       Q.   Okay.  What about the one acre carve out

14   transaction where we did the site line down to the --

15       A.   I was the -- I was contacted by the owner who was

16   trying to secure this guaranteed site line.  And I spoke with

17   him several times and communicated with Lou.  And then Lou

18   went out there to make the deal with the guy.  I wasn't

19   present at that time.

20       Q.   Okay.  So it was a cooperative effort with

21   Mr. Reese.

22       On the Big Island Eco lease, which is the first zipline

23   concept, you've testified a fair amount about your

24   involvement in that, right?

25       Do you remember at the time that Mr. Reese, the

 1  decedent, and his son, who we're calling Beau now, were

 2  working with Original Canopy Tours at or about the same time

 3  as this developed with Randy Andrews and Big Island Eco?

 4      A.    Not really.  That predated it by a couple of years.

 5      Q.    A couple of years difference?

 6      A.    Yes.

 7      Q.    Okay.  But they had been working on a zipline

 8  concept with the OCT people, we call them, Original Canopy

 9  Tours, at some point prior to this deal evolving with

10  Mr. Andrews, correct?

11      A.    Correct.  And it had been abandoned that prior

12  effort.  The inquiry had been abandoned.

13      Q.    Okay.  Well, one thing that confused me was that

14  this whole idea of resistance from Beau.  Was he -- he was

15  working with the Original Canopy Tours and he was apparently

16  in favor of a zipline.

17      Was there some difference in his mind, as he voiced it

18  to you, about OCT versus Randy?

19      A.    Well, I can speak to that, if you'd like.

20      OCT was out of the picture completely at that point.

21  They were dead set on doing the zipline in a certain area.

22  They thought it was the best area.  Some inquiries were made.

23  We -- the Makai property, we discovered that the neighbors

24  were going to resist vigorously.  And then Lou, Big Lou,

25  made, really just made the decision he did not want to be in

1  the transportation basis and have to buy cars or vehicles to

2  carry people up the mountain and do the zipline on a mountain

3  property.  It's just a decision he made.  So that was the end

4  of that.

5       And then some time later Mr. -- I don't remember how

6  much later -- Mr. Andrews appeared on the scene.  And then,

7  as I testified, then Mr. Reese died, Big Lou died.  And then

8  at that point Beau vigorously resisted the new zipline.  And

9  his reason for making -- his stated reasons were that there

10 was, the liability issues were too great.

11      Q.   But he didn't, or at least you don't recall that he

12 distinguished between OTC and Randy, vis-a-vis the scope of

13 risk of liability to the company?

14      A.   Not that I remember.

15      Q.   Okay.  You've testified about your involvement in

16 Ohana Living Farms lease, which is, quote, Beau's farm, and

17 that you originally were concerned about it and you

18 eventually got comfortable with the form of the lease; that's

19 correct?

20      A.   The lease changed dramatically in that process.

21      Q.   Correct.  And you felt you made a valuable

22 contribution to make it more fair to the company, correct?

23      A.   At least I could live with it, yeah.

24      Q.   Okay.  And at that time did you actually go out to

25 the property, at the time of that lease?

178

1       A.    I've been out to the property every year a couple

2   of times a year for years.  I don't know when you're

3   specifically referring to.

4                  MR. BEUTTENMULLER:  May I approach, Your

5   Honor?

6                  THE COURT:  You may.

7       Q.    Sir, I'd like you to look at that document and see

8   whether that refreshes your recollection about going out to

9   the property about the time of the Ohana Living Farms lease.

10      A.    Yes.

11      Q.    What do you remember now about going out to the

12  property, sir?

13      A.    I went out to the property and there had been some

14  improvements made around the cabin.  And at that point in

15  time the cabin was clean and it looked good.  There were some

16  chickens around.  And all sorts of notes on a white board

17  about big plans and, you know, there was a real operation

18  about to erupt and a lot of -- it appeared a lot of

19  enthusiasm and thought going into it.

20      Q.    So based on your inspection at that time, you were

21  generally favorably impressed with what was going on at that

22  time?

23      A.    At that moment, yes.

24      Q.    Okay.  During the Snell litigation, you were

25  actually involved as a party, correct?

1       A.   I was a defendant.

2       Q.   And you were personally involved and present at the

3  settlement mediation where, in fact, a compromise was

4  reached; is that right?

5       A.   Correct.

6       Q.   And you personally agreed to that settlement,

7  correct?

8       A.   Correct.

9       Q.   And all during the litigation the company provided

10 you a defense, correct?  They paid for you to have a lawyer,

11 correct?

12      A.   Correct.

13      Q.   Okay.  And, therefore, you had access to that same

14 lawyer that was representing the company; is that correct?

15      A.   That is correct.

16      Q.   You could call the law firm and say, Hey, I'm a

17 client, I want to talk to you about my case, right?

18      A.   Actually, Susan discouraged me from calling.

19      Q.   She did?

20      A.   Yes.

21      Q.   Because of money?

22      A.   The state reason was money.

23      Q.   Yeah.  That's Susan.

24       Okay.  On the financials.  Would you go to 64 in the

25 black binders, which are your attorney's binders?

```
 1              MR. KAUFMAN:  Your Honor, counsel objected to
 2   any line of questioning about this document on direct, so
 3   I'll object that it's outside the scope of direct.
 4              MR. BEUTTENMULLER:  That was overruled, I
 5   think, Your Honor.
 6              THE COURT:  Okay.  Just a minute.  D-64 -- I'm
 7   sorry, not D-64, Brand 64.  That -- I've admitted that.
 8              MR. KAUFMAN:  It's admitted, I think.
 9              THE COURT:  Okay.  It's admitted.
10              MR. KAUFMAN:  Withdraw the objection.
11              THE COURT:  You may proceed.
12              MR. BEUTTENMULLER:  Thank you, Your Honor.
13     Q.   Let's go to 64.
14        Now, you said that this document had your signature on
15   it, correct?
16     A.   Correct.
17     Q.   And that you didn't remember signing it, correct?
18     A.   Yes.
19     Q.   Okay.  Has anything happened during the course of
20   the day that made you remember signing it?
21     A.   Well, no specific memory, although I'm sure I
22   signed it.  That's my signature.
23     Q.   Okay.  You're confident that you signed Brand
24   Exhibit 64; is that right?
25     A.   I am confident that that's my signature and I'm the
```

1   one that signed it.

2       Q.    Okay.   Let's go to the second page of 64.   Well,

3   let's start on page 1.

4       If you look at the preamble, sir, start after the word,

5   surety, and please read to the Court the balance of that very

6   first paragraph starting with the word, And Louis G. Reese.

7       A.    And Louis G. Reese, III, Susan B. Reese, Dr. James

8   Brand, Fairfield Realty Corporation, Madison Pacific

9   Development Company, Pacific Plains, collectively the Reese

10  parties.

11      Q.    Okay.   So the Reese parties included you; is that

12  correct?

13      A.    Yes.

14      Q.    Okay.   Let's go over to page 2.   And please read

15  paragraph 2 aloud for the Court.

16      A.    The whereas?

17      Q.    No, I'm sorry.   Paragraph 2, the numbered paragraph

18  2 that starts, Representations of Reese parties.

19      A.    The Reese parties expressly affirm the

20  acknowledgement designating Pacific Plains as successor in

21  interest in all rights and duties of Louis G. Reese, III,

22  Susan B. Reese, James Brand, Fairfield Realty Corp., Madison

23  Pacific with respect to the Fairfield agreement, the parcel

24  agreement, and the settlement agreement.   The Reese parties

25  acknowledge that they're respective signatories to this

1  agreement and have the authority to bind the party or parties

2  on whose behalf the agreement is signed.  Blah, blah.

3       Q.   The notice is really not significant.

4       Okay.  This paragraph apparently refers to rights and

5  duties of Louis G. Reese, III under the settlement agreement.

6       Do you see where it says, And the settlement agreement,

7  in this paragraph 2?  Dr. Brand?

8       A.   Yeah.  Yes, I do.

9       Q.   It does; I'm correct, sir?

10      A.   Correct.

11      Q.   Okay.  Let's go find out what the settlement

12 agreement is.

13      I believe if you read the fourth whereas clause on page

14 1 you will see what the settlement agreement is.  Would you

15 read that aloud for the Court?

16      A.   On page 1?

17      Q.   It's back on page 1, the fourth whereas clause in

18 the --

19      A.   Yes.  Whereas by agreement dated August 15th, 1992,

20 between Surety, Fairfield, and Reese, the parties reaffirm

21 their respective obligations under the Fairfield agreement

22 and the (indecipherable word) agreement and Reese agree to

23 reimburse Surety for attorney's fees incurred in the defense

24 of the lawsuit filed in the District Court, Northern District

25 of Dallas, Dallas, Texas, Stockbridge Corporation versus

1   Reese, et al in the amount of $139,740.

2       Q.   Right.  And that number changed between the date of

3   the settlement agreement and the time they actually funded,

4   didn't it, sir?

5       A.   Yes.

6       Q.   Yes.

7        Okay.  But the settlement agreement is the agreement

8   where Mr. Reese agrees to fund the cost of defense for the

9   Surety people in the Stockbridge lawsuit; is that correct?

10      A.   Correct.

11      Q.   And then we learned earlier that this agreement

12  says that Pacific Plains is successor in interest to all

13  rights and duties of Louis G. Reese, III under that

14  agreement; is that correct?

15      A.   Yes.

16      Q.   Okay.  And this agreement -- do you know of any

17  agreement that was signed after this that changes the tenure

18  and meaning of these paragraphs, sir?

19      A.   No.

20      Q.   Okay.  Let's go now to Number 4 in that same

21  binder.

22       And, sir, can you tell me whether Brand Exhibit 4

23  that's admitted into evidence is the settlement agreement

24  that's referred to in Exhibit 64, the other settlement

25  agreement?

184

1       A.   I'm not sure.

2       Q.   You don't know?

3       A.   I don't know.

4       Q.   Okay.  This is dated 15 August '92.  The Exhibit 64

5  refers to an agreement dated August 15, 1992.

6       A.   That would appear to be the same.

7       Q.   It would appear to be the document, correct, sir?

8       A.   Yes, sir.

9       Q.   All right.  Then if you look also in that Exhibit 4

10  on the fourth page of that exhibit, is there reference to

11  granting a lien on the company's property to secure the

12  payment obligation that Mr. Reese originally engaged under

13  Exhibit 4?

14       A.   Paragraph 4?

15       Q.   Paragraph 4 on the fourth page.

16       A.   Yes.

17       Q.   So, in essence, the Chalon people had the right to

18  require a lien on company property for this obligation; is

19  that correct?

20       A.   According to this, yes.

21       Q.   Yes.  Okay.

22        Let's go now to Exhibit 61, again.  You've already

23  testified about it.  This is a letter dated November 13th,

24  2003 that appears to be to you from Mrs. Reese.  And you said

25  you don't remember receiving this letter; is that correct?

 1        A.    That's correct.

 2        Q.    If Mrs. Reese gets up and says, I sent that letter

 3   to Jim, do you deny receiving it?

 4        A.    I don't deny that she sent it.

 5        Q.    You don't deny --

 6        A.    I mean --

 7        Q.    -- she sent it?

 8        A.    I don't recall receiving it.  If she said she sent

 9   it, then I'm not going to --

10        Q.    Do you recall not receiving it?

11        A.    No.

12        Q.    Okay.  Following up on that is Exhibit 21.

13         Now, we jump from November 13th to December 3.  And

14   this is a notice of special meeting of members that has

15   Mr. Reese's signature.  Now, do you recall receiving that

16   document?

17        A.    I don't specifically recall receiving it.

18        Q.    Okay.  Do you -- do you deny that you received it,

19   since you remember not receiving it?

20        A.    No.

21        Q.    Okay.  So there's this document refers to some

22   specific content of what might have been discussed at a

23   meeting.  We don't know for sure.  But it refers to content

24   of outstanding loans of Susan B. Reese and related parties

25   and James Brand.  Do you see that reference?

1      A.   Yes.

2      Q.   Okay.  So someone was trying to talk about this,

3   apparently, from this in December of 2003.

4       Do you recall any meeting, or telephone conference, or

5   conference call that you were a party to around this time

6   where that issue was discussed?

7      A.   I don't specifically recall.

8      Q.   Okay.  Do you recall number 3, authorizing Jeff

9   Grad to pursue financing and refinancing for the company?  Do

10  you recall, the same question, conference call, meeting --

11     A.   Right.  I don't recall it specifically, no.

12     Q.   Okay.  Do you recall any discussion at the time

13  about organization and operations of a summer camp by David

14  Fuertes and you?

15     A.   I don't specifically recall this meeting.

16     Q.   Okay.  So 21 you don't know if you got it or not.

17  You don't remember it, correct?

18     A.   Correct.

19     Q.   And you don't remember whether there was a meeting

20  at that time or not to discuss these issues; is that correct?

21     A.   I don't remember.

22     Q.   Okay.  Let's go to 24.

23      I think on 24, this is an email referring to a

24  conference call.  And I think you do remember this conference

25  call, correct?

187

1       A.   I don't know.  I mean, if you remember some of the

2    content, I would remember the content of the calls.  I

3    wouldn't necessarily remember the --

4       Q.   Okay.  I can help you with that.  Let's go to 25,

5    which appear to be a cover note on the first page and appears

6    to be a page of minutes that relate to a January 10th

7    meeting.  And then go to 26, which appears to be the entire

8    minutes.  And see if that helps you.

9       A.   You know, it looks like I might not have been on

10   this call, if you look at the minutes.  It says the call

11   began at 3 p.m.  And Erma Brand, my wife, was on the call for

12   me.  It's possible I was at work.  I don't know.

13      Q.   Okay.  Who is Erma Brand?

14      A.   My wife.

15      Q.   Okay.  And did you authorize her sometimes, or on

16   this occasion to attend the meeting in your stead?

17      A.   I'm assuming that I did, based on these notes, yes.

18      Q.   Okay.  And, again, I think Mr. Spector went over

19   the content that's substantive here about the loans and about

20   trying to get the loans paid off.

21       Do you remember any efforts on your part to find a

22   banking relationship for the company that could have retired

23   these obligations?

24      A.   No significant efforts.

25      Q.   Okay.  Do you remember efforts by Jeff Grad to find

188

1    a banking relationship to retire these obligations?

2         A.    Not specifically, no.

3         Q.    Was there anything that ever happened that

4    indicated to you it was feasible to go get a bank to take out

5    the loans that had been made by Mrs. Reese's entities and

6    your entities, or you personally?

7         A.    No.

8         Q.    No.  Okay.

9          Let's go to 65.  And this appears to be the November

10   30, 2004 financials for Pacific Plains.  And you received a

11   copy of these prior to the January meeting, correct, sir?

12        A.    Presumably.

13        Q.    Okay.  Presumably, I'm going to take as a, yes.

14         And then this lays out, doesn't it, sir --

15        A.    If you're asking me if I specifically remember

16   seeing this, I don't.  But, you know, assuming that it was

17   sent, it says it was sent to me, so I'm assuming that it was.

18        Q.    Okay.  And on page 2 this shows the note payable to

19   you and to Susan Reese and related entities, correct?

20        A.    Correct.

21        Q.    And it shows the reversal of the loans that were

22   for the benefit of Kohala Mountain Camps, correct?

23        A.    Correct.

24        Q.    And no one is really disputing those needed to be

25   reversed, correct?

189

```
 1      A.    Correct.

 2      Q.    And then on the following -- two pages following,

 3  there's actually a detail of loans and interest, et cetera,

 4  at the top of that page.

 5       Do you see the top there, sir, Brand 65?

 6      A.    Yes.

 7      Q.    So that would really put a reasonable person on

 8  notice of what was going on, right?

 9            MR. KAUFMAN:  Objection; calls for a legal

10  conclusion.

11            THE COURT:  Sustained.

12      Q.    Okay.  And then you agree that in 2010 at some

13  point you received all of the financials from inception or

14  from 1997 until whenever they were current, correct?

15      A.    No.

16      Q.    No.

17      A.    We never received an opening balance sheet.  I

18  never received details of the accounting that the Yardi

19  program that we asked for was actually paid.  I received a

20  substantial amount of information, but I never received an

21  opening balance sheet, which was requested several times.

22      Q.    And what do you mean by the "opening balance

23  sheet"?

24      A.    Well, business started day one.  And so there had

25  to be some -- with the piece of property, there had to be
```

1  some piece of something that shows where we started.

2      Q.   Okay.  You want times zero balancing?

3      A.   Times zero, correct.

4      Q.   That this is how the company was funded and the day

5  one balance sheet?

6      A.   Correct.

7      Q.   Okay.

8      A.   But to answer your question --

9      Q.   Yes.

10     A.   -- I received a lot of data.

11     Q.   You did receive a lot.

12     A.   Yeah.

13     Q.   Of what the company readily had available on Yardi,

14  you received a lot?

15     A.   I'm not sure if I received what was on Yardi.  But

16  I received all of the tax statements and some other data, as

17  well.

18     Q.   Okay.

19     A.   You said I received everything.  The truth is, I

20  did not receive everything that was requested, but I received

21  a lot of financial data.

22     Q.   Okay.  I understand what you're saying, sir.  I

23  just -- was there a specific request you made somehow to

24  Mrs. Reese, or to another representative of the company for

25  this day one balance sheet?

```
 1      A.   Yes.

 2      Q.   Yes.  Okay.

 3       And you didn't get that?

 4      A.   Correct.

 5      Q.   Okay.  And that would have been for 1997, right?

 6  That would be March of 1997?

 7      A.   Day one of Pacific Plains.

 8      Q.   13 years earlier, correct?

 9      A.   Yes.

10      Q.   Okay.  Did you ever ask Mrs. Reese to evict Ohana

11  Living Farms from the property?

12      A.   No.

13      Q.   Did you ever ask Mrs. Reese to sue the Big Island

14  Eco Tours on the defaulted lease?

15      A.   No.

16      Q.   Did you ever offer to put up any money for legal

17  fees to do either of these ventures; the suit against Ohana

18  Living Farms or Big Island Eco Tours?

19      A.   No.

20      Q.   Okay.

21      A.   I didn't realize that Ohana Living Farms was not

22  paying its rent.  So I had no reason to know that they

23  weren't performing in accordance with their lease

24  arrangement.

25      Q.   So as far as you knew, Ohana Living Farms was
```

1 performing in accordance with its lease and, therefore, you

2 were not asking for any relief from Mrs. Reese?

3      A.   I asked Ms. Reese for their financial statements

4 for Ohana Living Farms.  That was never forthcoming.

5      Q.   Have your attorney since shared that to you, after

6 I provided it to them?

7      A.   I saw a note that there was no financial

8 statements.  That there were -- the farmers were selling

9 their fruit and coconuts at the market and that's all that

10 was happening.

11      Q.   Did you see Beau Reese's Schedule C that dealt with

12 the losses that he had had on this since then?

13      A.   No.

14      Q.   Okay.  Is it fair, sir, to say that the time you

15 were getting less communication from Mrs. Reese, you had

16 communicated that you did not want to participate in a new

17 zipline, that you disagreed with the loans from Mrs. Reese's

18 entities and how they were handled, and that you basically

19 wanted to partition the property and then the company?  Had

20 those things all been said?

21      A.   Over a period of a couple of years.

22      Q.   Okay.  But you had over those years taken these

23 positions that might be perceived as adverse by Mrs. Reese;

24 is that correct?

25      A.   Yes.

1      Q.   You said, sir, that you were -- I don't know if you

2   used the word offended or hurt by Mrs. Reese's decision to

3   file for Chapter 11 protection for this company, correct?

4      A.   Correct.

5      Q.   Okay.  And you felt that you should have been

6   consulted; is that correct?

7      A.   I felt I was a member.  I should have been

8   notified.

9      Q.   Well, you were notified, sir, weren't you, within

10  two weeks after the filing?

11     A.   Two months after we were sued by Snell.  And I

12  wasn't notified of the transfer of funds into OCT until

13  several months later.  And I was notified of the -- you're

14  talking about the filing for bankruptcy?

15     Q.   Yes, sir.  That's what we're talking about.

16     A.   That occurred fairly promptly after the filing.

17          MR. BEUTTENMULLER:  Judge, I believe that I

18  object as non-responsive to everything except, that occurred

19  fairly promptly after the filing.

20          THE COURT:  Sustained.

21     Q.   Do you understand that Mrs. Reese might well

22  rationally have decided that on the advice of counsel the

23  best solution to the problems that you were raising and the

24  Snell lawsuit might be to come to the judge and say, Judge,

25  we want to propose a plan to get some finality to these

```
 1   disputes that have been going on for years?

 2                MR. KAUFMAN:  Objection.  That's ambiguous and

 3   calls for a legal conclusion.

 4                THE COURT:  Overruled.

 5        A.   I don't really understand that.  I mean --

 6        Q.   Okay.  You understand, though, that you -- we're

 7   perfectly -- that Mrs. Reese is perfectly happy for your

 8   attorneys and you to object to the Madison Pacific debt claim

 9   in this case and attempt to convince the Court it should be

10   changed; you understand that, right?

11        A.   I understand that.

12        Q.   And you understand that Walter Berkowitz and

13   Mrs. Reese are perfectly happy to submit the question of the

14   $35,000 loan and the fairness of it to this Court for

15   determination in the claims proceeding, correct?

16        A.   Correct.  I don't know if she's happy or not.

17   You're -- how am I supposed to make that --

18        Q.   Because we told the Court we are.

19        A.   Okay.  Well, I'll take your word for it.

20        Q.   I just want to make sure you know what I've told

21   the Court already.

22        A.   I believe you.

23        Q.   Okay.  Sir, what is a Trustee going to do that the

24   Court can't do without a Trustee?

25                MR. KAUFMAN:  Objection; calls for a legal
```

 1  conclusion.

 2              THE COURT:  Sustained.

 3       Q.    In summary, sir, it sounds like you basically agree

 4  with everything the debtor has already done, so far as

 5  looking back, other than putting the solar stuff on the eco

 6  hut and making the loan to Walter Berkowitz; is that fair?

 7       A.    I don't agree with the bankruptcy.  I don't agree

 8  with not finding another way to honor the debt to Charles

 9  Snell.  So I agree with some of that.  I don't agree with all

10  of that.

11       Q.    Okay.  But I guess you're viewing not paying

12  someone as an act, right?

13       A.    Correct.

14       Q.    You're saying not -- not paying him is an act and

15  filing bankruptcy is an act.

16       Apart from those things, is there anything other than

17  the bankruptcy, the not paying Mr. Snell, and the loan from

18  Berkowitz, and the solar on the eco hut that you disagree

19  with?

20              MR. KAUFMAN:  Objection; asked and answered.

21  We've gone through this multiple times now.

22              THE COURT:  Overruled.

23       A.    I disagree with Larry Vineyard being made vice

24  president of Pacific Plains, certainly without any

25  consultation or notice to the members.  That was something I

1   disagree with.

2       Q.   Okay.  What else, sir?

3       A.   I don't have a laundry list.

4       Q.   Is it fair to say right now you're out of bullets?

5   I mean, those are your complaints?

6       A.   I don't think that's fair to say.  I don't have

7   anything right on the tip of my tongue right now.

8       Q.   Okay.  You understand --

9       A.   Let's go back.  What were the things you mentioned;

10  Walter Berkowitz and the --

11      Q.   Well, you disagree with the $35,000 loan that was

12  made by Walter Berkowitz to the company.  You've made that

13  clear.  You disagree with, to some extent, I wasn't totally

14  clear, with putting the solar panels on the eco hut.  You

15  were somewhat ambivalent, but you disagreed -- you said you

16  disagreed with --

17      A.   I disagree with --

18      Q.   You disagree with filing bankruptcy.  And you

19  disagree with the decision not to pay Charles Snell.  Those

20  were the things that I've heard so far.

21      A.   Well, and I take issue with the fact that we have

22  the lease with Beau and it's not being honored, it's not

23  being enforced.  And there's been no supervision.  Promises

24  were made about what would happen on the land and that the

25  property, which was originally the owner's property, would be

197

```
 1  left for our own enjoyment and wouldn't be used by the farm,
 2  and that's not the case.  So I have a problem with how the
 3  whole Ohana Farm, which I was very supportive of in the
 4  initial phases, I have a problem with the farm being out
 5  there when there's no real supervision of the guys who are
 6  living on the land.  And that troubles me.  I'm troubled by
 7  the fact that there was a large music festival scheduled to
 8  be on our property out there and no one knew about it except,
 9  until David Fuertes notified Susan and two days, three days
10  before it was scheduled to happen.  It was going to be a big
11  festival on the land.  And I'm disturbed by the fact that
12  there's that lack of oversight and lack of responsibility and
13  responsiveness and the lease is with a family member and
14  doesn't appear to be being honored or dealt with as if it
15  were a lease with a third party, a distant party.  I'm
16  disturbed by that.
17       Q.   Okay.  Anything else?
18       A.   Not that I can think of right at this second.
19       Q.   Okay.  You understand that the debtor's proposed a
20  plan, and Mrs. Reese is supporting it, that would pay
21  essentially -- well, it would pay off Mr. Snell over time,
22  that it would pay whatever your claim is adjudicated in full
23  immediately, that would rearrange the debt of Madison Pacific
24  to where the company could pay it over a very extended time,
25  and that would raise money for the company, correct?
```

1          MR. KAUFMAN:  Objection; calls for a legal

2    conclusion with respect to the plan.

3          THE COURT:  Overruled.

4     A.   In general terms I don't know the details of the

5    plan.  I don't really understand what all is on the table.

6    But how I understand the plan is further dilution of my

7    interest and dilution of my daughter's trust interest.

8     Q.   Okay.  And so your objection to the plan,

9    apparently, so far is that you disagree that Mrs. Reese

10   should get anything for putting the money in?

11    A.   No.  I'm not disagreeing with that.  I'm

12   disagreeing with the plan that dilutes the other members

13   without us having a real say in it.  You know, the plan

14   doesn't change anything.  We still are minority members and

15   don't have a say at the table, as you and Mr. Spector

16   articulately made me painfully aware of in your questioning.

17   And that we are basically just here without a real say in any

18   of this.

19    Q.   Okay.

20    A.   So it doesn't fix anything, from my perspective.

21    Q.   And what in your mind, sir, entitles you change the

22   governance of the company?

23    A.   A sense of fairness.  I think that there is a 24

24   years of history here and there's a way that things have been

25   done and there's a sense of fairness to the work that's been

1  done by the other members.  It's not being respected or

2  acknowledged.

3      Q.   Sir, you're aware, aren't you, that the company's

4  regulations contain a buy/sell?

5      A.   Not specifically.

6      Q.   Let's look at Number 31.

7              THE COURT:  Okay.  Brand Exhibit 31; is that

8  what you said?

9              MR. BEUTTENMULLER:  I'm sorry, Judge?

10             THE COURT:  Which exhibit?

11             MR. BEUTTENMULLER:  I thought it was 31,

12 although I'm having trouble --

13             MR. SPECTOR:  13, I think.

14             MR. BEUTTENMULLER:  13, I'm reversing digits.

15 I bet it's going to be page 31 of 13.

16     It is page 31 of 13, Judge.

17     Have you initiated any buy/sell under that agreement,

18 Dr. Brand?

19     A.   No.

20     Q.   Okay.  And would you honor the buy/sell if

21 Mrs. Reese were to initiate a buy/sell on the same terms that

22 are outlined in the plan, so far as the value of the company?

23     A.   I'm not sure at this time.  I don't fully

24 understand that.  I would certainly --

25     Q.   That's fair.

```
 1        Sir, when you travel to Kohala, how do you fly?  Do you

 2   fly coach?  First class?  Business class?  How do you fly?

 3        A.   Coach.

 4                  MR. KAUFMAN:  Objection to relevance.

 5                  THE COURT:  Sustained.

 6                  MR. BEUTTENMULLER:  I'll pass the witness.

 7                  THE COURT:  All right.  Redirect.

 8                  REDIRECT EXAMINATION

 9   BY MR. KAUFMAN:

10        Q.   Dr. Brand, are you an attorney?

11        A.   No.

12        Q.   Are you an accountant?

13        A.   No.

14        Q.   Do you have any education in the legal or

15   accounting fields?

16        A.   No.

17        Q.   What's your vocation?

18        A.   I'm a physician.

19        Q.   Are you involved in many partnerships like the one,

20   like the Pacific Plains Company?

21        A.   No.

22        Q.   So do you have any experience with buy/sell

23   provisions and company agreements, corporate regulations,

24   anything of that nature, other than your experience in --

25        A.   More now.  None prior.
```

1        Q.    You were close with Lou; is that correct, Lou

2   Reese?

3        A.    Yes.

4        Q.    Did you trust him?

5        A.    Yes.

6        Q.    What led you to trust Lou Reese?

7        A.    I think it was just the depth of our friendship I

8   thought was -- he was trustworthy.

9        Q.    Had he given you any reason to doubt his

10  trustworthiness in your history of friendship?

11       A.    In my personal friendship with him, no.  I mean, I

12  knew Lou very well, very, very well.  And I knew -- my

13  feeling was if Lou and I were doing something together and it

14  could work for both of us, then it would work for both of us.

15  And if push came to shove and only one of us could get over

16  the fence, he would get over the fence.  I knew that about

17  him.

18       Q.    There were some questions asked concerning a

19  meeting in 2005 where there were some corporate minutes.  And

20  I think that's Exhibit 26 in the movant's -- in the Brand

21  exhibit book.

22        Do you recall that line of questioning?

23       A.    Yes.

24       Q.    And your testimony was you weren't present at that

25  meeting; is that correct?

1      A.   Correct.

2      Q.   Did you ever receive a copy of these minutes, which

3   are Exhibit 26 in the Brand exhibit book?  Do you recall

4   reviewing these?

5      A.   I don't recall reviewing these.

6      Q.   So do you recall having an opportunity to object to

7   the accuracy of the minutes reflected here?

8      A.   I don't recall that either.

9      Q.   As of 2005, did you -- were you aware of the nature

10  of the debt, the 12 percent compounding interest and what the

11  advances went to pay by Susan Reese and her entities?

12     A.   I was generally aware of that.  I wasn't --

13     Q.   Were you specifically aware that a portion of the

14  advances went to satisfy the Chalon agreement?

15     A.   I was aware of that, that some advances went to

16  satisfy Chalon.

17     Q.   You were aware that some of the advances on the

18  books of the debtor had gone to satisfy an obligation of Lou

19  Reese?

20          MR. SPECTOR:  Objection, Your Honor.  Asked

21  and answered.

22          THE COURT:  Sustained.

23     Q.   In 2003 did you understand the nature -- in 2003,

24  which was the time of the settlement agreement among Chalon

25  and the Reese parties and yourself, did you understand

```
 1   that -- what did you understand the purpose of that agreement
 2   to be?
 3        A.   Well, my understanding was that we were -- this was
 4   finally our last agreement, our resolution, our agreement
 5   with Chalon that would finally entitle us to take possession
 6   of the land.  My understanding was it was just housecleaning.
 7        Q.   So clearing the hurdles for the company to get
 8   title to the Makai piece, correct?
 9        A.   That's what it was.
10        Q.   And what gave you that understanding?  Was it
11   discussions with an attorney, or discussions with Lou?
12        A.   It would have been discussions with Lou.
13        Q.   The company has written -- or the members of the
14   company have written debt off in the past; is that accurate
15   to say?
16        A.   I believe so.
17        Q.   And in connection specifically with Kohala Mountain
18   Camp; is that correct?
19        A.   Yes.
20        Q.   Were you a party to the Stockbridge litigation?
21        A.   I was a defendant.
22        Q.   Were there allegations in that lawsuit concerning
23   any act that you had -- any specific act that you had
24   partaken?
25        A.   I don't recall.  There may have been.
```

1      Q.   Did you -- Fairfield or the Reese entities paid a

2  settlement amount to the Stockbridge plaintiffs on your

3  behalf; is that accurate?

4      A.   Yes.

5      Q.   And you gave consideration for that payment; is

6  that correct?

7      A.   Yes.

8      Q.   And that consideration was a portion of your 50

9  percent interest in the property; is that correct?

10      A.   Correct.

11      Q.   Did you feel like you had any further obligations

12  to Lou Reese, or Chalon, or to the Stockbridge plaintiffs?

13      A.   No.   I thought that -- that was a third of my

14  property holdings at the time.   I thought that was --

15      Q.   The 2003 settlement agreement, was that ever

16  discussed with other members of the company?

17      A.   Not -- not that I'm aware of.

18      Q.   Was there a meeting held before that meeting in

19  2003 of the members?

20      A.   Not that I recall.

21      Q.   Would Deborah Brand, or Jeff Grad, or David Fuertes

22  have consented to that?

23      A.   Jeff Grad wouldn't have for sure.   Deborah and

24  David probably wouldn't have understood it, quite honestly.

25      Q.   Did you understand it?

1      A.    Not -- not entirely.

2      Q.    The regulations, which are Exhibit 13 in the

3  movant's book, throughout the debtor's, I guess 15 year

4  history now, do you feel like that the requirements of the

5  manager have been adhered to strictly?

6      A.    No.

7      Q.    Do you -- are you aware of any obligation of the

8  manager to provide financial statements on an annual basis?

9          MR. SPECTOR:  Objection; calls for a legal

10 conclusion.

11          THE COURT:  Overruled.

12     Q.    You can answer.

13     A.    I believe the minutes do call for that.

14     Q.    Do you recall receiving annual financial statements

15 on a yearly basis?

16     A.    No.  No, I did not.

17     Q.    When is the first time you received all of the

18 annual balance statements for the company from 1997 to the

19 present?

20     A.    I'm not sure, I guess 2000.

21     Q.    Do you recall the email that Mr. Spector had you

22 read --

23     A.    2003?

24     Q.    I believe that was April of 2010.

25     A.    2010.

206

1           MR. SPECTOR:  Objection; leading.

2           THE COURT:  Sustained.

3      Q.   Turn to Debtor's Exhibit 32, I believe.  It should

4  be in the red book there.

5      A.   Yes.

6      Q.   What's the date of this email?

7      A.   August 15th, 2010.

8      Q.   And what's attached to this email?

9      A.   The financials from the start of the company in

10  1997 through 2009.

11     Q.   This is -- do you recall receiving all of these

12  balance statements prior to this August 13th, 2010?

13     A.   Not prior to, no.

14     Q.   Let's go back to Exhibit 13 in the Brand exhibits.

15  And turn, if you would, to Section 7.5 on page 21.

16       The title of this section is interested transactions.

17  Could you read the first sentence of paragraph A there?

18     A.   No contract or transaction between the company and

19  any one or more of its managers or officers, or between the

20  company and any other limited liability company, corporation,

21  partnership, association, or other organization in which one

22  or more of its managers or officers, are managers, directors,

23  or officers or have a financial interest shall be void or

24  voidable solely for that reason, solely because the manager

25  or officer is present at, or participates in the meeting of

NATIONAL COURT REPORTERS (214) 651-8393

1   the managers, or of a committee thereof, which authorizes the

2   contract or transaction, or solely because such managers

3   votes are counted for such purpose.

4        Q.    Now, there's an "if" following that; is that

5   correct?

6        A.    Yes.

7        Q.    What are the two conditions that are stated after

8   that "if"?

9              MR. SPECTOR:   Objection, Your Honor.   There's

10  more than two conditions.   And I would ask that the rule of

11  optional completeness, that the witness just read the

12  paragraph.

13             THE COURT:   Sustained.

14       Q.    Read it all.

15       A.    The material -- if, One, the material facts as to

16  the relationship or interest, and as to the contract or

17  transaction are disclosed or are known to the managers or the

18  Committee, then the managers or the Committee in good faith

19  authorizes the contractor transaction by affirmative vote of

20  a majority of the disinterested managers, even though the

21  disinterested managers are less than a quorum.   Two, the

22  material facts as to the relationship or interest, and as to

23  the contract or transaction are disclosed or are known to the

24  members entitled to vote thereon, and the contract or

25  transaction specifically approved in good faith by vote of

208

1   the members.  Or, Three, the contract or transaction is fair

2   to the company as of the time it is authorized, approved, or

3   ratified, the managers or Committee thereof or the members.

4        Q.    Concerning the relationship between the company and

5   Ohana Living Farms, do you feel like the material facts of

6   the relationship have been disclosed to you?

7        A.    Well, I think so.

8        Q.    Do you feel the material facts of the contract and

9   the transaction had been disclosed to you and to all other

10  members prior to the execution?

11       A.    Not prior to the execution.

12       Q.    Did you feel that the contract or the transaction

13  with Ohana Living Farms was fair to the company?

14       A.    Had it been enforced and had the Ohana Farms done

15  as proposed.

16       Q.    Turn in your exhibit book, the Brand exhibit book

17  to Exhibit 95.

18        What's the date of this agreement, this license

19  agreement?

20       A.    Sorry.  July 1st, 2009.

21       Q.    Turn to the -- it's not the last page, but it's the

22  Section 11 signatures of the parties in the license.

23        Do you see that?

24       A.    Section --

25       Q.    It's the signature page, which is about three or

1   four from the end.

2        A.   Yes.

3        Q.   Who signed this license agreement?

4        A.   Meme Hu and Susan Reese.

5        Q.   Who is Meme Hu?

6        A.   She is Beau's wife.

7        Q.   Beau Reese?

8        A.   Yeah.  I don't think they were married at that

9   time.  She was his girlfriend at the time.

10       Q.   Now, turn, if you would, to Exhibit -- I think it's

11  14, actually.  No.  I apologize.  18, Debtor's Exhibit 18 in

12  the red book.

13       A.   Okay.

14       Q.   The red book?

15       A.   Oh, sorry.

16       Q.   I'm sorry.

17       A.   Okay.

18       Q.   Are you there?

19       A.   Yes.

20       Q.   What's the date of this email?

21       A.   August 13th, 2009.

22       Q.   And what did Susan say to you in the email?

23       A.   She said, Here's the license agreement for Ohana

24  Living Farms.  All terms have been agreed up, but I wanted

25  you to have a chance to look it over before we talk this

210

1    weekend.  I have not send it to David or Grad, as I don't

2    think that is necessary.  Talk this weekend.

3        Q.    So she sent you the agreement after it was signed?

4        A.    Apparently.

5        Q.    Did you know it had already been executed at the

6    time?

7        A.    No.

8        Q.    Concerning the notes of Berkowitz, Walter

9    Berkowitz, do you feel that the material terms of that

10   obligation had been disclosed to the members?

11       A.    Had they been disclosed to the members, no.

12       Q.    Do you believe it was a fair transaction for the

13   company?

14       A.    No.

15       Q.    Concerning the regulations on the debt, do you feel

16   that the material terms of the regulations and the obligation

17   of the company to Susan Reese and her entities had been fully

18   disclosed to the non -- disinterested members?

19       A.    No.

20       Q.    Why not?

21       A.    Well, because the transaction was undertaken with

22   no notice.  And the loan was carried at 12 percent interest,

23   which was --

24       Q.    When's the first time you recall being notified of

25   the 12 percent compounding interest?

1      A.   When I requested financial records, the records I

2  requested included the actual tax forms.  And my accountant

3  in Victoria went through them and he made some comment,

4  Here's a new loan to Walter Berkowitz, and I had no idea.

5  And so that's the first time I became aware of it.

6      Q.   And concerning the 12 percent compounding interest

7  to Susan Reese and her entities, when's the first time you

8  recall seeing that -- the -- being notified that that was an

9  obligation of the company?

10     A.   I'm not sure.  But it was -- I'm not sure when I

11 may have seen it.

12     Q.   Was it earlier than 2003?

13     A.   I don't think so.

14     Q.   And by 2003 do you recall what the interest accrued

15 on the obligation had become?

16     A.   It was $300,000.

17     Q.   So the total obligation had doubled?

18     A.   Yes.

19     Q.   Concerning the transactions; the appointment of

20 Larry Vineyard as an officer, the transfers to OCT Kohala,

21 the filing of bankruptcy, and the decision not to pay Snell,

22 do you feel that the members had been fully apprised of

23 material facts concerning those transactions?

24     A.   Absolutely not.

25     Q.   Do you feel that they were fair for the company?

```
 1        A.    No.

 2                    MR. KAUFMAN:  No further questions.

 3                    THE COURT:  All right.  Any recross?

 4                    MR. SPECTOR:  Just one question.

 5                    RECROSS-EXAMINATION

 6   BY MR. SPECTOR:

 7        Q.    Mr. Berkowitz -- Dr. Brand, the interest rate on

 8   the obligation to Mrs. Reese is the same as the interest rate

 9   on the obligation to you, correct?

10        A.    Bear in mind, I didn't know that the obligation was

11   to me.

12        Q.    But you know it now?

13        A.    Yes.  I'm perfectly willing to reduce that.

14        Q.    But you understand that there are --

15                    MR. SPECTOR:  Objection; non-responsive.

16                    THE COURT:  Sustained.

17        Q.    The interest rate on the obligation to you is

18   exactly the same as the interest rate on the obligation to

19   Mrs. Reese, right?

20        A.    As on the promissory note.

21        Q.    And on the obligation to her dad?

22        A.    Correct.

23                    MR. SPECTOR:  Pass the witness.

24                    THE COURT:  All right.  Any recross?

25                    MR. BEUTTENMULLER:  Nothing further, Your
```

```
 1   Honor.
 2                 THE COURT:  All right.  Thank you, Dr. Brand.
 3   You're excused from the witness stand.
 4        Let's talk about what we have left, because it's 4:26
 5   p.m.  Your other witnesses are going to be whom?
 6                 MR. ANDREWS:  We'll call Ms. Reese and
 7   Mr. Vineyard.  Ms. Reese, I think will be the longer of the
 8   two.  I don't expect that Mr. Vineyard will take that long.
 9   Ms. Reese, I would think would be for my part, 30 to 45
10   minutes.
11                 THE COURT:  All right.  And Mr. Vineyard?
12                 MR. ANDREWS:  15.
13                 THE COURT:  All right.  I think we're going to
14   go ahead and stop.  We do have all day tomorrow.  I am
15   concerned about this subpoena possibility.  Have you gotten
16   any updates from the office?
17                 MR. SPECTOR:  My cleaning lady says there's a
18   person waiting for me in my driveway, which I think is pretty
19   good -- I think I know who it is.
20                 THE COURT:  It's either a person with a
21   subpoena or something more troubling, maybe.
22                 MR. SPECTOR:  Right.  I'm hoping it's a
23   subpoena.
24        Your Honor, I don't know if this helps, but -- and I
25   don't know what the Court's calendar is, but I'm basically
```

1   completely open Thursday and Friday.  And at this point all

2   of the witnesses are local.  Dr. Brand is the only one who is

3   out of town.  We can -- perhaps Mr. Andrews could get through

4   Mr. Vineyard right now and we just won't cross him.

5              MR. ANDREWS:  I thought about that.  But I

6   can't -- it won't make any sense, if I take him out of order.

7              MR. SPECTOR:  Okay.

8              MR. ANDREWS:  I'd do it otherwise, I really

9   would.  I don't -- I hate inconveniencing them.

10             THE COURT:  All right.  I'm trying to figure

11  out can we finish in a half day.  I don't know.

12             MR. ANDREWS:  I think it depends on how long

13  the debtor thinks it may need, or Madison thinks it may need.

14  Our's is not --

15             MR. BEUTTENMULLER:  So much, Judge, of what we

16  need to get in is already in through Dr. Brand's testimony.

17  I don't anticipate much from Madison.  I would think 30

18  minutes direct testimony from me would be perfectly fine.

19             MR. SPECTOR:  And I can't imagine that I'm

20  going to need more than an hour to an hour and a half with

21  both witnesses combined.

22             MR. ANDREWS:  I think their points are well

23  taken.  Most of the exhibits that we were going to ask to be

24  entered are in.  I don't think there's very many left.

25             THE COURT:  All right.  So you all can come

1    back Thursday morning instead of --

2                    MR. ANDREWS:  Yes.

3                    THE COURT:  All right.  We'll just go ahead

4    then and scratch tomorrow and we'll come back Thursday at

5    9:30.  And let's just try and finish Thursday.  I have a 1:30

6    docket and then we have a 2:30.  That doesn't look

7    terribly -- we may, if we don't finish in a half a day,

8    Thursday, we may have time later in the afternoon to give you

9    an hour or so.  I can't remember what we have.

10       Okay.  Thursday afternoon is light, so we could come

11   back at 3, if we don't finish Thursday morning.  We can take

12   a break.  I have a 1:30 docket, a 2:30 docket, and then we'll

13   have another couple of hours Thursday afternoon, if we need

14   it.

15                   MR. ANDREWS:  Your Honor, I'm almost

16   embarrassed to say this, because I'm certain it will come

17   back, but I would just point out that --

18                   MR. SPECTOR:  You don't need to say it.

19   They'll be back.

20                   THE COURT:  Well, I'll just say it.  You're

21   still under a subpoena.  Come back Thursday.

22       All right.  We'll see you Thursday at 9:30.

23                   MR. SPECTOR:  Thank you, Your Honor.

24                   MR. ANDREWS:  Thank you.

25                       (End of Proceedings.)

1                    C E R T I F I C A T E

2           I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true, and complete

4    transcription of the proceedings as heretofore set forth in

5    the above-captioned and numbered cause in typewriting before

6    me.

7

8

9

10

11

12

13

14                                  /s/Cindy Sumner

15                         _____

16                         CINDY SUMNER, CSR #5832
                           Expires 12-31-13
17                         National Court Reporters
                           16 Gettysburg Lane
18                         Richardson, Texas  75080
                           214 651-8393
19                         Firm #417

20

21

22

23

24

25